WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
Robert P. Lesko (RPL 1553)
33 Washington Street
Newark, New Jersey 07102-3017
(973) 624-0800 ph.
(973) 624-0799 fx.
Attorneys for plaintiff,
American General Life Insurance Company

| | |
|---|---|
| AMERICAN GENERAL LIFE INSURANCE COMPANY | UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY |
| | Civil Action No: 3:08-cv-03489-MLC-TJB |
| Plaintiff, | |
| vs. | |
| GOLDKLANG SAVINGS IRREVOCABLE TRUST, et al., | |
| Defendants. | |

| | |
|---|---|
| AMERICAN GENERAL LIFE INSURANCE COMPANY | UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY |
| | Civil Action No: 3:08-cv-05364-MLC-TJB |
| Plaintiff, | |
| vs. | |
| ELLMAN SAVINGS IRREVOCABLE TRUST, JEFFREY LEVITIN, ISRAEL KUGIELSKY, CHAIM RUBIN, and JOHN DOES 1-10, | **FIRST AMENDED COMPLAINT AND JURY DEMAND** |
| | **[FILED ELECTRONICALLY]** |
| Defendants. | |

Plaintiff, American General Life Insurance Company ("American General"),

having its principal place of business at 2929 Allen Parkway Houston, Texas, 77019, by

and through its undersigned counsel, and by way of First Amended Complaint against the

812735.1

defendants, hereby alleges and says:

## INTRODUCTION

1.      By way of this action, American General alleges that defendants, in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) and (d) ("RICO") and other statutory and common law together conspired, devised, conducted and/or participated in a scheme and pattern of racketeering activity in furtherance of the business of an enterprise to wrongfully and unlawfully obtain issuance of life insurance policies and payment of life insurance death benefits from American General in contravention of state and federal statutes, common law and public policy, all to the detriment of American General, its shareholders, its policyholders, and the insurance-consuming public.  American General also alleges violations of the New Jersey Insurance Fraud Prevention Act, 17:33A-1, *et seq.*, common law fraud, violation of common law and statutory insurable interest requirements, and breach of fiduciary duty.

2.      More specifically, American General alleges that defendants together conspired, devised, conducted and/or participated in a scheme to obtain, through a series of fraudulent misrepresentations and deception, issuance of Flexible Premium Adjustable Life Policy UM0030862L (hereinafter "the Ellman Policy") issued by American General to defendant Ellman Savings Irrevocable Trust (hereafter "the Ellman Trust") as owner and insuring the life of Irving Ellman (hereafter "Ellman"), which provides Base Coverage in the amount of $10,000,000.

3.      In the application for the Policy and on multiple occasions throughout the underwriting process, Ellman, Rubin, and the Ellman Trust, by and through its then-trustee, Israel Kugielsky ("Kugielsky"), represented to American

2

General that Ellman's personal net worth was between $5,000,000 and $15,000,000 at the time the application was submitted, and further represented that Ellman's net worth was based upon assets valued at more than $17,000,000, consisting primarily of real estate holdings.  In fact, despite considerable efforts to do so, American General has been unable to verify Ellman's interest in or ownership of any real estate whatsoever.

4.     Ellman, Rubin and the Ellman Trust also represented that the purpose of the Ellman Policy was "estate planning," meaning preservation of the insured's purportedly sizeable estate from anticipated estate taxes.  However, upon information and belief, the actual beneficiary of the Trust is neither Ellman's estate nor his natural heirs, but rather "strangers" to Ellman seeking a windfall profit upon his death.

5.     Each of the defendants knew that all of these representations were false or recklessly disregarded the veracity of the representations and further knew that the transaction was consummated through fraud and deception, but each defendant nonetheless encouraged, facilitated, aided and abetted, transmitted and/or directly made representations to American General with the intention of defrauding American General into issuing the Ellman Policy.

6.     The defendants have engaged in a pattern of similar or identical conduct with respect to other policies issued by American General as well as policies issued by other life insurance companies.  By way of example, several of the defendants devised, conducted, participated in, encouraged, facilitated, and aided and abetted similar transactions resulting in the issuance of large life insurance policies by American General, including the issuance of: Flexible Premium Adjustable Life Policy UM

812735.1

0023805L  (hereinafter "the Goldklang Policy") in the amount of $15,000,000 issued to

the Goldklang Savings Irrevocable Trust (hereafter "the Goldklang Trust") as owner and

insuring the life of Risha Goldklang (hereafter "Risha"); Flexible Premium Adjustable

Life Insurance Policy UM0029927L (hereinafter "the Kremer Policy") in the amount of

$10,000,000 issued to Kremer Holding Irrevocable Trust (hereinafter "the Kremer

Trust") as owner and insuring the life of Rachelle Kremer (hereinafter "Kremer");

Flexible Premium Adjustable Life Insurance Policy UM0023803L (hereinafter "the

Rosenthal Policy") in the amount of $10,000,000 issued to Rosenthal Unit Irrevocable

Trust (hereinafter "the Rosenthal Trust") as owner and insuring the life of Judith

Rosenthal (hereinafter "Rosenthal").

      7.     Upon information and belief, defendants have also engaged in a pattern of

similar or identical conduct with respect to policies issued by other insurance companies,

including New York Life Insurance Company, which conduct is the subject of at least

one litigated matter pending before the Supreme Court of the State of New York, New

York County, Index No. 07101666.

      8.     Accordingly, American General demands, together or in the

alternative, compensatory damages, punitive damages, and treble damage arising

from the scheme to defraud American General set forth herein, rescission *ab initio*

of the Policy and restitution of American General to its original position prior to the

fraud, equitable remedies to include the imposition of constructive trusts with

tracing as necessary, restrictions on future conduct, costs of investigation and suit,

monetary interest, and attorneys fees.

**Parties, Participants, Jurisdiction, and Venue**

9.     This Court has original jurisdiction over the claim for relief set forth herein under 18 U.S.C. §§ 1964(a) (equity) and 1964(c) (damages, fees and costs) and 28 U.S.C. § 1331(a) (federal question).[1]

10.     Personal jurisdiction and venue are proper within this District based upon 18 U.S.C. §§ 1965(a) and (b) and 28 U.S.C. § 1391(b) because one or more defendants are residents of, have an agent or agents, or transact their affairs within this District, and the acts and occurrences in furtherance of the claims alleged herein arose in this District, and because the ends of justice require that other parties residing in other districts be brought before the Court.

11.     American General is a Texas corporation duly authorized to transact the business of insurance in the State of New Jersey, with its principal place of business in the State of Texas.  American General issued the Ellman Policy as well as several other policies obtained through the same or similar fraudulent and deceptive schemes in New Jersey.

12.     Israel Kugielsky ("Kugielsky"), upon information and belief is a citizen of the State of New Jersey whose last know residence address is 1478 Fernwood Avenue, Lakewood, New Jersey.  Kugielsky served as the trustee of the Ellman Trust at the time the Ellman Policy was applied for and issued.

13.     Jeffrey Levitin (hereinafter "the Trustee"), upon information and belief, is a citizen of the State of New York, maintaining an office address at 1430

---

[1] America General currently has insufficient information to determine the citizenship of the Ellman Trust. However, American General anticipates that discovery will reveal that the Ellman Trust is a citizen of a state or states other than Texas, in which case American General intends to assert that this Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332 based upon the diversity of citizenship of the parties and the amount in controversy exceeding $75,000.

5

Broadway, New York, NY.  Levitin serves as the Trustee of the Ellman Trust and other sham trusts established in furtherance of the enterprise.

14.     Upon information and belief, the Trust is an unincorporated jural entity formed for the sole purpose of serving as owner and beneficiary of the Policy for purposes of concealing from American General the ultimate beneficiaries of the Ellman Policy and circumventing statutory and common law rules relating to insurable interest.

15.     The address of the Trust was 1478 Fernwood Avenue, Lakewood, New Jersey, 08701 as of the time the Ellman Policy was issued and delivered, and was subsequently changed to 4429 18th Avenue, Brooklyn, New York.

