WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
Robert P. Lesko (RL 1553)
Karen Varina (KV 8419)
33 Washington Street
Newark, New Jersey 07102-3017
(973) 624-0800 ph.
(973) 624-0799 fx.
Attorneys for plaintiff,
American General Life Insurance Company

| | |
|---|---|
| AMERICAN GENERAL LIFE INSURANCE COMPANY | UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY |
| Plaintiff, | Civil Action No: 3:08-cv-03489-MLC-TJB |
| vs. | |
| GOLDKLANG SAVINGS IRREVOCABLE TRUST, et al., | [Filed Electronically] |
| Defendants. | |

| | |
|---|---|
| AMERICAN GENERAL LIFE INSURANCE COMPANY | UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY |
| Plaintiff, | Civil Action No: 3:08-cv-05364-MLC-TJB |
| vs. | **AMERICAN GENERAL LIFE INSURANCE COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT** |
| ELLMAN SAVINGS IRREVOCABLE TRUST, JEFFREY LEVITIN, ISRAEL KUGIELSKY, CHAIM RUBIN, and JOHN DOES 1-10, | |
| Defendants. | |

**Of Counsel**
Robert P. Lesko

**On the Brief**
Robert P. Lesko
Karen Varina

877430.3

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... ii

PRELIMINARY ...............................................................................................1

STATEMENT OF FACTS

    A.   Defendants knowingly provided false information to
        American General to induce issuance of the $10,000,000
        Ellman policy ...................................................................................5

    B.   The representations in the application regarding income,
        net worth, reason for the insurance and other life insurance
        were all false ...................................................................................7

    C.   Defendants have engaged in other similarly fraudulent schemes
        to obtain other large policies from American General and others ..................9

    D.    Defendants' fraud is a pock on the life settlements industry ......................11

LEGAL ARGUMENT

    I.    AMERICAN GENERAL HAS PLEADED FACTS SUFFICIENT
        TO ESTABLISH THAT EACH CAUSE OF ACTION IS PLAUSIBLE.....12

    II.   NEW JERSEY LAW APPLIES BASED ON THE PLACE OF
        CONTRACTING, EXPECTATIONS OF THE PARTIES, AND
        THE STATE WITH MOST SIGNIFICANT RELATIONSHIP ..................13

    III.   THE POLICY IS VOID DUE TO LACE OF INSURABLE
        INTEREST DESPITE THE CONTESTABLE CLAUSE ..........................16

        A.  The Trust laced any insurable interest in Ellman's life ..........................17

        B.  The contestable clause has no effect upon an insurer's
            right to Void the policy for lace of insurable interest ............................18

    IV.   THE CONTESTABLE CLAUSE DOES NOT BAR
        RESCISSION BECAUSE THE FRAUD WAS INTENTIONAL ............17

        A. New Jersey's Public Policy to Detect and Eradicate
           Insurance Fraud..................................................................................20

        B.  New Jersey law and public policy supports rescission
          of the Policy based on intentional fraud despite the

contestability clause .................................................................21

C.  Defendants made and incorporated numerous intentional
misrepresentations in the application for the policy .........................23

V.   THE CONTESTABLE CLAUSE DOES NOT PRECLUDE
RESCISSION IN THE CASE OF AN "IMPOSTER." ...........................25

VI.   AMERICAN GENERAL HAS PROPERLY PLEADED A
CAUSE OF ACTION BASED UPON RICO...........................................23

A.  RICO Claims are not to be dismissed at the pleading
stage based upon lack of specificity.....................................................26

B.   The RICO Claims Satisfy and Far Exceed the Minimum
Pleading Requirements of the Federal Rules of Civil
Procedure ............................................................................................27

VII.   THE CONTESTABLE CLAUSE IS NOT A BAR TO
STATUTORY FRAUD ACT AND RICO CLAIMS..............................34

VIII.   THE MCCARRAN-FERGUSON ACT DOES NOT
REVERSE PREEMPT AMERICAN GENERAL'S
RICO CLAIM ......................................................................................36

IX.   EVEN WITHOUT RICO, THE COURT SHOULD
NOT DISMISS BUT ORDER LIMITED DISCOVERY
TO ASSESS JURISDICTION...............................................................39

CONCLUSION.............................................................................................41

877430.3

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Abels v. Farmers Commodities Corp.*,
  259 F.3d 910 (8th Cir. 2001) ..........................................................32

*Agency Holding Corp. v. Malley-Duff & Associates, Inc.*,
  483 U.S. 143, 107 S. Ct. 2759 (1987)...............................................35

*Allianz Life Insurance Co. of N. America v. Bleich*,
  2008 U.S. Dist. LEXIS 90720 .........................................................12

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009)......................................................................9

*Barnes v. State Farm Mutual Automobile Insurance Co.*,
  2004 U.S. Dist. LEXIS 7200 (E.D. Pa. 2004) ..................................40

*Barticheck v. Fidelity Union Bank/First National State*,
  832 F.2d 36 (3d Cir. 1987)...............................................................27

*Begala v. PNC Bank, Ohio, N.A.*,
  214 F.3d 776 (6th Cir. 2000) ...........................................................33

*Bell Atlantic Corp. v. Twombly*,
  127 S. Ct. 1955 (2007).........................................................9, 14, 26

*Blue Cross of Western Penn. v. Nardone*,
  680 F. Supp. 195 (W.D. Pa. 1988)....................................................33

*Boyle v. U.S.*,
  129 S. Ct. 2237 (2009)......................................................................25

*Brosconic v.  M/V Mathilde Maersk*,
  1999 U.S. Dist. LEXIS 9230 (S.D.N.Y. 1999).................................39

*Ferguson v. Union Mutual Stock Life Insurance Co.*,
  673 F.2d 253 (8th Cir. 1982) ...........................................................34

*CGB Occupational Therapy v. RHA Health Services*,
  357 F.3d 375 (3d Cir. 2004)..............................................................40

*Carter v. Continental Life. Insurance Co.*,
  115 F.2d 947 (D.C. Cir. 1940) .........................................................15

iii

*Caterpillar Inc. v. Lewis,*
 519 U.S. 61, 117 S. Ct. 467 (1996)....................................................................40

*Cedric Kushner Promotions, Ltd. v. King,*
 533 U.S. 158, 121 S. Ct. 2087 (2001)..............................................................30

*Chawla v. Transamerica Occidental Life Insurance Co.,*
 2005 U.S. Dist. LEXIS 3473 (E.D. Va. Feb. 3, 2005)......................................14

*Chemical v. New York Life Insurance Co.,*
 1999 U.S. App. LEXIS 3101 (9th Cir., February 25, 1999).............................14

*ClearOne Communications, Inc. v. National Union Fire Insurance Co. of Pittsburgh,*
 494 F.3d 1238 (10th Cir. Utah 2007)...............................................................21

*Corely v. Rosewood Care Center, Inc.,*
 142 F.3d 1041 (7th Cir 1998) ..........................................................................24

*D'Aiuto v. City of Jersey City,*
 2007 U.S. Dist. LEXIS 57646 (D.N.J. Aug. 8, 2007)........................................9

*Defazio v. Wallis,*
 400 F. Supp. 2d 197 (E.D.N.Y. 2007) ..............................................................32

*Dunlap v. Great-West Life Assurance Co.,*
 1995 U.S. Dist. LEXIS 6490 (D.N.C., March 30, 1995)..................................13

*Filus v. LOT Polich Airlines,*
 907 F.2d 1328 (2d Cir. 1990)............................................................................39

*Fioretti v. Massachusetts General Life Insurance Company,*
 53 F.3d 1228 (11th Cir. 1995) ...........................................................19, 20, 23

*Freeport Transit, Inc. v. McNulty,*
 239 F. Supp. 2d 102 (D. Me. 2003) ..................................................................24

*General Ceramics Inc. v. Firemen's Fund Insurance Co.,*
 66 F.3d 647 (3d Cir. 1995)................................................................................11

*Griffin v. United States,*
 502 U.S. 46 (U.S. 1991)....................................................................................25

*Guaranteed Life Insurance Co. v. Wood,*
 631 F. Supp. 15 (N.D. Ga. 1984) ......................................................................15

iv

*H.J. Inc. v. Northwestern Bell Telegraph Co.*,
   492 U.S. 229, 109 S. Ct. 2893 (1989) ...................................................................26, 27, 30

*Humana, Inc. v. Forsyth*,
   525 U.S. 299 ...............................................................................................................36, 37

*Jaguar Cars. Inc. v. Royal Oaks Motor, Co.*,
   46 F.3d 258 (3d Cir. 1995) ...........................................................................................30, 31

*Katchen Iron Works, Inc. v. Standard Acc. Insurance Co.*,
   158  F. Supp. 616 (D.N.J. 1958) ............................................................................................9

*Kehr Packages v. Fidelcor, Inc.*,
   926 F.2d 1406 (3d Cir. 1991) ..............................................................................................34

*Kentucky Central Life Insurance Co v. McNabb*,
   825 F. Supp. 269 (D. Kan. 1993) ........................................................................................15

*Knop v. McMahan*,
   872 F.2d 1132 (3d Cir. 1989) ..............................................................................................40

*Ky. Association of Health Plans, Inc. v. Miller*,
   538 U.S. 329, 123 S. Ct. 1471 (2003) .................................................................................38

*Leibholz v. Hariri*,
   2006 U.S. Dist. LEXIS 52993 (D.N.J. July 13, 2006) .......................................................10

*McLendon v. Continental Group, Inc.*,
   602 F. Supp. 1492 (D.N.J. 1985) ........................................................................................24

*Md. National Bank v. Tower*,
   374 F.2d 381 (4th Cir. 1967) ..............................................................................................15

*Nelson v. Insurance Co. of North America*,
   264 F. Supp. 501 (D.N.J. 1967) ..........................................................................................10

*New England Data Services, Inc. v. Becher*,
   829 F.2d 286 (1st Cir. 1987) ...............................................................................................24

*Newman-Green, Inc. v. Alfonzo-Larrain*,
   490 U.S. 826, 109 S. Ct. 2218 (1989) .................................................................................40

*Ogden v. Microsoft Corp.*,
   486 F.3d 541 (9th Cir. 2007) ...............................................................................................25

*Oppenheimer Fund v. Sanders*,

     437 U.S. 340, 98 S. Ct. 2390 (1978) ................................................................................39

*Sedima, S.P.R.L. v. Imrex Co.,*
     473 U.S. 479, 105 S. Ct. 3275 (1985) ...............................................................24, 31, 35

*Seville Industrial Machinery v. Southmost Machinery Corp.,*
     742 F.2d 786 (3d Cir. 1984) ....................................................................................24, 25

*State Farm Mutual Automobile Insurance Co. v. Rosenfeld,*
     683 F. Supp. 106 (E.D. Pa. 1988) ...............................................................................34

*Swiger v. Allegheny Energy, Inc.,*
     2007 U.S. Dist. LEXIS 8610 (E.D. Pa. 2007) .................................................................40

*Swistock v. Jones,*
     884 F.2d 755 (3d Cir 1989) ........................................................................................24, 34

*Tabas v. Tabas,*
     47 F.3d 1280 (3d Cir.) *cert. deni*ed, 115 S. Ct. 2269 (1995) .........................26, 27, 29, 33