16.     Chaim Rubin ("Rubin") is a licensed insurance producer who served as producer of record with respect to the Ellman Policy, the Goldklang Policy, the Kremer Policy and the Rosenthal Policy.  Rubin is a citizen of either the State of New Jersey, maintaining a residence at 2 Malka Way, Lakewood, New Jersey.

17.     The Rubin Group, Inc. ("The Rubin Group") is a corporation incorporated and having its principal place of business in the State of New Jersey at 2 Malka Way, Lakewood, New Jersey.

18.     John Does 1 through 10 are individuals and/or entities whose true identities are not yet known, and who provided financing for the fraudulent and deceptive transactions alleged herein and are the actual beneficiaries of the Ellman Trust and perhaps other sham trusts established in furtherance of the enterprise.

19.     John Does 1 through 10 are individuals and or entities whose true identities are not yet known including but not necessarily limited to professionals in

6

the business of law, accounting, financial planning and/or estate planning, who engaged in the preparation and submission of forged, counterfeit, incorrect, incomplete, untrue, false, misleading and other deceptive documents and information to American General and other insurance companies in furtherance of the enterprise.

20.     John Does 1 through 10 are individuals and or entities whose true identities are not yet known, and who facilitated and/or coordinated meetings and/or communication between the insured individuals and other members of the enterprise and/or made payments of cash or other consideration to the insured individuals to secure their participation in the fraudulent and deceptive scheme, all in furtherance of the enterprise.

## Background
### (Stranger-Originated Life Insurance)

21.     Likely fueled by the same seemingly insatiable thirst for ever more exotic and lucrative investment opportunities that led to the current credit crisis, a secondary market for interest in the proceeds of life insurance policies has emerged as a new an potentially destructive phenomena in the life insurance industry in recent years.  Referred to variably as Stranger-Owned or Stranger-Originated Life Insurance  ("SOLI "or "STOLI"), or Investor-Owned or Investor-Originated Life Insurance ("IOLI"), the scheme typically involves the acquisition of outright or beneficial ownership interest in life insurance policies with large face amounts by investors who are strangers to the person insured by the policy and who have no insurable interest in the life of the person insured.

22.     These investor strangers typically take on the obligation of paying

premiums due on the policy in exchange for their interest in it, including the right to all or a portion of the death benefits to be paid when the insured person dies. Of course, the sooner the insured person dies, the fewer premiums the investor stranger is required to pay and the higher the return on their investment. In an attempt to ensure the highest possible rate of return through prompt pay-out of the death benefits, the investor strangers typically recruit elderly individuals to participate in the application process and serve as the proposed insured. The proposed insured is typically offered something of value, such as immediate cash payments, in exchange for his or her participation in the application process.

23.     Similarly, the higher the death benefit on the policy, the greater the ultimate return on the investor stranger's investment. Thus, as in this case, the net worth and other material information concerning the proposed insured is often inflated or otherwise misrepresented in order to qualify for the most valuable policies with the highest available death benefits at the lowest available premiums.

24.     These arrangements violate state statutory and common law insurable interest laws and are contrary to public policy because the strangers or investors acquire significant speculative economic and pecuniary interests which are best served by the prompt and premature death of the person insured rather than his or her continued life.

25.     The investor strangers have devised various schemes to conceal their lack of insurable interest and circumvent insurable interest laws and public policy. One such scheme – like the one perpetrated by the defendants in this case – involves the formation of an irrevocable life insurance trust ostensibly established by the

8

insured.  Perpetrators of the fraud identify a willing proposed insured, match the

proposed insured with investor strangers to fund the premiums required to acquire

the policy, arrange for preparation of a trust document, and arranges for any other

services necessary to conceal the fraud and secure issuance of the policy.

### The Ellman Fraud

26.     On or about November 9, 2005, United States Central Agency Services

Corporation ("USCAS") sent American General a Part A Life Insurance Application

purportedly executed by Irving Ellman (hereinafter "Ellman") and Rubin on November 9,

2005 ("November 9 Application Part A").

27.     USCAS is an Independent Marketing Organization authorized to accept

and submit applications for insurance to American General on behalf of itself and its duly

appointed insurance producers.  USCAS is located in New Jersey at 33 Tarnsfield Rd.,

Westampton, New Jersey.

28.     Rubin was appointed by USCAS to procure and submit applications for

life insurance policies to be issued by American General.  Rubin's authority to do so

arises out of written agreements entered into by and between Rubin and USCAS.

29.     The November 9 Application Part A was incomplete and was intended for

purposes of a preliminary premium quote for a life insurance policy insuring Ellman's

life in the amount of $5 million to $10 million.

30.     The November 9 application represented the purpose of the insurance as

"estate planning."

31.     The November 9 application represented Ellman's personal net worth as

$15 million.

32.     On November 17, 2005, USCAS forwarded to American General a Part B Life Insurance Application dated November 8, 2005 ("November 8 Application Part B"), purportedly executed by Ellman and Rubin.

33.     American General commenced a preliminary underwriting investigation and review based upon the information provided by Ellman and Rubin in the November 9 Application Part A and November 8 Application Part B.

34.     American General subsequently advised Rubin, through USCAS, of its preliminary determination that the application would be approved from a medical underwriting standpoint for issuance of a $10 million policy based on standard rates subject to financial justification for the amount of insurance sought.

35.     On November 23, 2005, Lab One completed a Comprehensive Inspection Report ("Inspection Report").  As part of its investigation, Lab One conducted a telephone interview with an individual claiming to be Ellman.  The results of the telephone interview are recorded in the Inspection Report.

36.     During this telephone interview with Lab One, Ellman represented that he had been retired for ten years from the real estate business, and had been previously self-employed for 30 to 35 years.  Ellman represented his current total unearned income as $643,000.00 from all sources, including dividends, interest and net rentals.  Ellman represented his assets to be $8,135,000.00, consisting of real estate and cash securities, car and personal assets and advised that his total liabilities consisted of $3,000,000.00 in mortgages.  Thus, Ellman represented to Lab One that he had a total net worth of $5,135,000.00.

37.     On November 29, 2005, Rubin forwarded to American General, through

USCAS, a letter purportedly from Ellman to Rubin dated October 28, 2005, in which Ellman purportedly set forth his balance sheet. The letter indicated net worth of $11,312,000.00 consisting of total assets of $17,870,000.00 less total liabilities of $6,558,000.00.

38.     American General demanded more detailed information concerning Ellman's net worth from his accountant in light of the discrepancy between the representations provided in the November 9 Application Part A, the initial Inspection Report for Lab One, and the October 28, 2005 letter from Ellman to Rubin.

39.     On March 13, 2006, an individual claiming to be Larry Ellman ("Larry") called Lab One to complete the accountant portion of the Inspection Report. The caller represented that he was Ellman's son, and had been providing personal accounting services to Ellman for twenty years, including tax returns and personal financial statements. The caller represented that Ellman had yearly gross income of $1,500,000.00 and net worth of $11,312,000.00.

40.     On March 13, 2006, Ellman and Rubin executed a new Part A Life Insurance Application addressed to American General ("March 13 Application Part A"). The March 13 Application Part A was also executed by Israel Kugielsky as Trustee for the Ellman Trust, the owner and sole beneficiary of the Ellman Policy. The March 13 Application Part A was purportedly executed by all parties in Lakewood, New Jersey.

41.     The March 13 Application Part A was completed on form number AGLIC 100585-2003 (NJ).

42.     Form number AGLIC 100585-2003 (NJ) is an application form intended by American General for use in the State of New Jersey.

11

43.     By way of the March 13 Application Part A, Ellman, Kugielsky, Rubin, and the Trust requested issuance of a "Contin UL" policy with Base Coverage of $10,000,000.00.  Kugielsky, Ellman and Rubin represented that the policy applied for was intended for "estate planning" purposes.