*U.S. v. Parise,*
     159 F.3d 790 (3d Cir.1998) ........................................................................................26

*United States v. Cianci,*
     378 F.3d 71 (1st Cir. 2004) ........................................................................................25

*United States v.  Perholtz,*
     842 F.2d 343 (D.D.C. 1988) ......................................................................................32

*United States v. Riccobene,*
     709 F.2d 214 (3d Cir 1983) ........................................................................................25

*United States v. Turkette,*
     452 U.S. 576 (1981) ....................................................................................................25

*Volmar Distributings, Inc. v. New York Post Co.,*
     825 F. Supp. 1153 (S.D.N.Y. 1993) ............................................................................24

*Warnock v. Davis,*
     104 U.S. 774 (1881) ....................................................................................................13

*Weiss v. First Unum Life Insurance Co.,*
     482 F.3d 254 (3d Cir 2007) ........................................................................................37

*Wexco, Inc. v. IMC, Inc.,*
     820 F. Supp. 194 (M.D. Pa. 1993) ............................................................................36

877430.3

*Wood, Inc. v. Village of Patchogue,*
  311 F. Supp. 2d 344 (E.D.N.Y. 2004) ............................................................32

*Wuliger v. Manufacturers Life Insurance Co.,*
  567 F.3d 787 (6th Cir. 2009) ..........................................................................13

## STATE CASES

*Beard v. The Amer. Agency Life Insurance Co.,*
  314 Md. 235, 550 A.2d 677 (1988) ..........................................................14, 15

*Bell v. National Life & Accident Insurance Co.,*
  41 Ala. App. 94 (1960) ....................................................................................14

*Bromley's Administrator v. Washington Life Insurance Co.,*
  122 Ky. 402, 92 S.W. 17 (1906) ......................................................................16

*Butler v. State Mutual Life Assur. Co.,*
  8 N.Y.S. 411 (N.Y. Sup. Ct. 1890) ..................................................................15

*Buzzone v. Hartford Accident & Indemnity Co.,*
  23 N.J. 447 (1957) ...........................................................................................10

*Commonwealth Life Insurance Co. v George,*
  248 Ala. 649, 28 So. 2d 910 (1947) .................................................................15

*Firmani v. Firmani,*
  332 N.J. Super. 118 (App. Div. 2000) .............................................................22

*Fowler v. The New York Indemnity Co.,*
  26 N.Y. 422 (1863) ..........................................................................................14

*Gantes v. Kason Corp.,*
  145 N.J. 478 (1996) ..........................................................................................11

*Geisler v. Mutual Ben. Health & Acci. Association,*
  163 Kan. 518 (1947) ........................................................................................14

*Gennari v. Weichert Co. Realtors,*
  148 N.J. 582 (N.J. 1997) ..................................................................................38

*Gibbons' Estate,*
  200 A. 55 (Pa. 1938) ........................................................................................15

*Gilbert Spruance Co. v. Pennsylvania Manufacturers Association Insurance Co.,*

877430.3

629 A.2d 885 (N.J. 1993)............................................................................11

*Hebela v. Healthcare Insurance Co.*,
370 N.J. Super. 260 (App. Div. 2004) ....................................................16

*Henderson v. Life Insurance Co. of Va.*,
176 S.C. 100, 179 S.E. 680 (1935) .........................................................15

*Home Life Insurance Co. v. Masterson*,
180 Ark. 170, 21 S.W.2d 414 (1929).......................................................15

*I ; McCabe v. Great Pacific Co.*,
222 N.J. Super. 397 (App. Div. 1988) .....................................................10

*Ledley v. William Penn Life Insurance Co.*,
138 N.J. 627 (1995) ............................................................17, 18, 19, 20

*Liberty National Life Insurance Co. v. Hale*,
285 Ala. 198 (Ala. 1969) ........................................................................21

*Logan v. Texas Mutual Life Insurance Association*,
121 Tex. 603 (Tex. 1932) .......................................................................17

*Lowe v. Rennert*,
869 S.W.2d 199 (Mo. App. 1993) ...........................................................14

*Merin v. Maglaki*,
126 N.J. 430 (1992) ...............................................................................17

*Nappe v. Anschelewitz, Barr, Ansell & Bonello*,
97 N.J. 37 (1984) ...................................................................................38

*Pasacic v. Ameriquest Mortgage Co.*,
2005 WL. 1200373 (N.D. Ohio May 19, 2005)........................................33

*Paul Revere Life Insurance Co. v. Haas*,
137 N.J. 190 (1994) ...............................................................................18

*People v. Alexander*,
183 A.D. 868 (N.Y. App. Div. 1918), affirmed, 225 N.Y. 717 (N.Y. 1919) ...................35

*Pfizer, Inc. v. Employers Insurance of Wausau*,
712 A.2d 634 (N.J. 1998).........................................................................11

*Saxon Construction & Management Corp. v. Masterclean of N.C., Inc.*,
273 N.J. Super. 231 (App. Div. 1994) .....................................................16

877430.3

*Sears Mortgage Corp. v. Rose*,
  134 N.J. 326 (1993) ...................................................................................38

*Southland Life Insurance Co. v. Donati*,
  201 Va. 855 (Va. 1960)................................................................................21

*Sovereign Camp of Woodman of the World v. Muth*,
  109 A. 853 (N.J. Ch. 1920)........................................................................13

*State Farm Mutual Automobile Insurance Co. v. Estate of Simmons*,
  84 N.J. 28 (1980) .....................................................................................10

*Tulipano v. U.S. Life Insurance Co.*,
  57 N.J. Super. 269 (App. Div. 1957) ....................................................16, 18

*Vasquez v. Glassboro Service Association, Inc.*,
  83 N.J. 86 (1980) .......................................................................................16

*Wharton v. Home Security Life Insurance Co.*,
  206 N.C. 254, 173 S.E. 338 (1934)............................................................15

*Wood v. New York Life Insurance Co.*,
  255 Ga. 300 (1985) ...................................................................................14

## FEDERAL AND STATE STATUTES

15 U.S.C. § 1012(b) ............................................................................................36

18 U.S.C. §§ 1341, 1343......................................................................................31

18 U.S.C. 1961(4) ................................................................................................25

18 U.S.C. § 1962(c) .............................................................................................24

N.J.S.A. 17B:25-4 ...............................................................................................18

N.J.S.A. § 17B:24-1.1(b) .....................................................................................13

N.J.S.A. 2C:41-1, *et seq*......................................................................................37

877430.3

## OTHER AUTHORITIES

John Alan Appleman and Jean Appleman
    INSURANCE LAW AND PRACTICE  § 319 ....................................................................9

17 COUCH ON INSURANCE § 240:9 (3d ed. 2009) .........................................................17

*Fed. R. Civ. P.* 8 .................................................................................................................23

*Fed. R. Civ. P.* 9(b) ..........................................................................................................24

*Fed. R. Civ*. P. 12(b)(6) ....................................................................................................9

Eric Mills Holmes
    HOLMES' APPLEMAN ON INSURANCE 2d § 15.1 ...............................................21

Eric Mills Holmes
    HOLMES' APPLEMAN ON INSURANCE 2d § 177.02 ...........................................34

x

## PRELIMINARY STATEMENT

The allegations in the First Amended Complaint (hereafter "Complaint"), taken as true, establish that defendants have committed intentional fraud as part of an ongoing scheme to induce American General and other insurers to issue multimillion dollar life insurance policies insuring individuals with little or no assets for the benefit investors who are strangers to the insured. This fraud scheme is morally repugnant and criminally illegal. [1] It also has the potential to undermine the nature of the insurance relationship, the life settlements industry, and the insurance industry in the same way that the derivative securities debacle has recently compromised the mortgage industry.

Defendants do not protest their innocence. Instead, they seek to exploit what they mistakenly perceive to be loopholes in the law governing insurance fraud. Because defendants committed intentional, legal fraud in procuring the insurance, law and public policy dictate that the legal defenses upon which defendants rely are not available.

The Complaint sets forth plausible facts supporting the claims upon which the relief requested can be granted as to each cause of action asserted. The defendants made fraudulent misrepresentations in the application for the policy at issue with respect to the insured's income, net worth, reason for purchasing the insurance, and in force and pending life insurance policies and applications. The owner of the policy also lacked

---

[1] Defendants attempt to divert the Court's attention from their own conduct with false allegations that American General was somehow complicit in the defendants' fraud; allegations which are not contained in the Complaint, and not properly before the Court on this motion. Defendants rely upon a fleeting reference to American International Group, Inc. (AIG) in a complaint filed by the New York State Attorney General against several independent life settlements brokers who colluded among themselves to breach their fiduciary duties to policy owners. AIG is mentioned as being among several institutional investors in the life settlements market. There is no suggestion of wrongdoing by AIG or other investors. Nor were the offending brokers alleged to be tied in any way to AIG. American General was not mentioned anywhere in the Attorney General's complaint. What's more, all of the conduct alleged in the Attorney General's complaint, which does not assert wrongdoing against AIG, occurred prior to August 29, 2001, when AIG acquired a twice-removed, indirect ownership interest in American General.

1

insurable interest when the policy was issued.  Each of these allegations is a basis for rescission of the Policy.  The contestable clause does not protect an insured, policy owner, or beneficiary who engages in intentional fraud in procurement of a policy.  Nor is the contestable clause applicable to the insurable interest requirement.

The Complaint also includes extensive allegations of defendants' participation in an enterprise engaged in illegal racketeering activity and insurance fraud.  The contestable clause does not apply to Fraud Act and RICO claims.  Even if it did, it would not apply here because defendants' fraud was knowing and intentional, and also because the Fraud Act and RICO claims are quasi-criminal causes of action prosecuted by American General in its capacity as a "private attorney general"; one of a few special circumstances to which the contestable clause is not applicable.

## STATEMENT OF FACTS[2]

### A.    Defendants knowingly provided false information to American General to induce issuance of the $10,000,000 Ellman policy.

Defendants, including Jeffrey Levitin and the Ellman Trust ("the Trust"), all participated in the fraud scheme described in the Complaint to obtain Flexible Premium Adjustable Life Policy UM0030862L ("the Policy") with base coverage of $10,000,000. Compl., ¶2.  The scheme commenced on or before November 9, 2005, when United States Central Agency Services Corporation ("USCAS")[3] sent to American General a life insurance application purportedly executed by Irving Ellman and Rubin.  *Id.* at ¶26.  The November 9 Application misrepresented the reason for the proposed policy as "estate

_____

[2] All of the following facts are taken directly from the First Amended Complaint unless otherwise indicated.

[3] USCAS is an independent marketing organization authorized to submit applications for insurance to American General on behalf of its duly appointed insurance producers.  *Id.* at ¶27.  Rubin was appointed by USCAS to procure such applications.  Rubin's authority to do so arises out of written agreements entered into by and between Rubin and USCAS.  *Id.* at ¶28.

planning," meaning preservation of a purportedly sizeable estate from estate taxes.[4] *Id.* at ¶¶ 30-31.  It also misrepresented Ellman's personal net worth as $15 million.  *Id.*

As part of underwriting, Lab One completed a Comprehensive Inspection Report including a telephone interview, in which an individual claiming to be Ellman represented that he was retired from the real estate business.  He represented his current unearned income as $643,000, and total net worth as $5,135,000.00.   *Id.* at ¶¶ 35-36.  On November 29, 2005, Rubin forwarded a letter purportedly from Ellman to Rubin setting forth Ellman's balance sheet indicating net worth of $11,312,000.00.  *Id.* at ¶ 37.