44.     According to the March 13 Application Part A, Ellman's personal income was $1,500,000 million annually and his net worth was $11,312,000.  That is, in response to questions regarding income and net worth on the March 13 Application Part A, Ellman, Rubin, Kugielsky, and the Trust expressly incorporated the values provided in the inspection report, namely $1,500,000 and $11,312,000, respectively.

45.     The March 13 Application Part A indicated that there was then no other pending or in force life insurance or annuity on the Ellman's life.

46.     By executing the Application, Ellman acknowledged and agreed that American General would rely upon the information provided in the application in determining whether to issue the Policy, and promised that the information contained in the application was true and complete as follows:

> I have read the above statements or they have been read to me.  They are true and complete to the best of my knowledge and belief.  I understand that this application: (1) will consist of Part A, Part B, and if applicable, related forms; and (2) shall be the basis for any policy issued.  I understand that any misrepresentation contained in this application and relied upon by the Company may be used to reduce or deny a claim or void the policy if: (1) it is within its contestable period; and (2) such misrepresentation materially affects the acceptance of the risk.

47.     Rubin also knew that American General would rely upon the information provided in the application in deciding whether to issue the Ellman Policy.

48.     In reliance upon the information provided in the March 13

12

Application Part A, the November 8 Application Part B and each and every statement and representation made by Ellman, Larry, Kugielsky, the Ellman Trust and Rubin in the March 13 Application Part A, November 8 Application Part B, Inspection Report, and throughout the course of the underwriting process, American General executed and issued the Ellman Policy and caused it to be delivered to the Ellman Trust with an Issue Date of March 14, 2006.

49.     The Ellman Policy was issued using policy form number 04337. Form 04337 was created and intended by American General for use in the State of New Jersey.

50.     The Policy Schedule page of the Ellman Policy, which contains the specifics as to applicable face amount, premiums amounts, etc. relating to that particular policy, indicates in all capital letters "THIS IS A NEW JERSEY POLICY."

51.     The Ellman Policy provided Base Coverage of $10,000,000.00 with an annual premium of $663,600.00.

52.     American General delivered the Ellman Policy to Rubin in New Jersey on or about March 16, 2006 for delivery to the Trust.

53.     The Policy was delivered to Kugielsky and the Ellman Trust in New Jersey on March 22, 2006.

54.     On January 16, 2007, Kugielsky renounced his appointment as Trustee of the Ellman Trust and advised that Levitin would be his successor.

55.     Levitin accepted the assignment on January 23, 2007.

56.     Ellman died on May 21, 2008.

13

57.     On May 22, 2008, Levitin completed and executed a Proof of Death of Claimant's Statement (hereinafter "Claimant's Statement") on behalf of the Ellman Trust. In the Claimant's Statement, Levitin represented that the Ellman Policy had been lost, and he requested a lump sum payment to the Ellman Trust directed to his law office in New York, New York.

58.     On May 23, 2008, Ira Lipsius, Esq. (hereinafter "Lipsius") called American General to inquire where to send an overnight delivery for the claim.  That same day, Lipsius also faxed a letter advising American General that he represented the Ellman Trust and the Trustee and enclosed the Claimant's Statement.

59.     American General commenced a routine claim investigation.

60.     In the course of its investigation, American General discovered for the first time that Ellman, Kugielsky, the Ellman Trust, and Rubin had materially misrepresented Ellman's occupation, personal income, and net worth in connection with the application for the Ellman Policy.  American General also discovered for the first time that Ellman was given cash payments for his role in the application and misrepresentations to American General, and that the Ellman Trust very likely lacked insurable interest in the life of Ellman.  American General also discovered for the first time that Ellman was insured under several other life insurance policies issued by New York Life Insurance Company totaling at least $5,000,000 in death benefits.

61.     In the course of its investigation, American General interviewed Ellman's son, Larry Ellman.  Larry informed American General's investigator that Ellman was last employed from 1978 to 1994 by the New York State Department of Insurance, Liquidation Bureau.  He was not self-employed in the real estate business as had been

14

represented to American General.

62.     According to Larry, in his retirement, Ellman's personal income consisted of approximately $2,000.00 per month consisting of New York State Pension and Social Security Benefits.

63.     According to Larry, Ellman owned no stock, bonds, equity, or real estate of any kind.

64.     According to Larry, Ellman's total net worth is estimated as less than $25,000.00.

65.     Larry further advised that he is not an accountant and had never served as such for Ellman.  Larry also stated that he had no knowledge of any life insurance on Ellman's life until after Ellman's death.

66.     According to Larry, Ellman had met with Rubin several times, and on each occasion, Rubin gave to Ellman $500.00 to $1,000.00.

67.     As of the date of the March 13 Application Part A, Ellman was insured under at least one other life insurance policy issued by New York Life Insurance Company in the amount of $5,000,000.

68.     Based upon all of the foregoing and upon information and belief, Ellman, Kugielsky, the Trust and Rubin misrepresented the purpose of the policy as "estate planning."  Upon information and belief, the policy was not sought for "estate planning" purposes.

69.     The misrepresentations in the March 13 Application Part A, the November 8 Application Part B and each and every statement and representation made or purportedly made by Ellman, Larry, Kugielsky, the Ellman Trust and Rubin

in the March 13 Application Part A, November 8 Application Part B, Inspection

Report, and throughout the course of the underwriting process regarding Ellman's

financial status and the purpose of the Ellman Policy affected American General's

decision to issue and deliver the Ellman Policy as written and to accept the risks

upon which issuance and delivery of the Ellman Policy was based.

70.     Each of the foregoing representations made and offered by and on

behalf of Ellman, the Ellman Trust and Rubin outlined above are false or otherwise

misleading.

71.     Rubin knew that each of the foregoing representations were false or

he recklessly disregarded the truth of the representations.

72.     Ellman knew that each of the foregoing representations were false or

he recklessly disregarded the truth of the representations.

73.     Kugielsky knew that each of the foregoing representations were false

or he recklessly disregarded the truth of the representations.

74.     Rubin, Kugielsky, and Ellman transmitted each of the forgoing

misrepresentations to American General by mail, facsimile or other electronic

means or caused them to be so transmitted on or around the dates referenced above

in violation of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud) and 1344

(financial institutions fraud).

75.     If American General had been aware of Ellman's true financial status

and the true purpose of the Ellman Policy, American General would not have

executed, issued or caused to be delivered the Ellman Policy.

76.     If American General had been aware of the true reason for the

Ellman Policy American General would not have executed, issued or caused to be delivered the Ellman Policy.

77. If American General had been aware of the existing New York Life Insurance Company policies, American General would not have executed, issued or caused to be delivered the Ellman Policy.

78. On September 3, 2008, American General wrote to Lipsius requesting a copy of the Ellman Trust documents.

79. On September 25, 2008, an attorney from Lipsius' office, David Ben Haim, Esq. ("Ben Haim"), wrote to American General challenging American General's right to the document, refusing to produce it, and demanding immediate payment of the proceeds.

80. On October 9, 2008, American General advised Lipsius and Ben Haim that the document was necessary to confirm that the owner and beneficiaries of the Ellman Policy possessed the requisite insurable interest in the life of Ellman at the time that the Ellman Policy was issued.

81. On October 28, 2008, Lipsius advised American General that the Ellman Trust refused to provide the Ellman Trust documents for American General's review.

82. Upon information and belief, the reason for the Ellman Trust's refusal to produce the Ellman Trust documents is that such documents reveal the lack of any insurable interest in the life of Ellman on the part of the Ellman Trust.

83. Defendants have also engaged in other similarly fraudulent and deceptive schemes to obtain other large life insurance policies from American General.

812735.1

**The Goldklang Fraud**

84.     On or about February 8, 2006, Rubin submitted to American General, through USCAS, a Quote Request for a policy of Flexible Premium Adjustable Life Insurance in the amount of $15,000,000 on the life of Risha Goldklang ("Risha"). Rubin also submitted certain medical records relating to Risha.

85.     On or about March 6, 2006, Risha purportedly submitted to a medical exam and also completed and executed Part B Life Insurance Application.  Rubin submitted The Part B Life Insurance Application and medical examination findings or caused them to be submitted to American General in support of Risha's application for the Goldklang Policy.