American General demanded confirmation of net worth from Ellman's accountant.  *Id.* at ¶ 38.  On March 13, 2006, an individual claiming to be Larry Ellman called Lab One, and represented that he had been providing personal accounting services to Ellman for twenty years   The caller represented that Ellman had yearly gross income of $1,500,000.00 and net worth of $11,312,000.00.  *Id.* at ¶39.

On March 13, 2006, Ellman, Rubin, and Israel Kugielsky, as Trustee, executed a new insurance application identifying  the Ellman Trust as the owner and sole beneficiary of the Ellman Policy.  This application was purportedly executed in Lakewood, New Jersey, and was completed on form number AGLIC 100585-2003 (NJ), an application form intended by American General for use in the State of New Jersey.  *Id.* at ¶¶ 40-43.

---

[4] In the context of life insurance issued on the lives of seniors, "estate planning" clearly refers to estate tax planning.  The following explanation appears under "estate planning" on the Wikipedia.com website,: "**Tax.**  Because the United States tax code does not tax life insurance proceeds as income, a life insurance trust could be used to pay estate taxes. However, if the decedent holds any incidents of ownership like the ability to remove or change beneficiary, the proceeds will remain in his estate. For this reason, the trust vehicle is used to own the life insurance policy and it must be irrevocable to avoid inclusion in the estate." http://en.wikipedia.org/wiki/Estate_planning (July 23, 2009).

877430.3

In the March 13 application, Ellman, Kugielsky, Rubin, and the Trust specifically requested issuance of a policy with Base Coverage of $10,000,000.00.  They again represented that the policy was intended for "estate planning," and misrepresented Ellman's personal income and net worth by expressly incorporating the values provided in the inspection report, namely $1,500,000 and $11,312,000, respectively. *Id.* at ¶¶ 43-44.  They also misrepresented that there was then no other pending or in force life insurance or annuity on the Ellman's life.  *Id.* at ¶45.

In reliance upon the information provided by defendants throughout the course of the underwriting process, American General issued the Policy and caused it to be delivered with an Issue Date of March 14, 2006.  *Id.* at ¶ 48.  The Policy was issued using policy form number 04337, which was created and intended for use in the State of New Jersey.  *Id.* at ¶ 49.  The Policy Schedule page indicates in all capital letters "THIS IS A NEW JERSEY POLICY."  *Id.* at ¶ 50.  American General delivered the Ellman Policy to Rubin in New Jersey on or about March 16, 2006 for delivery to the Trust.  *Id.* at ¶52.  Rubin delivered it to Kugielsky in New Jersey on March 22, 2006.  *Id.* at ¶ 53.

On January 16, 2007, Kugielsky renounced his appointment as Trustee and advised that Levitin would be his successor.  *Id.* at ¶54.  Levitin accepted the assignment on January 23, 2007.  *Id.* at ¶ 55.  Ellman died on May 21, 2008.  Thereafter, Levitin executed a Proof of Death of Claimant's Statement on behalf of the Trust.  *Id.* at ¶ 57.

### B.     The representations in the application regarding income, net worth, reason for the insurance and other life insurance were all false.

In a subsequent interview, Larry informed an investigator that Ellman was last employed from 1978 to 1994 by the New York State Department of Insurance, Liquidation Bureau, and was not in the real estate business as represented in the

4

application.  *Id.* ¶ 61.  He estimated Ellman's personal income at $2,000.00 per month in state pension and social security benefits, with no stock, bonds, equity, or real estate at all.  *Id.* ¶¶ 62-63.  Ellman's total net worth is estimated at less than $25,000.00.  *Id.* ¶ 64. Larry also admitted he is not an accountant and had never served as such for Ellman. Larry had no knowledge of any life insurance or trust until after Ellman's death.  *Id.* at ¶ 65.  Thus, Larry could not have been the person who spoke with Lab One on the telephone and verified Ellman's income and net worth.

Each time Ellman met with Rubin concerning the Policy, Rubin gave Ellman $500.00 to $1,000.00.  *Id.* at ¶ 66.  As of the date of the application, Ellman was insured under at least one other life insurance policy issued by New York Life Insurance Company in the amount of $5,000,000.  *Id.* at ¶ 67.

Defendants misrepresented the purpose of the policy as "estate planning."  *Id.* at ¶ 68.  The ultimate beneficiaries of the Policy are not Ellman's estate or his natural heirs, but complete strangers with no interest in seeing his life continue.  *Id.* at ¶4. The sole purpose of the Policy was to create a windfall profit to these strangers.

Each defendant encouraged, facilitated, aided and abetted, transmitted and/or directly made representations with the intention of defrauding American General into issuing the Policy.  *Id.* at ¶5.  The misrepresentations affected American General's decision to issue the Policy as written and to accept the risks upon which the Policy was based.  *Id.* at ¶ 69.  If American General had been aware of Ellman's true financial status, reason for the Policy, or the existence of other policies, American General would not have issued the Policy.  *Id.* at ¶¶ 75-77.

5

**C.     Defendants have engaged in other similarly fraudulent schemes to obtain other large policies from American General and others.**

<u>The Goldklang Fraud</u>:  Rubin commenced the Goldklang portion of the fraud scheme when he submitted a Quote Request dated February 8, 2006 for a 15-million-dollar life insurance policy insuring Risha Goldklang.  *Id.* ¶84.  In a formal application transmitted to American General on or about May 3, 2006, Rubin, Risha, and Hersh Goldklang as Trustee of the Goldklang Trust, misrepresented Risha's net worth as $17,000,000 and the reason for the insurance as "estate planning."  *Id.* ¶¶ 87-96.  Rubin compounded the fraud in a letter dated May 10, 2006 in which he represented that Risha's portfolio had a "net total of $21 Million."  Rubin further represented that Risha owned real estate "worth about $18.5 Million" and held an additional "$2.5 Million...made up of liquid assets in a Brokerage house."  *Id.* ¶ 98.  In another letter, Rubin affirmed the misrepresentation of the reason for which the insurance was sought as "estate planning."  *Id.* ¶ 101.  A woman identifying herself as Risha telephoned Lab One to complete an inspection interview, and confirmed that the insurance was intended for estate planning.   *Id.* at ¶ 99.

On July 11, 2006, Rubin sent to American General, a string of correspondence purportedly exchanged between himself and one Martin Cohen, CPA, including a June 21, 2006 purportedly from Martin Cohen to Risha enclosing a purported balance sheet for Risha as of December 31, 2005 representing a net worth of $18,554,500, comprised of real estate holdings and cash and security accounts.  Rubin included a letter from Cohen dated July 5, 2006, indicating rental income of $1,958,000 annually.  *Id.* ¶¶ 103-105.

In reliance upon the information provided by Rubin, Goldklang and the Goldklang Trust, American General issued the Goldklang Policy with an Issue Date of

6

July 12, 2006.  *Id.* ¶ 106.  American General has since attempted to verify the representations regarding Risha net worth and income, but has been unable to locate any record or other indication that Risha has ever owned any real estate whatsoever.  The search for Martin Cohen, CPA revealed that no such individual even exists, and that the documents purportedly authored by him are forgeries.  *Id.* ¶¶ 109-114.

Just as in the fraud scheme involving Ellman, Levitin took over as trustee for Hersh Goldklang after the Policy was issued in or around January 17, 2007.  *Id.* at ¶ 107.

The Kremer Fraud:  Rubin submitted an informal application to insure Rachel Kremer on or about March 22, 2006 in which Kremer's net worth was misrepresented as $38,000,000 and her income was misrepresented as $2,500,000.  *Id.* ¶¶ 148-150.  In the subsequent formal application, Rubin, Kremer, and Joshua Lieberman, on behalf of the Kremer Trust, repeated the misrepresentations as to income and net worth, and also misrepresented the reason for the insurance as "estate planning."  *Id.* ¶¶ 153-159.

A woman identifying herself as Kremer later told a representative of Lab One that her current income was $2,000,000 and her net worth was $34,090,000.  *Id,* ¶ 161.  Rubin compounded the fraud in a letter in which he represented that Kremer's  "net worth from her real estate holdings is approximately $30 million," and the reason for insurance was estate planning. *Id.* ¶ 162.  Rubin also provided a balance sheet and income statement purportedly prepared by Susan Buren, CPA and portraying net income of $2,556,602 for 2005 based upon total rental income of $3,721,000 and net worth as of December 31, 2005 of $20,635,078.  *Id.* ¶ 163.

Relying upon the information provided by Rubin, Kremer, Lieberman and the Kremer Trust, American General issued the Kremer Policy with an Issue Date of July 28,

2006.  *Id.* ¶ 164.  American General attempted to verify Kremer's net worth and income, but has been unable to locate any record or other indication that Kremer has ever owned any real estate other than the home in which she lives and an automobile.  *Id.* ¶¶ 166-169.

The Rosenthal Fraud:  Defendants submitted an informal application for life insurance dated April 22, 2006 in which Judith Rosenthal ad Rubin represented that Rosenthal had a net worth of $15,000,000.  *Id.* ¶¶ 122-124.  Rosenthal, Rubin, and Eric Beane, as trustee of the Rosenthal Trust, executed a formal application seeking issuance of a $10,000,000 policy and representing Rosenthal's personal income as $1,500,000 and net worth as $17,000,000.  *Id.* ¶¶ 127-128.  Rubin supplied an income statement and balance sheet for the year 2005 for Rosenthal, purportedly prepared by Susan Buren, CPA.  The balance sheet showed a net worth of $14,405,815.  The income statement showed net income of $1,352,660 derived from gross rental income of $2,550,000.  *Id.* ¶¶ 134-135.

In reliance upon this information, American General issued the Rosenthal Policy with an Issue Date of July 28, 2006.  *Id.* ¶ 137.  However, American General has been unable to verify Rosenthal's net worth and income or locate any record or other indication that Rosenthal has ever owned any real estate other than the home in which she lives and an automobile.  *Id.* ¶¶ 138-141.

**D.     Defendants' fraud is a pock on the life settlements industry.**

In the Complaint, American General included a description of the "black market" established with Stranger Originated Life Insurance (STOLI).  *Id.* ¶¶ 21-25.  The purveyors of STOLI prey upon desperate or unsuspecting consumers by promising them cash, free temporary life insurance, and/or other valuable consideration in exchange for

877430.3

participation in schemes to defraud life insurers such as American General.  *Id.* ¶ 22.

While lacking any insurable interest in the life of the unsuspecting consumer, these black

marketeers take for themselves all or most of the beneficial interest in the policies and

hope for the early – even untimely – death of the consumer whose life has been

fraudulently insured.  *Id.* ¶¶ 22-23.

Although the STOLI black market operates within the life settlements market

space, American General makes no allegations at all in the Complaint concerning the

legitimacy, usefulness or merits of the life settlement industry itself.  That debate is

reserved for a later date or another proceeding.  It is not before this Court on this motion.