86.     On or about March 24, 2006, American General's underwriter advised Rubin, through USCAS, that Risha would qualify for preferred premium rates based upon preliminary information submitted, and that issuance of the Goldklang Policy would be contingent upon Risha submitting to and meeting all outstanding underwriting requirements, including among other things, financial justification for the amount of insurance requested.

87.     On or about April 24, 2006, Risha and Rubin completed and executed Part A Life Insurance Application in which Risha and Rubin represented that Risha had a net worth of $17,000,000.  Risha and Rubin further represented that the reason for the insurance being applied for was "estate planning."  Risha and Rubin further represented that the document was executed in Lakewood, New Jersey.

88.     Also on or about April 24, 2006, Rubin completed and executed an

Agent's Report in which he represented that he had known Risha for one year. Rubin further represented that he personally saw Risha on the date of the application and was not "aware of any information that would adversely effect any proposed insured's eligibility, acceptability, or insurability[.]"

89.    On April 26, 2006, Rubin executed an Agent Certification Form in which he certified that "[n]one of the premiums for the policy sought with the application for Risha Goldklang (Insured) dated 4-24-06 will be financed other than pursuant to a split-dollar agreement."

90.    On or about April 27, 2006, Rubin submitted to American General, through USCAS, the Part A Life Insurance Application, the Agent's Report and the Agent Certification with the knowledge and intent that America General would rely on the statements and information contained therein when making its determination as to whether to issue the Policy.

91.    On or about May 1, 2006, Risha, the Trust, and Rubin executed a second Part A Life Insurance Application, in which Risha and Hersh Goldklang ("Hersh") on behalf of the Goldklang Trust represented that Risha had a net worth of $17,000,000.  Risha, Rubin and Hersh also again represented that the reason for the insurance being applied for was "estate planning."  This document was also purportedly executed in Lakewood, New Jersey.  Risha and Rubin also executed a second Part B Life Insurance Application at the same time and place.

92.    By executing the Application, Risha, Hersh and the Trust acknowledged and agreed that American General would rely upon the information provided in the application in determining whether to issue the Policy, and they

promised that the information contained in the application was true and complete as follows:

> I have read the above statements or they have been read to me.  They are true and complete to the best of my knowledge and belief.  I understand that this application: (1) will consist of Part A, Part B, and if applicable, related forms; and (2) shall be the basis for any policy issued.  I understand that any misrepresentation contained in this application and relied upon by the Company may be used to reduce or deny a claim or void the policy if: (1) it is within its contestable period; and (2) such misrepresentation materially affects the acceptance of the risk.

93.     Rubin also knew that American General would rely upon the information provided in the application in deciding whether to issue the Goldklang Policy.

94.     Rubin executed a second Agent's Report on May 1, 2006 in which he again represented to American General that he had known Risha for one year. Rubin also again represented that he personally saw Risha on the date of the application and was not "aware of any information that would adversely effect any proposed insured's eligibility, acceptability, or insurability[.]"

95.     The next day, Rubin executed another Agent Certification Form in which he certified that "[n]one of the premiums for the policy sought with the application for Risha Goldklang (Insured) dated 5-1-06 will be financed other than pursuant to a split-dollar agreement."

96.     On May 3, 2006, Rubin through USCAS, transmitted to American General via facsimile this "formal application" consisting of the Part A Life Insurance Application, Part B Life Insurance Application, Agent's Report and Agent Certification with the knowledge and intention that American General would rely

upon the statements and information contained therein when making its
determination as to whether to issue the Policy.

97.     Upon receipt of the "formal application," American General again
advised Rubin through USCAS that it required additional verification of Risha's net
worth, confirmation of the purpose of the Policy, and financial justification for the
amount of insurance sought.

98.     Rubin submitted to American General through USCAS a letter dated
May 10, 2006 in which Rubin represented that he had personally seen a "small
sampling" of Risha's "portfolio of assets" and advised that the assets had a "net total
of $21 Million."  Rubin further represented that Risha owned "a number of
warehouses in Manhattan . . . worth about $18.5 Million according to the last
appraisal they had done on the properties."  Rubin further represented that Risha
also held and additional "$2.5 Million . . . made up of liquid assets in a Brokerage
[sic] house."

99.     On or about May 19, 2006, a woman identifying herself as Risha
telephoned a representative of Lab One to complete an inspection interview in
furtherance of the application for the Goldklang Policy.  Risha confirmed to the Lab
One representative that the insurance for which she and the Goldklang Trust had
applied was intended for estate planning purposes.  Risha was unable to confirm any
information regarding finances or net worth, but instead deferred to her purported
accountant and advised that the caller's son would provide an accounting reference.

100.    Lab One also asked specific questions intended to reveal whether the
policy applied for fell into the broad category of stranger-originated or stranger-

21

owned life insurance.  In response to these specific questions, Risha represented that: no one was borrowing any part of the premiums for the policy; she had not received cash payment or any other benefit to acquire the policy, and; there was no agreement to transfer the ownership of or any agreement for an option or right of first refusal to transfer the policy to any other person or entity.

101.    On or about May 30, 2006, Rubin transmitted a letter to American General through USCAS in which he affirmed the reason for the insurance applied for as estate planning.  He advised that Risha and her husband had "built up a huge real estate empire" and Risha had "approached [Rubin] in reference to life insurance as she wants to make sure that her children inheriting her estate will not have to sell of [sic] what she worked so hard to build up."

102.    American General acknowledged Rubin's letter and asked for further information to substantiate Risha's net worth.

103.    By way of correspondence dated June 12, 2006, Rubin purportedly wrote to Martin Cohen, CPA ("Cohen") and requested his assistance in providing a balance sheet demonstrating Risha's net worth for the expressed purpose of submitting the balance sheet to American General to obtain issuance of the Policy. On or about June 21, 2006, Cohen purportedly corresponded with Risha by way of letter with a carbon copy to Rubin.  In the June 21, 2006 correspondence, Cohen enclosed a purported balance sheet for Risha as of December 31, 2005 representing a net worth of $18,554,500.  The balance sheet provided detail regarding the specific nature and value of the assets comprising net worth to include real estate holdings valued at $21,250,000 and cash and security accounts valued at $1,500,000.

104.    By way of correspondence to Risha dated July 5, 2006, Cohen purportedly further represented that in the previous two years, Risha earned average gross rental income of $1,896,000 and $800,000 from residential and commercial rental properties, respectively, and that net income from these sources is $1,958,000 annually.

105.    On or about July 11, 2006, Rubin transmitted to American General through USCAS the foregoing information, purportedly provided by Cohen, with the knowledge and intention that American General would rely upon the statements and information contained therein when making its determination as to whether to issue the Policy.

106.    In reliance upon all of the foregoing information submitted to American General by Rubin on behalf of Risha and the Goldklang Trust, among other things, American General executed, issued and caused to be delivered to the Goldklang Trust the Goldklang Policy with an Issue Date of July 12, 2006.

107.    By letter dated January 17, 2007, Hersh advised that he had resigned as trustee of the Goldklang Trust and had been replaced as trustee by Levitin.

108.    American General incurred costs in connection with the issuance and administration of the Policy.

109.    Subsequent to issuance of the Goldklang Policy, American General conducted a routine review and investigation of the facts and information submitted to American General in support of the application for the Goldklang Policy.

110.    In the course of its investigation, American General discovered for the first time that Risha, Rubin, Hersh and the Trust materially misrepresented

Risha's net worth in connection with the application for the Goldklang Policy.

111.    Specifically, American General has attempted to verify Risha's net worth by obtaining confirmation of real estate holdings, upon which her representations of net worth were based.

112.    American General's investigation revealed no record of any real or personal property owned or transferred by Risha at any time.

113.    American General has also been unable to locate Cohen to verify his representations concerning Risha's net worth and income despite substantial efforts to do so.  In fact, American General's investigation leads to the conclusion that Cohen likely does not exist and that the documents purportedly submitted by Cohen are fraudulent.