## LEGAL ARGUMENT

### I.   AMERICAN GENERAL HAS PLEADED FACTS SUFFICIENT TO ESTABLISH THAT EACH CAUSE OF ACTION IS PLAUSIBLE

Rule 12(b)(6) requires the Court to construe the Complaint in the light most

favorable to American General, and deny the motion to dismiss unless it appears to a

certainty that American General would not be entitled to relief under *any* plausible state

of facts that could be proved in support of its claim.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937

(2009); *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007).  Requiring that a claim

be "plausible" does not impose a probability requirement at the pleading stage; it simply

calls for enough facts to raise a reasonable expectation that discovery will reveal what has

been alleged to be true.  *D'Aiuto v. City of Jersey City*, 2007 U.S. Dist. LEXIS 57646, 6-7

(D.N.J. Aug. 8, 2007).  All well pleaded facts must be accepted as true for the purpose of

the motion, and plaintiff shall be given the benefit of every favorable inference that can

be drawn from those allegations.  *Katchen Iron Works, Inc. v. Standard Acc. Ins. Co.*, 158

F. Supp. 616, 619 (D.N.J. 1958);   *Leibholz v. Hariri*, 2006 U.S. Dist. LEXIS 52993 (D.N.J. July 13, 2006).

American General has pleaded facts sufficient to establish that the claims asserted are – at an absolute minimum – plausible.  Accordingly, defendants' motion to dismiss should be denied.

## II.   NEW JERSEY LAW APPLIES BASED ON THE PLACE OF CONTRACTING, EXPECTATIONS OF THE PARTIES, AND THE STATE WITH MOST SIGNIFICANT RELATIONSHIP

Where there is a question as to which of two states' conflicting laws will apply to a dispute involving an insurance contract, the law of the place of contracting generally governs.  *State Farm Mut. Auto. Ins. Co. v. Estate of Simmons*, 84 N.J. 28, 37 (1980); *see also Buzzone v. Hartford Accident & Indem. Co.*, 23 N.J. 447, 452 (1957) ("The question of what is the obligation imposed by a contract of insurance…has usually rightly been held to be governed by the law of the place of contracting."); *Nelson v. Insurance Co. of North America*, 264 F. Supp. 501, 503 (D.N.J. 1967) (applying law of the state where group health policy was applied for, countersigned, issued and delivered and where the group arrangement was administered, and the premiums were paid).  This rule best comports with the reasonable expectations of the parties and provides certainty and consistency in selecting the applicable state law.  *Estate of Simmons*, 84 N.J. at 37.

The Court must also make a full comparison of the significant relations of each state to each party and the transaction, including "an evaluation of important state contacts as well as a consideration of the state policies affected by, and governmental interest in, the outcome of the controversy."  *Id; McCabe v. Great Pacific Co.*, 222 N.J. Super. 397 (App. Div. 1988).  The goal of the most significant relationship test is to

10

determine which state has the most significant connections with the parties and the transaction, *Gilbert Spruance Co. v. Pennsylvania Mfrs. Ass'n. Ins. Co.,* 629 A.2d 885, 885 (N.J. 1993), and which state has the greatest interest in resolving the particular issue that is raised. *Gantes v. Kason Corp.*, 145 N.J. 478, 484 (1996).

The most significant relationship test requires an analysis of the factors set forth set forth in the RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 193 and 6. *Pfizer, Inc. v. Employers Ins. of Wausau*, 712 A.2d 634, 638-639 (N.J. 1998). The court should first look to Section 193 and apply the law of the place that "the parties understood...to be the principal location of the insured risk...unless some other state has a more significant relationship under the principles stated in [*section*] 6 to the transaction and the parties." *Id.* at 638. In assessing the most significant relationship, the court must consider the following factors: (1) competing interests of relevant states; (2) national interests of commerce among several states; (3) interests of parties; (4) interest of underlying contract law, and; (5) interests of judicial administration. *Id.* at 639; *General Ceramics Inc. v. Firemen's Fund Ins. Co*., 66 F.3d 647, 656 (3d Cir. 1995). The significant relationship test focuses upon that state having the most meaningful connections with the transaction and the parties in issue. *Estate of Simmons*, 84 N.J. at 37.

Beginning with the presumption that the place of contracting applies, giving full effect to the reasonable expectation of the contracting parties, the analysis begins with the presumption that New Jersey law applies. The contract states on its face "THIS IS A NEW JERSEY POLICY," and was issued to a New Jersey insured, in New Jersey, based upon an application for insurance executed in New Jersey and submitted to American General by a New Jersey insurance producer. Therefore, the parties expected and desired

11

that New Jersey law would apply.  Indeed, in their Answer to the Complaint, Rubin and

the Rubin Group acknowledge that the Policy was issued in New Jersey under New

Jersey law and that New Jersey has a substantial interest in the outcome of this case.

Rubin Ans., doc. no. 38, 2d Sep. Def. ¶¶ 1-2.

Proceeding to the second phase of the analysis – consideration of a dominant and

significant relationship of another state dictating that the basic rule should yield – the

Court should conclude that New Jersey law applies.  New Jersey has a compelling

interest in the outcome of the case.  This Court has already observed in this case that it

appears "New Jersey has a local interest in this litigation since the insurance policies at

issue are New Jersey Policies that were specifically approved by the New Jersey

Department of Insurance for issuance in New Jersey."   3/25/09 Mem. Op., doc. no. 23.

This Court has also recently observed in another case that a life insurance policy issued

pursuant to New Jersey law bears on the local interest in deciding the matter as well as

New Jersey's public policy regarding the interpretation of life insurance policies.  *Allianz*

*Life Ins. Co. of N. Am. v. Bleich*, 2008 U.S. Dist. LEXIS 90720 at \*17.   In addition, as

more fully discussed in Point IV(A), New Jersey has an extremely significant public

interest in detecting, preventing and punishing incidents of insurance fraud within its

borders.   There is no question that the transaction at issue involved substantial fraud.  If,

as defendants argue, application of New York law would permit the fraud to go

unchecked while New Jersey law provides a substantial remedy, New Jersey has a

compelling interest in applying its own law.

### III.   THE POLICY IS VOID DUE TO LACK OF INSURABLE INTEREST DESPITE THE CONTESTABLE CLAUSE

The Trust lacked insurable interest because its beneficiaries had no pecuniary interest in Ellman's life.  On the contrary, their sole interest was in seeing Ellman die prematurely.  Therefore, the Policy is void.  The contestable clause has no bearing upon American General's right to rescind for lack of insurable interest.

New Jersey law prohibits any person from procuring or causing to be procured insurance upon the life of another unless the proceeds are payable to a person having an insurable interest in the insured when the contract is issued.  N.J.S.A. § 17B:24-1.1(b).  Unless the owner of a life insurance policy falls within the categories of persons enumerated in the statute, insurable interest arises only where continuance of the insured's life is to the beneficiary's benefit, such as where the insured has an obligation to provide care and assistance.  *Sovereign Camp of Woodman of the World v. Muth*, 109 A. 853 (N.J. Ch. 1920); N.J.S.A. 17B:24-1.1(a)(2) (insurable interest exists where there is expectation of pecuniary interest based upon continued life of the insured).[5]

A life insurance policy procured on the life of another by one who lacks insurable interest on the date the policy is issued is void as contrary to public policy.  This is a general axiom of insurance law.  *Wuliger v. Manufacturers Life Ins. Co.*, 567 F.3d 787, 798 (6th Cir. 2009).  "Otherwise the contract is a mere wager, by which the party taking the policy is directly interested in the early death of the assured.  Such policies have a tendency to create a desire for the event.  They are, therefore, independently of any statute on the subject, condemned, as being against public policy."  *Warnock v. Davis*, 104 U.S. 774, 779 (1881).  *See also*, *Dunlap v. Great-West Life Assurance Co.*, 1995 U.S.

---

[5] New York law is in accord.  N.Y. Ins. § 3205(a)(1)(B).

Dist. LEXIS 6490 (D.N.C., March 30, 1995);  *Chem v. New York Life Ins. Co.*, 1999 U.S.

App. LEXIS 3101 (9th Cir., February 25, 1999); *Lowe v. Rennert*, 869 S.W.2d 199 (Mo.

App. 1993);  *Wood v. New York Life Ins. Co.*, 255 Ga. 300 (1985); *Beard v. The Amer.

Agency Life Ins. Co.*, 314 Md. 235, 550 A.2d 677 (1988); *Bell v. National Life &

Accident Ins. Co.*, 41 Ala. App. 94 (1960); *Geisler v. Mut. Ben. Health & Acci. Ass'n*, 163

Kan. 518 (1947); *Fowler v. The New York Indem. Co.*, 26 N.Y. 422, 423-424 (1863) (lack

of insurable interest renders a policy a mere wager policy and therefore void as a matter

of statute as well as independently of the statute, at common law).

### A.    The Trust lacked any insurable interest in Ellman's life.

Insurance trusts are not among the categories of persons and entities with

insurable interest enumerated in the statute.  Therefore, unless the trust has a pecuniary

interest in the continued life of the insured, it has no insurable interest.  At least one court

has applied this analysis and found that the insurance trust at issue lacked insurable

interest, thereby rendering the policy purchased by the trust void.  *Chawla v.

Transamerica Occidental Life Ins. Co.*, 2005 U.S. Dist. LEXIS 3473 (E.D. Va. Feb. 3,

2005) (reasoning that insurance trust benefited more from insured's death that his

continued life and suffered no pecuniary loss as result of death) *aff'd in part and vacated

in part,* 440 F.3d 639 (4th Cir. 2006).

A trust's insurable interest is derived from the presence or absence of the

insurable interest on the part of the beneficiaries of the trust.  A trust and its trustee holds

bare legal title to the trust assets and must administer the assets for the benefit of the trust

beneficiaries who hold equitable title to the assets.  To properly assess insurable interest,

therefore, the court must consider whether the beneficiaries of the trust have an insurable

interest in the life of the insured.  *See Md. Nat'l Bank v. Tower,* 374 F.2d 381, 382-86 (4th

Cir. 1967) (holding that trustee of pension plan had insurable interest to extent benefits

were due to beneficiary of pension plan); *Gibbons' Estate,* 200 A. 55, 56-57 (Pa. 1938)

(holding that insurable interest existed where trust was established for the benefit of

creditors of the insured); *Butler v. State Mut. Life Assur. Co.,* 8 N.Y.S. 411, 412 (N.Y.

Sup. Ct. 1890) (trust lacked insurable interest because the beneficiary of the trust was not

related to the insured).  Even where the trust beneficiary would otherwise possess

insurable interest, it is lacking where the trust is set up with the intent to sell or transfer

the ownership interest in the policy to one lacking insurable interest.