114.    Risha and Hersh have refused to speak with American General's representative concerning the transaction.  Instead, counsel purporting to represent Risha and Hersh in connection with American General's inquiries has directed American General's representative to seek the information through litigation.

115.    American General was not aware of the true facts concerning Risha's net worth or income prior to issuing, executing or delivering the Goldklang Policy.

116.    American General was not aware of the true facts concerning Risha's reasons for seeking issuance of the Goldklang Policy prior to issuing, executing or delivering the Goldklang Policy.

117.    American General reasonably relied upon the misrepresentations and omissions contained in the application for the Goldklang Policy.

118.    American General incurred costs in connection with the investigation

24

regarding defendants' misrepresentations.

119.     The misrepresentations in the application concerning Risha's financial status and reason for applying affected American General's decision to issue and deliver the Goldklang Policy as written and to accept the risks upon which issuance and delivery of the Goldklang Policy was based.

120.     If American General had been aware of Risha's true net worth, income and/or reason for applying for insurance, American General would not have issued the Goldklang Policy.

121.     If true and complete information had been provided in response to the questions on the application, American General would not have issued the Goldklang Policy.

### The Rosenthal Fraud

122.     On or about April 22, 2006, Judith Rosenthal ("Rosenthal") and Rubin executed Part A Life Insurance Application seeking issuance of the Rosenthal Policy.

123.     The application was purportedly executed in Lakewood, New Jersey.

124.     Question number 1 on the Application asked for Rosenthal's income and net worth.  In response, Rosenthal and Rubin represented that Rosenthal had a net worth of $15,000,000.

125.     On the same day, Rubin executed an Agent's Report in which he represented that he had known Rosenthal for one year as of the date of the application.

126.     On April 27, 2006, Rubin executed an Agent's Certification in which

he certified that "none of the premiums for the policy sought with the application for Judith Rosenthal (insured) dated 4-22-06 will be financed other than pursuant to a split dollar agreement."

127.    On or about July 17, 2006, Judith Rosenthal, Rubin, and Eric Beane ("Beane"), as trustee of the Rosenthal Trust executed Part A Life Insurance Application seeking issuance of the Rosenthal Policy.

128.    The application was purportedly executed in Lakewood, New Jersey.

129.    Question number 1 on the Application asked for Rosenthal's income and net worth.  In response, Rosenthal, Rubin, and Beane represented that Rosenthal had a net worth of $17,000,000 and personal income of $1,500,000.

130.    By executing the Application, Rosenthal and Beane acknowledged and agreed that American General would rely upon the information provided in the application in determining whether to issue the Rosenthal Policy, and they promised that the information contained in the application was true and complete as follows:

> I have read the above statements or they have been read to me.  They are true and complete to the best of my knowledge and belief.  I understand that this application: (1) will consist of Part A, Part B, and if applicable, related forms; and (2) shall be the basis for any policy issued.  I understand that any misrepresentation contained in this application and relied upon by the Company may be used to reduce or deny a claim or void the policy if: (1) it is within its contestable period; and (2) such misrepresentation materially affects the acceptance of the risk.

131.    Rubin also knew that American General would rely upon the information provided in the application in deciding whether to issue the Rosenthal Policy.

132.    Rubin executed another Agent's Report on July 17, 2006 in which he

again represented that he had known Rosenthal for one year and an Agent Certification in which he certified that "none of the premiums for the policy sought with the application for Judith Rosenthal (insured) dated 7-17-06 will be financed other than pursuant to a split dollar agreement."

133.    On or about April 20, 2006 Rubin transmitted the foregoing "formal application" to American General through USCAS.

134.    On or about July 31, 2006, Rubin transmitted to American General through USCAS additional fraudulent information concerning Rosenthal's financial background in support of the application for the Rosenthal Policy.

135.    Specifically, Rubin wrote to American General's underwriter advising that Rosenthal's net worth is $20,000,000 and her annual income in the previous fiscal year was $1,500,000 and that the primary source of the premium for the Rosenthal Policy would be her regular income.  Rubin also provided an income statement and balance sheet for the year ending December 31, 2005 for Rosenthal, which was purportedly prepared by Susan Buren, Rosenthal's purported accountant. The balance sheet showed a net worth of $14,405,815 and the income statement showed net income of $1,352,660 purportedly derived from gross rental income of $2,550,000.

136.    In reliance upon all of the foregoing information, American General executed, issued and caused the Rosenthal Policy to be delivered to the Rosenthal Trust with an Issue Date of July 28, 2006.

137.    American General incurred costs in connection with the issuance and administration of the Policy.

27

138.    American General has conducted a routine review of the application and representations contained therein.

139.    In the course of this review, American General has discovered for the first time that Rosenthal, Rubin, and the Rosenthal Trust materially misrepresented Rosenthal's net worth and personal income in connection with the application for the Rosenthal Policy.

140.    Specifically, American General has attempted to verify Rosenthal's net worth and income by obtaining confirmation of real estate holdings, upon which representations of her net worth and income were based.

141.    American General's investigation revealed no record of any real or personal property owned or transferred by Rosenthal at any time, other than the home in which she lives and an automobile.

142.    American General was not aware of these facts concerning Rosenthal's true net worth and income prior to issuing, executing or delivering the Rosenthal Policy.

143.    American General reasonably relied upon the misrepresentations and omissions contained in the application for the Rosenthal Policy.

144.    American General incurred costs in connection with the investigation regarding the misrepresentations.

145.    The misrepresentations in the application concerning Rosenthal's financial status affected American General's decision to issue and deliver the Rosenthal Policy as written and to accept the risks upon which issuance and delivery of the Rosenthal Policy was based.

146.     If American General had been aware of Rosenthal's true net worth and income, American General would not have issued the Rosenthal Policy.

147.     If true and complete information had been provided in response to the questions on the application, American General would not have issued the Rosenthal Policy.

### The Kremer Fraud

148.     On or about March 22, 2006, Rachel Kremer ("Kremer") and Rubin executed Part A Life Insurance Application seeking issuance of the Kremer Policy.

149.     The application was purportedly executed in Lakewood, New Jersey.

150.     Question number 1 on the Application asked for Kremer's income and net worth.  In response, Kremer and Rubin represented that Kremer had a net worth of $38,000,000 and personal income of $2,500,000.

151.     On the same day, Rubin executed an Agent's Report in which he represented that he had known Kremer for one year as of the date of the application.

152.     On April 24, 2006, Rubin executed an Agent's Certification in which he certified that "none of the premiums for the policy sought with the application for Rachel Kremer (insured) dated 3-22-06 will be financed other than pursuant to a split dollar agreement."

153.     On or about May 17, 2006, Kremer, Rubin and Joshua Lieberman ("Lieberman") as trustee for the Kremer Trust executed Part A Life Insurance Application seeking issuance of the Policy.

154.     The application was purportedly executed in Lakewood, New Jersey.

155.     Question number 1 on the Application asked for Kremer's income

and net worth.  In response, Kremer Rubin and Lieberman represented that Kremer

had a net worth of $38,000,000 and personal income of $2,500,000.

156.    Kremer Rubin and Lieberman represented that the reason for the

Kremer Policy was "estate planning" and identified the Kremer Trust as owner and

beneficiary of the Kremer Policy.

157.    By executing the Application, Kremer and Lieberman acknowledged

and agreed that American General would rely upon the information provided in the

application in determining whether to issue the Kremer Policy, and they promised

that the information contained in the application was true and complete as follows:

> I have read the above statements or they have been read to
> me.   They are true and complete to the best of my
> knowledge and belief.  I understand that this application:
> (1) will consist of Part A, Part B, and if applicable, related
> forms; and (2) shall be the basis for any policy issued.  I
> understand that any misrepresentation contained in this
> application and relied upon by the Company may be used
> to reduce or deny a claim or void the policy if: (1) it is
> within    its    contestable    period;    and    (2)    such
> misrepresentation materially affects the acceptance of the
> risk.