   **B.     The contestable clause has no effect upon an insurer's right to void
           the policy for lack of insurable interest.**

   The majority of courts that have considered the effect of the contestable clause

upon insurable interest have held that expiration of the contestable period is not a bar to

the insurable interest defense.  *Kentucky Cent. Life Ins. Co v. McNabb*, 825 F. Supp. 269,

273 (D. Kan. 1993); *Beard v. Amer. Agency Life Ins. Co.*, 314 Md. 235, 550 A.2d 677

(1988); *Guaranteed Life Ins. Co. v. Wood*, 631 F. Supp. 15 (N.D. Ga. 1984);

*Commonwealth Life Ins. Co. v George*, 248 Ala. 649, 28 So. 2d 910 (1947); *Carter v.

Continental Life. Ins. Co.*, 115 F.2d 947 (D.C. Cir. 1940); *Henderson v. Life Ins. Co. of

Va.*, 176 S.C. 100, 179 S.E. 680 (1935); *Wharton v. Home Security Life Ins. Co.*, 206 N.C

254, 173 S.E. 338 (1934); *Home Life Ins. Co. v. Masterson*, 180 Ark. 170, 21 S.W.2d 414

(1929).  The reasoning most cited by these courts is summed up in one of its earliest

pronouncements:

          If the contract is against public policy, the court will not
          lend its aid to its enforcement. . . .  The parties to an illegal
          contract cannot by stipulating that it shall be incontestable,

15

> tie the hands of the court and compel it to enforce contracts
> which are illegal and void.  If this were allowed, then the
> law might be evaded in all cases and the aid of the court
> might be secured in aid of its infraction.

*Bromley's Admr. v. Washington Life Ins. Co.*, 122 Ky. 402, 92 S.W. 17 (1906).

New Jersey has not specifically addressed the issue.  However, the New Jersey Supreme Court would undoubtedly follow the majority rule based on the same reasoning articulated by other courts and cited above.  S*ee Hebela v. Healthcare Ins. Co.*, 370 N.J. Super. 260, 270 (App. Div. 2004) ("Our courts will decline to enforce an insurance policy, like any other contract, if its enforcement would be contrary to public policy."); *Vasquez v. Glassboro Service Ass'n, Inc.*, 83 N.J. 86, 99 (1980) ("In the past, courts in New Jersey have refused to enforce contracts that violate the public policy of the State…Contracts have been declared invalid because they violate statutes…"); *Saxon Construction & Management Corp. v. Masterclean of N.C., Inc.*, 273 N.J. Super. 231, 237 (App. Div. 1994) ("It is equally well recognized that our courts may refuse to enforce contracts that are unconscionable or violate public policy."); *Tulipano v. U.S. Life Ins. Co.,*57 N.J. Super. 269, 277 (App. Div. 1957) (noting that "an insurance policy violative of public policy or good morals cannot be enforced simply because the incontestability clause has run.").

The Complaint alleges that the beneficiaries of the Trust did not possess any insurable interest in the life of Ellman.  Assuming this allegation is true, the trust lacks insurable interest.

16

## IV.   THE CONTESTABLE CLAUSE DOES NOT BAR RESCISSION BECAUSE THE FRAUD WAS INTENTIONAL

Incontestability clauses are not intended to be used to "legitimize a clear fraud, *deliberately perpetrated*," upon an insurer. John Alan Appleman and Jean Appleman, INSURANCE LAW AND PRACTICE § 319 (emphasis added).  Accordingly, "a beneficiary who makes false representations cannot claim the benefit of an incontestable clause in the policy." 17 COUCH ON INSURANCE § 240:9 (3d ed. 2009).  Courts have long declined to extend the protection of the incontestability clause to culpable beneficiaries.  *See, e.g., Logan v. Texas Mut. Life Ins. Ass'n*, 121 Tex. 603 (Tex. 1932) (holding insurer's denial of a beneficiary's claim was proper due to the beneficiary's fraud in completing the application for the policy, despite the expiration of the contestable period).

In keeping with this axiom, and in recognition of New Jersey's very strong public policy aimed at elimination of insurance fraud, the New Jersey Supreme Court observed that a life insurer can rescind based upon legal fraud even after expiration of the contestable period.  *Ledley v. William Penn Life Insurance Co.*, 138 N.J. 627, 635 (1995).

### A.   New Jersey's Public Policy to Detect and Eradicate Insurance Fraud

In 1983, New Jersey's legislature enacted the Fraud Act "to confront aggressively the problem of insurance fraud" by, among other things, facilitating its detection and "requiring the restitution of fraudulently obtained insurance benefits" N.J.S.A. 17:33A-2. The Supreme Court of New Jersey has recognized that "[i]nsurance fraud is a problem of massive proportions that currently results in substantial and unnecessary costs to the general public in the form of increased rates.  In fact, approximately ten to fifteen percent of all insurance claims involve fraud."  *Merin v. Maglaki*, 126 N.J. 430, 436 (1992). Thus, the Court has held that "insurers should compensate victims to the extent 'that

compensation will not condone and encourage intentionally wrongful conduct[,]'" and if the Court was "to permit a dishonest insured to recover, insurers would include the cost of that risk in premiums charged to honest insureds." *Paul Revere v. Haas*, 137 N.J. at 208-209.

New Jersey's strong public policy abhors the result that defendant's urge here: application of the contestable clause as a shield against intentional fraud. To apply the contestable clause as defendants urge, would be to promote the very sort of fraudulent abuses inimical to the very core of New Jersey's public policy.

> **B.**     **New Jersey law and public policy supports rescission of the Policy based on intentional fraud despite the contestability clause.**

In *Ledley v. William Penn Life Insurance Co.*, the Supreme Court of New Jersey stated:

> A court may order rescission of a life insurance policy for equitable fraud even after the death of the insured. . . . Within the statutory two-year period of contestability, *N.J.S.A.* 17B:25-4, an insurer may contest a policy for equitable fraud, whether the insured is alive or dead. . . . *Even after the expiration of the contestability period, an insurer may deny a claim if the insured committed fraud in the policy application*. *Paul Revere Life Ins. Co. v. Haas*, 137 N.J. 190 (1994).

138 N.J. 627, 635 (1995) (emphasis added). *See also Tulipano,*57 N.J. Super. at 277 ("an insurance policy violative of public policy or good morals cannot be enforced simply because the incontestability clause has run.")

Defendants might mistakenly argue that the *Ledley* Court's reliance on *Paul Revere v. Haas*, *supra,* renders the statement inapposite. In *Haas,* the insurer had a choice of contestable clauses under N.J.S.A. 17B:26-5, including one that would have

18

excluded fraudulent misstatements from operation of the contestable clause.  Such

provision would have allowed the insurer to void the policy for a fraudulent

misstatement.  *Haas*, 137 N.J. at 198-199.  However, the insurer chose the provision that

extended the contestable period based on periods of disability of the insured.  The Court

concluded that because the insurer could haven chosen the option that would have

specifically excluded fraudulent misstatements, and the insurer chose not to, it thereafter

could not seek to rescind the policy on the grounds of fraudulent misstatements in the

application.  *Id.*

      However, while the statute affords disability insurers the option to include an

"except for fraud" clause in policies, life insurers do not have that option.  Therefore, the

Supreme Court's acknowledgement in *Ledley* – a case concerning a life insurance policy

– that an insurer can rescind based on fraud in the policy application after the contestable

period may only be interpreted as establishing an exception to incontestability in the case

of life insurance.  Any other interpretation would be illogical and would condone an end-

run around the public policy observed by both the legislature and the Court.

      Further support for this interpretation is found in *Fioretti  v. Massachusetts

General Life Insurance Company*, 53 F. 3d 1228 (11th Cir. 1995), in which the court was

confronted with an insurer who sought to rescind a life insurance policy based on

misrepresentations on the final policy application and the Statement of Good Health

submitted by the insured.  After ruling that the of New Jersey law governed, the Eleventh

Circuit surveyed the law in New Jersey and concluded:

> incontestability clauses are generally construed as statutes
> of limitations that upon expiration, preclude all coverage
> defense, including fraud....  This principle found some

> support in early New Jersey cases....  However, in a recent
> decision involving the incontestability clause of a life
> insurance policy governed by 17B:25-4, the New Jersey
> Supreme Court explicitly stated that this statue does not
> prevent a life insurer from denying coverage when its
> insured has committed fraud in securing coverage.

*Fioretti*, 53 F.3d at 1236-1237 *(citing Ledley*, 138 N.J. at 651).

In light of New Jersey's strong public policy of combating insurance fraud in all forms, and given the egregiousness of the fraud in this case, defendants may not invoke the contestable clause to elude responsibility for their conduct.

### C.   Defendants made and incorporated numerous intentional misrepresentations in the application for the policy.

Defendants repeatedly misrepresented Ellman's net worth and annual income, the reason for the Policy, and the existence of other in force and pending life insurance policies.  The misrepresentations were first uttered in the initial "informal" application. They were repeated and compounded in Ellman's purported balance sheet. They were repeated to LabOne during the inspection interview by individuals purporting to be Ellman and Ellman's accountant.  LabOne memorialized the oral misrepresentations in the inspection report, including the representations of net worth ranging from more than $5,000,000 to more than $11,000,000 and annual income of $643,000 to $1,500,000.

In the final "formal" application, defendants again ratified these fraudulent statements.  With respect to income and net worth, defendants wrote "per inspection," thereby specifically incorporating the fraud uttered to LabOne and recorded in the inspection report.  As to the reason for insurance, defendants repeated their "estate planning" lie.  And finally, defendants repeated the lies as to other pending or existing in

force life insurance policies and applications by failing to disclose several multimillion dollar policies issued by New York Life and insuring Ellman.

Each of these misrepresentations, including the "per inspection" lie, is a basis to rescind the Policy.  An insurer may rescind based upon material misrepresentations contained in the application attached to the Policy where they are incorporated from an unattached document and serve as a factual predicate of the application inducing issuance of the policy.  *ClearOne Communications, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 494 F.3d 1238, 1245 (10th Cir. Utah 2007).  In fact, "where fraud is clearly shown, most courts have permitted avoidance of the policy, even where the application itself was not attached to the policy."  Eric Mills Holmes, HOLMES' APPLEMAN ON INSURANCE 2d § 15.1; *see also Southland Life Ins. Co. v. Donati*, 201 Va. 855 (Va. 1960) (holding though life policy acceptance acknowledgement misrepresenting continuing good health was not attached to the policy insurer not precluded from relying on it to void the policy); *Liberty Nat'l Life Ins. Co. v. Hale*, 285 Ala. 198 (Ala. 1969) ("A part of an application for insurance, even though not attached to a policy and made a part thereof, is admissible in evidence in support of a plea of misrepresentation made with intent to deceive").

There is nothing in N.J.S.A. § 17B:24-3(a) or the cases applying it that suggests otherwise.  The statute merely requires that the application "be attached to or endorsed upon the policy . . .  when issued." *Id.*[6]  There is no allegation in the Complaint that American General failed to attach the application to the Policy.  Nor is there any

---

[6] Defendants improperly rely on  *Daly v. Paul Revere Variable Annuity Ins. Co.*, where it was undisputed that the application was attached to the policy and the case turned on whether the application, originally made by insured for a disability policy, could properly be considered as part of his application for a life policy.  199 N.J. Super. 584 (Law Div. 1984).  Defendants also cite to *Aliaga v. Cont'l Assur. Co.*, which involved a group policy to which § 17B:24-3(a) was not even applicable. 2006 U.S. Dist. LEXIS 82447 (D.N.J. Nov. 13, 2006).  Incidentally, both cases held for the insurer and permitted rescission of the policies on the basis of material misrepresentations.

argument to that effect by defendants.  In fact, the application was attached to the Policy.