158.    Rubin also knew that American General would rely upon the

information provided in the application in deciding whether to issue the Kremer

Policy.

159.    Rubin transmitted the foregoing "formal application" to American

General through USCAS on or about May 18, 2006.

160.    On July 19, 2006, Lab One completed a Comprehensive Inspection

Report.  As part of its investigation, Lab One conducted a telephone interview with an

individual claiming to be Kremer.  The results of the telephone interview are recorded in

the Inspection Report.

161.    During the telephone interview with Lab One, Kremer represented that she had been retired for ten years from the real estate management business, where she had been employed for her entire life.  Kremer represented her current total unearned income, including dividends, interest and rents, as $2,000,000.00. Kremer reported her net worth as $34,090,000.

162.    On or about July 31, 2006, Rubin transmitted to American General through USCAS a memo in which he represented that Kremer "has shown me an overview of her portfolio, this includes a number of commercial real estate buildings with very little money owed on them.  She has 5 apartment buildings in the South Jersey, Atlantic City area, valued at approximately $2-$3 million each and 2 strip malls, in the same area" the latter of which had been recently appraised at a value of $13.6 million.  Rubin further stated that "her net worth from her real estate holdings is approximately $30 million."  Rubin further represented that "[Kremer] has been urged by her family and her accountant to procure a life insurance policy to cover estate taxes."   Rubin further advised that "the primary source of her premium payment will be income from her real estate holdings and cash that she has readily available."

163.    On or about July 31, 2006, Rubin also transmitted to American General through USCAS a balance sheet and income statement purportedly prepared by Susan Buren, CPA and purportedly relating to Kremer.  The income statement portrayed net income of $2,556,602 for 2005 based upon total rental income of $3,721,000.  The balance sheet indicated Kremer's net worth as of December 31, 2005 as $20,635,078.

31

164.    In reliance upon these answers and each and every statement and representation made by Kremer, Rubin, Lieberman, and the Kremer Trust in the application and the information subsequently provided on behalf of Kremer and the Kremer Trust, American General executed, issued and caused the Kremer Policy to be delivered to the Kremer Trust with an Issue Date of July 28, 2006.

165.    American General incurred costs in connection with the issuance and administration of the Kremer Policy.

166.    American General has conducted a routine investigation of the application and representations contained therein.

167.    In the course of this review, American General has discovered for the first time that Kremer, Rubin, Lieberman, and the Kremer Trust materially misrepresented Kremer's net worth and personal income in connection with the application for the Kremer Policy.

168.    Specifically, American General has attempted to verify Kremer's net worth and income by obtaining confirmation of real estate holdings, upon which her representations of net worth and income were based.

169.    American General's investigation revealed no record of any real or personal property owned or transferred by Kremer at any time, other than the home in which she lives and an automobile.

170.    American General was not aware of these facts concerning Kremer's true net worth and income prior to issuing, executing or delivering the Kremer Policy.

171.    American General reasonably relied upon the misrepresentations and

812735.1

omissions contained in the application for, and otherwise submitted in connection with the application for the Kremer Policy.

172.     American General incurred costs in connection with the investigation regarding the misrepresentations.

173.     The misrepresentations in the application concerning Kremer's financial status affected American General's decision to issue and deliver the Kremer Policy as written and to accept the risks upon which issuance and delivery of the Kremer Policy was based.

174.     If American General had been aware of Kremer's true net worth and income, American General would not have issued the Kremer Policy.

175.     If true and complete information had been provided in response to the questions on the application, American General would not have issued the Kremer Policy.

## COUNT I
## (Violation of 18 U.S.C. § 1962(c))

176.     American General hereby repeats and reasserts each of the allegations contained in each of the foregoing paragraphs as if fully set forth at length.

177.     The Rubin Group is a "person" within the meaning of 18 U.S.C. § 1961(3) and § 1964(c).

178.     The Ellman Trust is a "person" within the meaning of 18 U.S.C. § 1961(3) and § 1964(c).

179.      Rubin is a "person" within the meaning of 18 U.S.C. § 1961(3) and § 1964(c).

180.    Levitin is a "person" within the meaning of 18 U.S.C. § 1961(3) and § 1964(c).

181.    Kugielsky is a "person" within the meaning of 18 U.S.C. § 1961(3) and § 1964(c).

182.    John Does 1 through 10 are all "persons" within the meaning of 18 U.S.C. § 1961(3) and § 1964(c).

183.    The Rubin Group is an "enterprise" within the meaning of 18 U.S.C. § 1961(4) and § 1962(c), which enterprise was engaged in and the activities of which affected interstate commerce during all relevant times.  The purpose of the enterprise is to fraudulently obtain the issuance of large life insurance policies insuring the lives of individuals who do not qualify for such insurance and whose deaths and resulting payment of life insurance benefits would inure solely to the benefit the enterprise.

184.    The Rubin Group, Rubin, Levitin, Kugielsky, the Ellman Trust, and/or John Does 1 through 10, at all relevant times, were, are, and are likely to continue to be associated in fact to form an "enterprise" within the meaning of 18 U.S.C. § 1961(4) and § 1962(c), which enterprise was engaged in and the activities of which affected interstate commerce during all relevant times.  The purpose of the enterprise is to fraudulently obtain the issuance of large life insurance policies insuring the lives of individuals who do not qualify for such insurance and whose deaths and resulting payment of life insurance benefits would inure solely to the benefit the enterprise.

185.    The Rubin Group, Rubin, Levitin, Kugielsky, the Ellman Trust,

and/or John Does 1 through 10 were each employed by or associated with the enterprise, and did conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B) and 1961(5) and 1962(c), including: multiple instances of mail fraud in violation of 18 U.S.C. § 1341; multiple instances of wire fraud in violation of 18 U.S.C. § 1343; and multiple instances of financial institutions fraud in violation of 18 U.S.C. § 1344.

186.    By reason of the violation of 18 U.S.C. § 1962(c), American General has been injured in an as yet undetermined amount within the meaning of 18 U.S.C. § 1964(c).

WHEREFORE American General demands judgment in its favor and against defendants as follows:

a.    In an undermined amount, the sum duly trebled in accordance with 18 U.S.C. § 1964(c).

b.    For costs of suit, including reasonable attorneys fees in accordance with 18 U.S.C. § 1964(c).

c.    Equitable relief against defendants in the form of such injunctive and related relief as might be appropriate in accordance with 18 U.S.C. § 1964(a), including:

i.    Reasonable restrictions on the future activities of defendants;

35

ii.      An equitable accounting for all insurance policies issued by American General of which any or all of the defendants or the enterprise is the ultimate beneficiary as well as all payments in the form of insurance benefits paid by American General, together with all consideration and profits received directly or indirectly or underlying, including but not limited to the imposition of a constructive trust with tracing;

iii.      The imposition and execution of equitable liens;

iv.      Indemnification for any and all sums and losses that may be judged to be due or payable from American General as a consequence of the defendants' activities;

v.      Such other damages, relief and pre-judgment and post-judgment interest as the Court may deem just and proper.

## COUNT II
### (Violation of 18 U.S.C. § 1962(d))

187.    American General hereby repeats and reasserts each of the allegations contained in each of the foregoing paragraphs as if fully set forth at length.

188.    The Rubin Group is a "person" within the meaning of 18 U.S.C. § 1961(3) and § 1964(c).

189.    The Ellman Trust is a "person" within the meaning of 18 U.S.C. § 1961(3) and § 1964(c).

190.     Rubin is a "person" within the meaning of 18 U.S.C. § 1961(3) and § 1964(c).

36

191.     Levitin is a "person" within the meaning of 18 U.S.C. § 1961(3) and § 1964(c).

192.     Kugielsky is a "person" within the meaning of 18 U.S.C. § 1961(3) and § 1964(c).

193.     John Does 1 through 10 are all "persons" within the meaning of 18 U.S.C. § 1961(3) and § 1964(c).

194.     The Rubin Group is an "enterprise" within the meaning of 18 U.S.C. § 1961(4) and § 1962(c), which enterprise was engaged in and the activities of which affected interstate commerce during all relevant times.  The purpose of the enterprise is to fraudulently obtain the issuance of large life insurance policies insuring the lives of individuals who do not qualify for such insurance and whose deaths and resulting payment of life insurance benefits would inure solely to the benefit the enterprise.