Defendants' representation of Ellman's net worth and annual income as "per inspection"

– plainly stated – was a lie.

Defendants' misrepresentation of the reason for the insurance as "estate planning"

was also a lie, and serves as an additional and independent basis to rescind.  In the

context of life insurance – especially life insurance on the lives of seniors – "estate

planning" clearly refers to estate tax planning.[7]  Defendants' reliance on the broadest

conceivable interpretation of "estate planning" should be rejected simply because it is, at

its best, a "weak and dubious justification" for an obviously intentional

misrepresentation.  *Cf. Firmani v. Firmani*, 332 N.J. Super 118, 124 (App. Div. 2000)

(rejecting "estate planning" explanation for a fraudulent transfer to avoid obligation to

ex-wife as insufficient to rebut the inference of actual fraudulent intent).   The Complaint

alleges that defendants intended "estate planning" in the manner described above and the

representation was made with the intent to defraud.  Taking these allegations as true, the

"estate planning" lie is a basis upon which rescission can and should be granted.

Finally, there is no dispute that the failure to disclose other in force and pending

life insurance policies and applications was a knowing omission intended to deceive

American General.  At the very least, the allegations establish a plausible set of facts

upon which relief can, and should, be granted.

### V.  THE CONTESTABLE CLAUSE DOES NOT PRECLUDE RESCISSION IN THE CASE OF AN "IMPOSTER."

American General may also be entitled to rescission based upon fraud in the

execution of the Policy, also known as the "imposter defense."  Fraud in the execution is

---

[7] *See* Note 4, *supra.*.and http://en.wikipedia.org/wiki/Estate_planning (July 24, 2009).

877430.3

not subject to the contestable clause.  In *Strawbridge v. New York Life Insurance Company*, the District Court of New Jersey found that "although New Jersey cases have never dealt with the issue of whether the incontestability clause bars proof of imposture, it is a well established principle of insurance law that the clause does not bar such proof." 504 F. Supp. 824, 830 (D.N.J. 1980).  In *Fioretti*, the court held that "since New Jersey law permits an insurer to rescind even when its insured has committed an innocent representation, it seems obvious that New Jersey law would also recognize the 'imposter defense' as the fraud in such a case is far more egregious."  *Fioretti*, 53 F. 3d at 1237.

In this case, Larry Ellman advised American General that he is not an accountant and had never served as such for Ellman.  Larry also stated that he had no knowledge of any insurance on Ellman's life until after his death.  Complaint ¶ 65.  If this is true, Larry could not have been the person who purported to be Ellman's only son and who spoke with Lab One on the telephone and verified Ellman's income and net worth.  The inference that Larry may have been impersonated by an imposter, also suggests that Ellman may also have been impersonated both with respect to execution of the application containing the misrepresentations and his own telephone interview with Lab One in which his income and net worth were reported.  Thus, the Policy may have been procured, in whole or in part, based upon the representations of an imposter.

## VI.   AMERICAN GENERAL HAS PROPERLY PLEADED A CAUSE OF ACTION BASED UPON RICO

### A.   RICO Claims are not to be dismissed at the pleading stage based upon lack of specificity.

With limited exceptions, the sufficiency of RICO pleadings is governed by the general notice pleading requirements of *Fed. R. Civ. P.* 8.  The particularity requirement

877430.3

of *Fed. R. Civ. P.* 9(b) applies only to those aspects of RICO allegations sounding in legal or equitable fraud.  All other elements of RICO need not be pleaded with particularity. *Seville Industrial Machinery v. Southmost Machinery Corp.*, 742 F.2d 786 (3d Cir. 1984); *McLendon v. Continental Group, Inc.*, 602 F. Supp. 1492 (D.N.J. 1985).

Moreover, to the extent that the particularity requirement does apply, it is to be relaxed where the plaintiff lacks access to all facts necessary to detail its claim.  *Corely v. Rosewood Care Center, Inc.*, 142 F.3d 1041, 1051 (7th Cir 1998) (holding that particularity requirement must be relaxed where plaintiff lacked access to discovery that would identify individuals to whom misrepresentations were allegedly directed).  *See also, Volmar Distribs., Inc. v. New York Post Co.*, 825 F. Supp. 1153 (S.D.N.Y. 1993). Reasonable discovery should be permitted to give plaintiff the opportunity to ascertain the necessary specificity.  *Swistock v. Jones*, 884 F.2d 755 (3d Cir 1989) (observing reluctance to dismiss RICO claims before plaintiff has had an opportunity to flesh out allegations through discovery); *New England Data Services, Inc. v. Becher*, 829 F.2d 286 (1st Cir. 1987) (same); *Freeport Transit, Inc. v. McNulty*, 239 F. Supp. 2d 102 (D. Me. 2003) (same).

     **B.**     **The RICO Claims Satisfy and Far Exceed the Minimum Pleading Requirements of the Federal Rules of Civil Procedure.**

In order to establish entitlement to relief for violation of 18 U.S.C § 1962(c), American General must ultimately prove (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S. Ct. 3275, 3285 (1985).

1.      American General Has Alleged a RICO 'Enterprise' including Chaim
        Rubin, The Rubin Group, Irving Ellman, the Trust, and John Does.

The "enterprise" element is to be broadly construed in keeping with the breadth of

its statutory definition.  *Ogden v. Microsoft Corp.*, 486 F.3d 541, 548 (9th Cir. 2007);

*United States v. Cianci*, 378 F.3d 71, 78 (1st Cir. 2004).  There is no particularity of

pleading requirement with respect to the 'enterprise' element.  *Seville Indus. Mach.*

*Corp.*, 742 F.2d at 789-790.  Nevertheless, the Complaint does specifically describe an

'association in fact enterprise' in which each of the defendants has and does participate.

A RICO 'enterprise' "includes any individual, partnership, corporation,

association, or other legal entity, and any union or group of individuals associated in fact

although not a legal entity."  18 U.S.C. 1961(4).  An 'association in fact enterprise'

consists of (1) a group of associated individuals that form an ongoing formal or informal

organization (2) which functions as a continuing unit and (3) which is separate and

distinct from the underlying predicate criminal activity.  *United States v. Turkette*, 452

U.S. 576, 583 (1981).

        a.      *The Organization Comprising the Enterprise.*

The requirement of structure or organization is <u>not</u> a pleading burden under Rule

8.  *United States v. Riccobene*, 709 F.2d 214 (3d Cir 1983) *overturned on other grounds*,

*Griffin v. United States*, 502 U.S. 46 (U.S. 1991) (relating to standard relied on for

conspiracy conviction).  Therefore, American General's RICO claims should not be

dismissed on these grounds in any event.

An association-in-fact enterprise is required to have a structure, but it does not

need to have an ascertainable structure beyond that inherent in the pattern of racketeering

activity in which it engaged.  *Boyle v. U.S.*, 129 S. Ct. 2237 (2009).  The jury may infer

25

the existence of an association-in-fact enterprise from proof of a pattern of racketeering activity.  *Id*.  Nor does the organization need not have a hierarchical structure, a chain of command, or other business-like attributes.  *Id*.  Decisions may be made on an ad hoc basis and by any number of methods.  *Id.*  Members of the group need not have fixed roles; different members may perform different roles at different times.  *Id.*

The organization of the RICO enterprise in this case, as described in the Complaint, includes, but is not necessarily limited to, an insurance broker, a premium financier, a trust and its trustee, a third-party financial reference, an insurance applicant, and trust beneficiaries who lack any insurable interest in the life of the insured.  Each individual filled a roll and was complicit in the scheme to defraud American General into issuing the $10,000,000 life insurance policy insuring the life of Ellman.  American General has been able to specifically identify some of the individuals who filled the various rolls in the organization in the Complaint, but lacks the access to information necessary to identify others.

### b.     Continuity

"Continuity" refers to conduct demonstrating the existence or threat of continuing racketeering activity on the part of the enterprise.  *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 240, 109 S. Ct. 2893, 2901 (1989).  It does not require that each member of the enterprise participate in it from beginning to end provided each member participated at one time or another.  *U.S. v. Parise*, 159 F.3d 790 (3d Cir.1998).

Closed-ended continuity may be established by demonstrating one or more related predicate acts over a substantial period of time.  *H.J. Inc.*, 492 U.S. at 241-242, 109 S. Ct. at 2902; *Tabas v. Tabas*, 47 F.3d 1280, 1292-1293 (3d Cir.) (*en banc*) *cert. denied*, 115 S.

Ct. 2269 (1995).  Open-ended continuity may be established through either (1) proof of criminal conduct that by its nature projects into the future with a threat of repetition, or (2) proof that the predicate acts are the enterprise's regular way of doing business.  *Id.*; *Tabas*, 47 F.3d at 1295-1296.  *See also Barticheck v. Fidelity Union Bank/First National State*, 832 F.2d 36, 39 (3d Cir. 1987) (even a single unlawful scheme can satisfy the required continuity, the court may infer from the nature of the scheme that defendants engaged in considerably more than two acts).  Proof that the defendant has participated in multiple distinct but related racketeering schemes is also highly indicative of continuity. *H.J. Inc.* 492 U.S. at 241, 109 S. Ct. at 2901.  Viewing allegations of the Complaint most favorably to American General, the allegations demonstrate continuity based on any or all of the conceptual formulas for continuity discussed and endorsed by the Supreme Court and the Third Circuit: closed-ended continuity, open-ended continuity, and/or continuity based upon multiple distinct but related schemes perpetrated by the enterprise.

The racketeering activity alleged in the Complaint ranges at least as far back in time as to include fraudulent misstatements and omissions directed to New York Life Insurance and Annuity Corporation weeks or months before June 27, 2005, the date on which New York Life issued the first of several policies insuring the life of Ellman and made the subject of litigation commenced by New York Life in the Supreme Court of New York entitled *New York Life Insurance and Annuity Corporation v. Harry Stimler, as Trustee of the Ellman Holding Irrevocable Life Ins. Trust, et al.*, Index No.  07 101666.  Compl. ¶ 7.  The Complaint further alleges conduct of the enterprise projecting forward through May 2008 when the Trust made claim for the death benefit following Ellman's demise.  The Complaint also specifically alleges fraudulent misrepresentations

27

constituting four separate and distinct, but related fraudulent schemes directed to American General, alone, resulting in the issuance of four separate multimillion dollar life insurance policies insuring four separate insureds; none of which American General would have agreed to issue but for the fraudulent misrepresentations.