195.     The Rubin Group, Rubin, Levitin, Kugielsky, the Ellman Trust, and/or John Does 1 through 10, at all relevant times, were and are and are likely to continue to be associated in fact to form an "enterprise" within the meaning of 18 U.S.C. § 1961(4) and § 1962(c), which enterprise was engaged in and the activities of which affected interstate commerce during all relevant times.  The purpose of the enterprise is to fraudulently obtain the issuance of large life insurance policies insuring the lives of individuals who do not qualify for such insurance and whose deaths and resulting payment of life insurance benefits would inure solely to the benefit the enterprise.

196.     The Rubin Group, Rubin, Levitin, Kugielsky, the Ellman Trust,

and/or John Does 1 through 10 were each employed by or associated with the enterprise, and did conspire to conduct or participate, directly or indirectly, in the conduct of the affairs of enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B) and 1961(5) and 1962(c), including: multiple instances of mail fraud in violation of 18 U.S.C. § 1341; multiple instances of wire fraud in violation of 18 U.S.C. § 1343; and multiple instances of financial institutions fraud in violation of 18 U.S.C. § 1344.

197. By reason of the violation of the violation of 18 U.S.C. § 1962(d), American General has been injured in an as yet undetermined amount within the meaning of 18 U.S.C. § 1964(c).

WHEREFORE American General demands judgment in its favor and against defendants as follows:

a. In an undermined amount, the sum duly trebled in accordance with 18 U.S.C. § 1964(c).

b. For costs of suit, including reasonable attorneys fees in accordance with 18 U.S.C. § 1964(c).

c. Equitable relief against defendants in the form of such injunctive and related relief as might be appropriate in accordance with 18 U.S.C. § 1964(a), including:

i. Reasonable restrictions on the future activities of defendants;

812735.1

    ii. An equitable accounting for all insurance policies issued by American General of which any or all of the defendants or the enterprise is the ultimate beneficiary as well as all payments in the form of insurance benefits paid by American General, together with all consideration and profits received directly or indirectly or underlying, including but not limited to the imposition of a constructive trust with tracing;

    iii. The imposition and execution of equitable liens;

    iv. Indemnification for any and all sums and losses that may be judged to be due or payable from American General as a consequence of the defendants' activities;

    v. Such other damages, relief and pre-judgment and post-judgment interest as the Court may deem just and proper.

## COUNT III
### (Material Misrepresentation)

198. American General hereby repeats and reasserts each of the allegations contained in each of the foregoing paragraphs as if fully set forth at length.

199. The response to Question 1 on the Ellman Application was false and failed to disclose Ellman's true income, net worth, and intention for the Ellman Policy.

200. The statement of acknowledgement and agreement by virtue of Ellman's, Rubin's, Kugielsky's and the Ellman Trust's signatures on the

Application for the Ellman Policy was false.

201.    All other statements made or submitted to American General relating to Ellman's income, net worth and the intentions for the Ellman Policy were false, incomplete and otherwise materially misleading.

202.    Ellman' true financial status, including net worth, which was not disclosed in the application for the Ellman Policy, was material to the risk undertaken by American General in issuing the Ellman Policy as written and was relied upon by American General in issuing the Ellman Policy.

203.    Ellman's true intention and reason for seeking issuance of the Ellman Policy, which was not disclosed in the application therefore, was material to the risk undertaken by American General in issuing the Ellman Policy as written and was relied upon by American General in issuing the Ellman Policy.

204.    American General's reliance upon the material misrepresentations and omissions in the application for the Ellman Policy and/or in connection therewith was reasonable.

205.    If Ellman and/or the Ellman Trust or any of the defendants had fully and completely disclosed Ellman's net worth, or his true reason for seeking issuance of the Ellman Policy or if the true facts had otherwise been made known by them before or at the time of issuance or delivery of the Ellman Policy, the Ellman Policy would not have been executed, issued or delivered by American General and the premiums for the Ellman Policy would never have been accepted by American General.

206.    Because of the foregoing material misrepresentations and failure to

disclose, the Ellman Policy is void *ab initio* and of no force or effect since its inception, and American General never has been and never will become liable to anyone thereunder.

207.    American General has been damaged by virtue of defendants' material misrepresentations, and has incurred damages, expenses and costs in connection with, among other things, its underwriting and issuance of the Ellman Policy, payment of commissions and fees in connection with issuance of the Ellman Policy, administration and servicing of the Ellman Policy, investigation of the misrepresentation, fraud and concealment outlined above, and commencement of the present litigation to enforce its rights.

208.    In light of the foregoing damages, expenses and costs incurred by American General, American General should be permitted to retain the premiums paid for the Ellman Policy as an offset against such damages and costs and/or disgorgement of defendants' ill-gotten gains.  Without such retention, offset and/or disgorgement, the equitable remedies sought herein, including restitution, accounting, constructive trust, and the like, would be rendered futile or impossible.

209.    Notwithstanding the foregoing, American General stands ready, willing and able to refund or otherwise make payment of all or any portion of the premiums paid for the Ellman Policy as directed by the Court in accordance with American General's demand for rescission of the Ellman Policy and restitution of the parties to their relative pre-contract positions insofar as is possible and equitable.

210.    Accordingly, American General hereby makes constructive tender of the premiums paid for the Ellman Policy and respectfully seeks the Court's direction

as to actual payment of same.

WHEREFORE, American General demands judgment in its favor and against defendants as follows:

a.      A declaration pursuant to 28 U.S.C. § 2201 that American General is entitled to keep all premiums paid under the Ellman Policy as offset against damages, costs, fees and expenses incurred by American General on account of defendants' fraudulent conduct as necessary to restore American General to its pre-contract position, and that the Ellman Policy is void *ab initio* and of no force and effect from inception, and that defendants have no interest therein; that the Ellman Policy be canceled and rescinded as of the date of its inception; and that defendants be ordered to surrender to American General the original and all copies of the Ellman Policy in their possession, custody and control for cancellation;

b.      A declaration pursuant to 28 U.S.C. § 2201 that upon American General's deposit with the Court of the total amount of premiums paid under the Ellman Policy, the Ellman Policy is void *ab initio* and of no force and effect from inception, and that defendants have no interest therein; that the Ellman Policy be canceled and rescinded as of the date of its inception; and that defendants be ordered to surrender to American General the original and all copies of the Ellman Policy in their possession, custody and control for cancellation;

c.      An order requiring  defendants, jointly and individually, to reimburse American General for and/or permitting American General to offset its

42

cost associated with the underwriting, issuance, and administration of the Ellman

Policy together with its cost of investigation, costs of suit and attorneys fees;

       d.      Judgment in favor of American General and against defendants,

jointly and individually, for compensatory damages, punitive damages, costs of

suit, and attorneys fees;

       e.      Such other and further relief as may be available to American

General which the Court deems to be equitable and just.

## COUNT IV
### (Fraud)

211.    American General hereby repeats and reasserts each of the

allegations contained in each of the foregoing paragraphs as if fully set forth at

length.

212.    The misrepresentations and failure to disclose Ellman's true net

worth in the application were made and done knowingly by Ellman, Rubin,

Kugielsky and the Ellman Trust with intent to deceive American General into

issuing and delivering the Ellman Policy.

213.    The foregoing fraudulent misrepresentations did, in fact, induce and

deceive American General to its detriment to issue and deliver the Ellman Policy.

214.    If Ellman's true net worth had been disclosed to American General

prior to or at the time of the issuance or delivery of the Ellman Policy, American

General would never have executed, issued, or delivered the Ellman Policy, nor

would American General have accepted premiums for the Ellman Policy.