The allegations demonstrate open-ended continuity because they illustrate that fraud and deceit of life insurers is the enterprise's regular way of doing business.  The fraudulent misrepresentations in support of the life insurance applications came both by way of writing and orally, including in letters, questionnaires, financial statements, telephone calls and interviews.  As to the Ellman Policy, the allegations demonstrate that the enterprise made and transmitted no less than six fraudulent statements to American General from November 9, 2005 (the date of the first fraudulent application) through delivery of the policy on March 16, 2006 and claim for the death benefit in May 2008. *Id*. ¶¶ 26-83.  As to the Goldklang policy, the enterprise made and transmitted no less than ten fraudulent misrepresentations to American General between February 8, 2006 (the date of the first fraudulent application) through delivery of the policy on or after July 12, 2006.  *Id*. ¶¶ 84-121.  As to the Rosenthal policy, the enterprise made and transmitted at least four fraudulent misrepresentations between April 22, 2006 (the date of the first fraudulent application) through delivery of the policy after July 31, 2006.  *Id*. ¶¶ 122-147. As to the Kremer policy, the enterprise is guilty of no less than six fraudulent misrepresentations between March 22, 2006 (the date of the first fraudulent application) through delivery of the policy after July 31, 2006.  *Id*. ¶¶ 148-175.  In addition, the enterprise made misrepresentations and omissions in connection with three policies issued by New York Life.  *Id*. ¶ 7.

Such repetition of predicate offenses is precisely the sort of conduct that establishes an enterprise's "regular way of doing business."  Thus, in *Tabas*, the Third Circuit concluded that a continuing series of transactions to divert a partnership's income for the personal use of one of the partners and his family to the detriment of another partner's estate and heirs constituted a regular way of doing business and met the standard for open-ended continuity.  *Tabas*, 47 F.3d at 1295-1296.

The allegations demonstrate closed-ended continuity because the predicate acts of mail and wire fraud, as well as the underlying fraudulent misrepresentations and omissions,[8] occurred over a period of time exceeding twelve months.  *Tabas*, 47 F.3d at 1293 (observing that closed-ended continuity typically requires conduct lasting more than twelve months).  The earliest policy insuring Ellman referenced by New York Life in its complaint against Henry Stimler, *et al.*, was issued on June 27, 2005.  Logic dictates, and discovery is likely to show, that any misrepresentation or omission perpetrated by the enterprise occurred on or – more likely – before that date.  The enterprise continued to apply for and fraudulently obtain life insurance policies insuring Ellman through at least July 31, 2006, when the enterprise submitted two separate writings to American General in which it made material misrepresentations about the annual income and net worth of Rosenthal and Kremer with respect to pending insurance applications.

Finally, the allegations demonstrate that the enterprise has perpetrated multiple, distinct, but related, racketeering schemes.  .  "[P]roof that a RICO defendant has been involved in multiple criminal schemes would certainly be highly relevant to the inquiry

---

[8] "The continuity test requires us to look beyond the mailings and examine the underlying scheme or artifice.  Although the mailing is the actual criminal act, the instances of deceit constituting the underlying fraudulent scheme are more relevant to the continuity analysis."  *Tabas v. Tabas*, 47 F.3d 1280, 1294 (3d Cir. 1995) (citing *Kehr Packages v. Fidelcor, Inc.*, 926 F.2d 1406, 1414 (3d Cir. 1991)).

of the defendant's racketeering activity." *H.J. Inc.* 492 U.S. at 241, 109 S. Ct. at 2901.

The enterprise was successful in fraudulently obtaining several high face amount life

insurance policies from New York Life.  The enterprise also successfully defrauded

American General into issuing at least four multimillion dollar life insurance policies

insuring four separate individuals.  The enterprise's repeated success in obtaining the

numerous high value life insurance policies insuring so many different individuals is, by

itself, enough to satisfy the minimal pleading requirements of Rule 8.

     *c.*     *Separateness*

"[T]o establish liability under [RICO] one must allege and prove the existence of

two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same

person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533

U.S. 158, 161, 121 S. Ct. 2087, 2090 (2001).  The 'person' that is subject to liability

under RICO cannot be the same entity as the 'enterprise.'  There must be a 'person'

employed by or associated with an 'enterprise.'  *Jaguar Cars. Inc. v. Royal Oaks Motor,*

*Co.*, 46 F.3d 258, 268 (3d Cir. 1995).  "[A]lleging conduct by officers or employees who

operate or manage a corporate enterprise satisfies this requirement."  *Id.*  "The corporate

owner/employee, a natural person, is distinct from the corporation itself, a legally

different entity with different rights and responsibilities due to its different legal status.

And we can find nothing in the statute that requires more 'separateness' than that."

*Cedric Kushner Promotions, Ltd.*, 533 U.S. at 163, 121 S. Ct. at 2091.  Thus, "[a]

corporate employee who conducts the corporation's affairs through an unlawful RICO

'pattern … of activity,' [] uses that corporation as a 'vehicle' whether he is, or is not, its

sole owner."  *Id.* at 165, 121 S. Ct. at 2092.

American General has pleaded, in the alternative, both forms of 'enterprise.' That is, the complaint asserts that the RICO enterprise here is comprised of The Rubin Group, Inc.; a legal entity.  Compl. ¶¶ 183, 194.  Alternatively, the Complaint asserts that the enterprise consist of The Rubin Group, Inc., Chaim Rubin, the Trust, Levitin, Kugielsky, and/or one or more John Does; a union or group of individuals associated in fact although not a legal entity.  Compl. ¶¶ 184, 195.

Under the first alternative pleading of enterprise, each of the individual defendants, including John Does, would be liable for the prohibited racketeering activity that will be ultimately proven, but The Rubin Group itself might not be.  Under the second alternative, each of the individual defendants, including The Rubin Group, would be liable for the prohibited racketeering activity that will be ultimately proven.  *Jaguar Cars. Inc.*, 46 F.3d at 268 (3d Cir. 1995).

2. <u>American General has properly alleged a pattern consisting of misrepresentations to American General and other insurers.</u>

"[T]o prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J., Inc.*, 492 U.S. at 239, 109 S. Ct. at 2900; *Sedima, S.P.R.L*, 105 S. Ct. at 3278.

a. *The Racketeering Predicates*

The Complaint includes multiple detailed allegations of mail, wire, and financial institutions fraud in violation of 18 U.S.C. §§ 1341, 1343, and 1344, respectively. Compl. ¶¶ 185, 196.  Specifically, each defendant, acting through or in furtherance of the enterprise, has committed mail, wire and/or financial institutions fraud by transmitting or causing to be transmitted through the mail or by electronic means numerous fraudulent

31

misrepresentations.  With respect to the Ellman transaction:  November 9, 2005, Part A Life Insurance Application. Compl., ¶26; Lab One telephone interview with an individual claiming to be Ellman *Id*. at ¶¶ 35-36; November 29, 2005, letter purportedly from Ellman to Rubin dated October 28, 2005, in which Ellman purportedly set forth his balance sheet.  *Id*. at ¶ 37; March 13, 2006, Lab One telephone interview with an individual claiming to be Larry Ellman.  *Id*. at ¶39; On March 13, 2006, Part A Life Insurance Application.  *Id*. at ¶¶ 40-45; May 2008 claim of entitlement to payment of benefits.  *Id*. at ¶¶ 57-58, 77-81.

Defendants also committed numerous instances of mail and wire fraud with respect to: the Goldklang transaction, *See Id*. at ¶¶ 87-96, 98-101, 103-105; the Rosenthal transaction, *See Id*. at ¶¶ 122-124, 126-135, and; the Kremer transaction, *See Id*. at ¶¶ 148-150, 152-163.

These allegations more than satisfy the general pleading requirements of Rule 8. Mail or wire fraud need not be plead with specificity:  *Abels v. Farmers Commodities Corp.,* 259 F.3d 910, 918 (8th Cir. 2001) (holding plaintiff is not required to plead Civil RICO predicated on mail fraud with particularity); *Defazio v. Wallis*, 400 F. Supp. 2d 197, 204 (E.D.N.Y. 2007) (mail or wire fraud predicate need not contain fraudulent statement as long as complaint pleads mail or wire transmission was used in furtherance of alleged scheme to defraud); *Wood, Inc. v. Village of Patchogue*, 311 F. Supp. 2d 344, 359 (E.D.N.Y. 2004) (same).

b.    *Continuity*

American General respectfully refers the Court to Point (VI)(B)(1)(b), above, discussing continuity in the context of the 'enterprise' element.  *See United States v.*

*Perholtz*, 842 F.2d 343 (D.D.C. 1988) ("Organization or structure can be inferred from the pattern of racketeering activity"); *Pasacic v. Ameriquest Mortgage Co.*, 2005 WL 1200373 (N.D. Ohio May 19, 2005) (*citing Begala v. PNC Bank, Ohio, N.A.,* 214 F.3d 776, 781-782 (6th Cir. 2000)) ("Plaintiff may allege the separate elements of 'enterprise' and a 'pattern of racketeering activity' through the same facts").

      *c.*     *Relatedness*

"Predicate acts are related if they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *H.J., Inc.,* 492 U.S. at 240, 109 S. Ct. at 2901; *Tabas* 47 F.3d at 1292.  The predicate acts enumerated above and in the Complaint were all perpetrated for the purpose of causing American General and other insurers to issue high face amount policies insuring individuals who would not otherwise qualify for the insurance, and they all achieved the same results.  The victims of all of the predicates are life insurance companies, their investors and the insurance consuming public.  Finally, the predicate acts were all committed by the same method; namely false representations and omissions regarding income and net worth of insurance applicants backed by further fraudulent misrepresentations by persons purporting to be the insured/applicant or his/her accountant, all of which was transmitted to the insurer through the mail or electronically.

Courts in this Circuit have repeatedly found similar such predicate acts to establish the requisite RICO pattern.  *See, e.g.*, *Blue Cross of Western Penn. v. Nardone*, 680 F. Supp. 195, 199 (W.D. Pa. 1988) (allegations that a pharmacy operator repeatedly submitted fraudulent claims for prescriptions over a period of 13 months sufficient to

877430.3

satisfy the pattern); *State Farm Mut. Auto Ins. Co. v. Rosenfeld*, 683 F. Supp. 106, 110

(E.D. Pa. 1988) (four acts of mail fraud by an attorney against three insurers sufficient to

meet the pattern).  *See also, Swistock v. Jones*, 884 F.2d 755 (3d Cir 1989) (allegations of

mail and wire fraud as part of scheme regarding lease of coal producing properties

withstands motion to dismiss).  *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406 (3d

Cir. 1991) (numerous acts of mail fraud related to common purpose of causing default on

loans satisfied relatedness requirement).

### VII.   THE CONTESTABLE CLAUSE IS NOT A BAR TO STATUTORY FRAUD ACT AND RICO CLAIMS

Invocation of the contestable clause as a shield against illegal fraud and

racketeering activity should be rejected for the same reasons discussed above in Point IV.

In any event, the contestable clause does not insulate defendants from civil and criminal

liability under the Fraud Act or RICO.  The Fraud Act and RICO claims represent a

quasi-criminal prosecution by a "private attorney general" aimed at extirpating criminal

conduct infiltrating the life insurance industry in accordance with the intent of the civil

remedy scheme enacted by the New Jersey Legislature and Congress.

The contestable clause is subject to various legislative and judicial exceptions in

circumstances "such as purchasing a policy as a part of an ongoing criminal conspiracy."

Eric Mills Holmes, HOLMES' APPLEMAN ON INSURANCE 2d § 177.02 (emphasis added).