215.    Because of the intentional and fraudulent misrepresentations and

43

concealment, the Ellman Policy is void *ab initio* and of no force and effect since

their inception and American General never has been nor will American General

become liable to anyone thereunder.

216.     American General has sustained damages as a result of the

misrepresentations, non-disclosure and/or concealment.

WHEREFORE, American General demands judgment in its favor and

against defendants as follows:

      a.     A declaration pursuant to 28 U.S.C. § 2201 that American General

is entitled to keep all premiums paid under the Ellman Policy as offset against

damages, costs, fees and expenses incurred by American General on account of

defendants' fraudulent conduct as necessary to restore American General to its

pre-contract position, and that the Ellman Policy is void *ab initio* and of no force

and effect from inception, and that defendants have no interest therein; that the

Ellman Policy be canceled and rescinded as of the date of its inception; and that

defendants be ordered to surrender to American General the original and all

copies of the Ellman Policy in their possession, custody and control for

cancellation;

      b.     A declaration pursuant to 28 U.S.C. § 2201 that upon American

General's deposit with the Court of the total amount of premiums paid under the

Ellman Policy, the Ellman Policy is void *ab initio* and of no force and effect from

inception, and that defendants have no interest therein; that the Ellman Policy be

canceled and rescinded as of the date of its inception; and that defendants be

ordered to surrender to American General the original and all copies of the

Ellman Policy in their possession, custody and control for cancellation;

     c.     An order requiring  defendants, jointly and individually, to reimburse American General for and/or permitting American General to offset its cost associated with the underwriting, issuance, and administration of the Ellman Policy together with its cost of investigation, costs of suit and attorneys fees;

     d.     Judgment in favor of American General and against defendants, jointly and individually, for compensatory damages, punitive damages, costs of suit, and attorneys fees;

     e.     Such other and further relief as may be available to American General which the Court deems to be equitable and just.

## COUNT V
### (Declaratory Relief)

217.    American General hereby repeats and reasserts each of the allegations contained in each of the foregoing paragraphs as if fully set forth at length.

218.    An actual controversy has arisen and now exists between American General and defendants concerning their respective rights and duties under the Ellman Policy.

219.    American General contends that because of the material and fraudulent misrepresentations and concealments regarding Ellman's true net worth, income and intention for the Ellman Policy, the Ellman Policy is void *ab initio* and of no force and effect since its inception, and American General never has been and never will become liable to anyone thereunder.

812735.1

220.     A declaration is necessary and appropriate at this time in order that American General may ascertain and know its rights and obligations under the Policy.

WHEREFORE, American General demands judgment in its favor and against defendants as follows:

f.     A declaration pursuant to 28 U.S.C. § 2201 that American General is entitled to keep all premiums paid under the Ellman Policy as offset against damages, costs, fees and expenses incurred by American General on account of defendants' fraudulent conduct as necessary to restore American General to its pre-contract position, and that the Ellman Policy is void *ab initio* and of no force and effect from inception, and that defendants have no interest therein; that the Ellman Policy be canceled and rescinded as of the date of its inception; and that defendants be ordered to surrender to American General the original and all copies of the Ellman Policy in their possession, custody and control for cancellation;

g.     A declaration pursuant to 28 U.S.C. § 2201 that upon American General's deposit with the Court of the total amount of premiums paid under the Ellman Policy, the Ellman Policy is void *ab initio* and of no force and effect from inception, and that defendants have no interest therein; that the Ellman Policy be canceled and rescinded as of the date of its inception; and that defendants be ordered to surrender to American General the original and all copies of the Ellman Policy in their possession, custody and control for cancellation;

812735.1

h.      An order requiring  defendants, jointly and individually, to reimburse American General for and/or permitting American General to offset its cost associated with the underwriting, issuance, and administration of the Ellman Policy together with its cost of investigation, costs of suit and attorneys fees;

i.      Judgment in favor of American General and against defendants, jointly and individually, for compensatory damages, punitive damages, costs of suit, and attorneys fees;

j.      Such other and further relief as may be available to American General which the Court deems to be equitable and just.

## COUNT VI
### (Violation of the New Jersey Insurance Fraud Prevention Act N.J.S.A.  17:33A-1, *et seq.*)

221.    American General hereby repeats and reasserts each of the allegations contained in each of the foregoing paragraphs as if fully set forth at length.

222.    By virtue of the foregoing facts, defendants concealed or knowingly failed to disclose the occurrence of an event which affects the initial or continued right or entitlement to an insurance benefit or payment from American General under the Ellman Policy.

223.    By virtue of the foregoing facts, defendants prepared or made a written or oral statement intended to be presented to American General for the purpose of obtaining the Ellman Policy, knowing that the statement contained false or misleading information concerning a fact or thing material to the insurance application or contract.

224.    By virtue of the foregoing facts, defendants concealed or knowingly failed

47

to disclose evidence, written or oral, which may have been relevant to a finding that defendants prepared or made a written or oral statement intended to be presented to American General for the purpose of obtaining an insurance policy, knowing that the statement contained false or misleading information concerning a fact or thing material to the insurance application or contract.

225.    By virtue of the foregoing facts, defendants knowingly assisted, conspired with or urged a person or persons to violate one or more of the provisions of the New Jersey Insurance Fraud Prevention Act.

226.    By virtue of the foregoing facts, defendants have engaged in a pattern of violating the New Jersey Insurance Fraud Prevention Act.

WHEREFORE, American General demands judgment in its favor and against defendants for compensatory damages, including but not limited to, cost of investigation, costs of suit and attorneys fees, trebled, and such other and further relief as may be available to American General which the Court deems to be equitable and just.

## COUNT VI
### (Breach of Fiduciary Duty)

227.    American General hereby repeats and reasserts each of the allegations contained in each of the foregoing paragraphs as if fully set forth at length.

228.    By virtue of his acceptance of appointment as an authorized producer for American General, Rubin served in a fiduciary capacity to American General in the solicitation of applications for individual life insurance policies and submission of said applications to American General.

812735.1

229.     By virtue of the  appointment of Rubin as a producer authorized to solicit applications for individual life insurance policies and submit them to American General, American General placed in Rubin significant trust and confidence to solicit and submit applications from only qualified applicants.

230.     By virtue of the appointment of Rubin as a producer authorized to solicit applications for individual life insurance policies and submit them to American General, Rubin was in a dominant and superior position to assess the suitability of applicants for individual life insurance policies to be issued by American General, including the Ellman application.

231.     By virtue of the appointment of Rubin as a producer authorized to solicit applications for individual life insurance policies and submit them to American General, Rubin was duty bound to refrain from soliciting or submitting applications for individuals whom he knew, or had reason to know, were not qualified for the policy applied for.

232.     By virtue of the appointment of Rubin as a producer authorized to solicit applications for individual life insurance policies and submit them to American General, Rubin had a duty of complete candor to American General and was further duty bound to apprise American General of any and all information potentially affecting an applicant's qualifications for any policy for which an application had been submitted or was to be submitted immediately upon discovering any such information.

233.     Rubin knew or should have known that Ellman was not a suitable candidate for the Ellman Policy.

234.     Specifically, Rubin knew or should have known that Ellman misrepresented his income and net worth on the Ellman application.

235.     Rubin further knew or should have that the reason for the Ellman Policy, as stated in the application for the Elman Policy, was false.

236.     Rubin failed to apprise American General of these material facts and information, and thereby breached his duty to American General.

WHEREFORE, American General demands judgment in its favor and against Rubin for compensatory damages, including but not limited to, cost of investigation, costs of suit and attorneys fees, punitive damages, and such other and further relief as may be available to American General which the Court deems to be equitable and just.

## DEMAND FOR TRIAL BY JURY

American General hereby demands a jury trial with respect to all issues, claims and causes of action set forth herein that are so triable.

WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
Attorneys for plaintiff, American General Life Insurance Company


By:___ s/ *Robert P. Lesko*_____
         Robert P. Lesko

Dated: January 26, 2009

50

812735.1