*C.f. Ferguson v. Union Mutual Stock Life Ins. Co.*, 673 F.2d 253 (8th Cir. 1982) (where

insured withdrew a disability claim and re-filed after the expiration of the contestable

period was not "an ordinary circumstance" making the incontestability clause unavailable

as a defense).  An incontestability clause in a life insurance policy does not preclude the

state from prosecuting a criminal action based upon fraud in connection with issuance of

the policy.  *People v. Alexander*, 183 A.D. 868, 887 (N.Y. App. Div. 1918), *affirmed,* 225 N.Y. 717 (N.Y. 1919) ("public policy...requires that such provisions of a policy be limited to legitimate policies actually taken out by the insured for the protection of his named beneficiary, and should not be deemed intended to apply for the benefit of others, as in the case at bar").  Although this action is not being prosecuted by the state in a criminal forum, the proceeding is quasi-criminal in nature as it seeks to impose liability under statutes specifically intended to ferret out fraud and racketeering activity for the good of society at large.  It is being prosecuted by a "private attorney general" according to the statutes' punitive civil enforcement scheme and the expressed intent of the state and federal legislatures.

RICO was enacted for the expressed purpose of eradicating the influence of organized crime and other racketeering activity from our society.  *Sedima*, 473 U.S. 479, 105 S. Ct. 3275.  Congress included a private civil remedy and treble damages in order to enhance the effectiveness of the statute by "bring[ing] to bear the pressure of 'private attorneys general' on a serious national problem for which public prosecutorial resources are deemed inadequate."  *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 151, 107 S. Ct. 2759, 2764 (1987); *Sedima*, 473 U.S. at 487, 105 S. Ct at 3280.  The Fraud Act was enacted for similar reasons.  *See* Point IV(A)*, supra.*

By virtue of the Fraud Act and RICO claims, American General is serving as such a "private attorney general" to supplement the resources of the state and federal governments in identifying and prosecuting illegal racketeering activity based upon insurance fraud.  The conduct at issue, which defendants seek to shield with the

35

contestable clause, is criminal in nature.  It is, therefore, among those unusual

circumstances excepted from application of the contestable clause.

### VIII.   THE MCCARRAN-FERGUSON ACT DOES NOT REVERSE PREEMPT AMERICAN GENERAL'S RICO CLAIM

RICO is not inconsistent with existing state law applicable to defendants' fraud

and racketeering activity.  On the contrary, RICO aids and enhances state law intended to

detect and punish insurance fraud within the State consistent with the New Jersey's

public policy pertaining to such fraud.  Nor does defendants' fraud and racketeering

activity constitute the 'business of insurance' under the McCarran-Ferguson Act.  For

both of these reasons, reverse preemption does not apply.

The McCarran-Ferguson Act provides, in relevant part:  "No Act of Congress

shall be construed to invalidate, impair, or supersede any law enacted by any State for the

purpose of regulating the business of insurance...unless such Act specifically relates to

the business of insurance...."  15 U.S.C. § 1012(b).  "The []Act thus precludes application

of a federal statute in face of state law 'enacted...for the purpose of regulating the

business of insurance,' if the federal measure does not 'specifically relate to the business

of insurance,' and would 'invalidate, impair, or supersede' the State's law."  *Humana,*

*Inc. v. Forsyth*, 525 U.S. 299, 307; 199 S .Ct. 710, 761 (1999).  Thus, reverse preemption

depends upon application of a four-part test, and applies only where:  (1) the conduct

targeted by the federal law constitutes the business of insurance; (2) there is a state law

applicable to the conduct enacted for purposes of regulating the business of insurance; (3)

the federal law does not specifically relate to the business of insurance; and (4) the

federal law would invalidate, impair, or supersede the state law.  *Wexco, Inc. v. IMC,*

*Inc.*, 820 F. Supp. 194, 198 (M.D. Pa. 1993).

The RICO claims here are directed at defendants' intentionally false representations that defrauded American General and others into issuing high-dollar policies.  There is state law applicable to such conduct, though it is intended not to regulate so much as to eradicate such conduct, namely the Fraud Act and state RICO. N.J.S.A. 2C:41-1, *et seq*.   However, applying federal RICO will not invalid, impair or supersede such laws, and it is therefore not reverse preempted.

"When federal law is applied in aid or enhancement of state regulation, and does not frustrate any declared state policy or disturb the State's administrative regime, the McCarran-Ferguson Act does not bar the federal action."  *Humana*, 525 U.S. at 303; 199 S .Ct. 710at 759.  The nonexclusive list of factors to be considered by the court to assess conflict or interference with state policy or administrative regime includes:  "(1) availability of private right of action under state statute; (2) the availability of a common law right of action; (3) the possibility that other state laws provide grounds for suit; (4) the availability of punitive damages; (5) the fact that the damages available could exceed the amount recoverable under RICO; … (6) the absence of a position by the State as to any interest in any state policy or their administrative regime; (7) the fact that insurers have relied on RICO to eradicate insurance fraud."  *Weiss v. First Unum Life Ins. Co.*, 482 F.3d 254 261 (3d Cir 2007).

Application of the *Weiss* factors plainly demonstrates how RICO enhances, and does not interfere with, the Fraud Act.  The Fraud Act provides a private cause of action to defrauded insurers.  N.J.S.A. § 17:33A-7.  Like RICO, the Fraud Act makes treble damages, costs, and fees available to aggrieved insurers.  *Id*.  State law also affords a common law fraud cause of action and the potential for both compensatory and punitive

37

damages arising from the same conduct targeted by RICO.  *See Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 N.J. 37, 53 (1984) (holding that a party may be awarded punitive damages for common law fraud even if he does not recover compensatory damages); *Gennari v. Weichert Co. Realtors*, 148 N.J. 582 (N.J. 1997) (same).

Reverse preemption is also not available because defendants' fraudulent conduct does not reasonably fall within the definition of the "business of insurance."  It is the business of fraud and deceit.  Whether conduct constitutes the "business of insurance" depends on three factors:  (1) whether the practice has the effect of transferring a policyholder's risk; (2) whether the practice is an integral part of the policy relationship between the insurer and the insured; (3) whether the practice is limited to entities within the insurance industry.  *Ky. Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 339, 123 S. Ct. 1471 (2003).

In the case of a STOLI transaction, the fraudulent procurement of the life policy does not transfer a policyholder's risk at all.  The risk sought to be transferred under a life insurance policy is the risk of the insured's untimely death.  In this case, the defendant policyholder did not seek to insure *against* Ellman's untimely demise, but actually bargained *for* it; the more untimely, the better.  This turns the risk transference aspect of a legitimate life insurance transaction directly on its proverbial head.  Fraud in the procurement of life insurance is not an integral part of the policy relationship.  On the contrary such fraud is anathema to the relationship.  *See, e.g., Sears Mortgage Corp. v. Rose*, 134 N.J. 326, 347 (1993)("The duty of good faith and fair dealing pervades insurance contracts…the prospective insured must not misrepresent or conceal

information concerning risks.") And finally, fraud and racketeering activity is certainly

not limited to the insurance industry.

Accordingly, defendants' conduct to which the RICO claims are directed do not

constitute the business of insurance.  Moreover, RICO aides and enhances the objectives

and effects of applicable state law.  Therefore, reverse preemption does not apply.

### IX.   EVEN WITHOUT RICO, THE COURT SHOULD NOT DISMISS BUT ORDER LIMITED DISCOVERY TO ASSESS JURISDICTION

Even if the Court determines that American General's RICO claims should be

dismissed, the Court should not dismiss based on lack of subject matter jurisdiction, but

require that the trustee disclose the identities and citizenship of the beneficiaries of the

Trust or permit limited discovery to ascertain the citizenship of the trust.  While

American General has the burden to demonstrate jurisdiction, plaintiffs are generally

allowed limited discovery regarding jurisdictional issues, especially where, as here, the

facts are exclusively within the control of the defendants.

"Where issues arise as to jurisdiction or venue, discovery is available to ascertain

the facts, bearing on such issues."  *Oppenheimer Fund v. Sanders*, 437 U.S. 340, 351 n

13, 98 S. Ct. 2390 (1978).  Such procedure is preferred so that district courts can make

informed evaluations of their jurisdiction.  *Filus v. LOT Polich Airlines*, 907 F.2d 1328,

1333 (2d Cir. 1990).  In response to a challenge as to subject matter jurisdiction, "a

plaintiff may be allowed limited discovery with respect to the jurisdictional issue" *Id*. at

1332.  This rule is particularly appropriate where the facts necessary to buttress plaintiff's

assertion of jurisdiction are within the exclusive control of the defendant.  *Brosconic v.*

*M/V Mathilde Maersk*, 1999 U.S. Dist. Lexis 9230 (S.D.N.Y. 1999). [9]

Thus, in *Swiger v. Allegheny Energy, Inc.*, 2007 U.S. Dist. LEXIS 8610 *4 (E.D. Pa. 2007), the district court permitted limited discovery to determine the citizenship of the Morgan, Lewis & Bockius, LLP law firm, which challenged plaintiff's assertion of diversity jurisdiction.   Only after limited jurisdictional discovery, the court made findings of fact regarding the citizenship of certain of the firm's partners and ruled that diversity was lacking.  *See also*, *Brocsonic Co. v. M/V Mathilde Maersk*, 1999 U.S. Dist. LEXIS 9230 (S.D.N.Y. 1999) ( "[a]lthough it is clear that plaintiff bears the burden [to show that he is properly before the court], it is clear that 'generally a plaintiff may be allowed limited discovery with respect to the jurisdictional issue'"); *Barnes v. State Farm Mut. Auto. Ins. Co*., 2004 U.S. Dist. LEXIS 7200 (E.D. Pa. 2004) (where the court denied motion for remand pending jurisdictional discovery to determine the amount in controversy).

The facts necessary to fully assess diversity of all of the ultimate beneficiaries of the Trust are within the exclusive control of the Trust and Levitin.  Therefore, the Court can and should simply order Levitin to produce the trust document and/or otherwise identify the actual beneficiaries of the Trust and their citizenship.

---

[9] The interest of manifest justice and judicial economy also support limited discovery regarding the jurisdiction issue prior to dismissal.  *See, e.g., Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 109 S. Ct. 2218 (1989) (where the Court observed that the lower courts have the authority to determine whether to drop a dispensable non-diverse party in the interest of judicial economy in order to preserve its diversity jurisdiction).  *See also Caterpillar Inc. v. Lewis*, 519 U.S. 61, 74, 117 S. Ct. 467 (1996) (holding that considerations of finality, efficiency and judicial economy dictate that the judgment should be allowed to stand even if diversity was initially lacking); *CGB Occupational Therapy v. RHA Health Servs.*, 357 F.3d 375, 381 (3d Cir. 2004) (noting that principals of judicial economy support maintaining diversity jurisdiction over an action even though diversity jurisdiction appears to have been lacking as of the time of removal, but is subsequently cured); *Knop v. McMahan*, 872 F.2d 1132, 1138-39 (3d Cir. 1989) (same).

**CONCLUSION**

For all of the forgoing reasons, the Court should deny defendants' motion to

Dismiss the Amended Complaint.

> WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
> Attorneys for plaintiff, American General Life Insurance Company
>
>
> By:_____*s/ Robert P. Lesko*_____
>         Robert P. Lesko

Dated: August 3, 2009

41

i