

LIPSIUS –BENHAIM
LAW, LLP

80-02 Kew Gardens Road
Kew Gardens, NY 11415
212.981.8440
Facsimile 888-442-0284
www.lipsiuslaw.com

DAVID BENHAIM
Direct Line: 212-981-8446
Email: dbenhaim@lipsiuslaw.com

March 19, 2012

**VIA ECF**

Honorable Tonianne J. Bongiovanni, U.S.M.J.
United States District Court
For the District of New Jersey
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street Room 2020
Trenton, NJ 08608

> Re:   **American General Life Insurance Co. v. Ellman Savings Irrevocable Trust
> Docket No. 08 CV 5364 (MLC) (TJB)
> Our File No. 4206.0002**

Dear Honorable Judge Bongiovanni:

We represent the defendants in the above referenced matter. In accordance with this Court's rulings, we write to seek an order striking the amended complaint filed by American General Life Insurance Company ("American General" or "AIG") as sanctions for American General's repeated, calculated and wanton attempts to frustrate discovery by purposefully concealing evidence that would disintegrate the fabricated allegations contained in the Amended Complaint and repeated by American General in hundreds of lawsuits filed across the nation. While recognizing that the sanction sought is appropriate only under the most severe violations of the rules governing discovery, as will be displayed below, American General's conduct in this litigation is worthy of nothing less.

American General not only refused to participate in discovery in good-faith and not only frustrated every attempt to learn the true facts surrounding the issues here but adopted a policy of concealment, which included making blatant misrepresentations and taking positions

LIPSIUS-BENHAIM LAW, LLP

Honorable Tonianne J. Bongiovanni, U.S.M.J.
March 19, 2012
Page 2

unsupported by law or fact. The ultimate sanction is necessary because (1) while the Trust has

independently discovered some of the evidence American General has sought to conceal, it is

impossible to know what evidence American General successfully concealed and (2) it is the

only punitive measure, which will have any deterrent effect on American General.

For the reasons set forth below, the Trust seeks an order striking the amended complaint

by American General and a declaration that the Ellman policy at issue in this litigation is not

void and is in full force and effect.

**Procedural Background**

The Ellman policy was issued at the height of American General's command of the

elderly, high-value life insurance market. Many of these policies were destined for the investor

market. When the benefits became due, however, American General refused to pay, taking the

position that it was deceived into issuing these policies and had it known the true investor-owned

nature of the policies, the policies would never have been issued. The Ellman policy is one of

hundreds of similarly situated lawsuits. As an example, a search of the national PACER database

reveals that in the 29 prior years ending in 2002, American General is a party to 124 lawsuits but

in the last 10 years it is a party in 686 actions.

The allegations contained in the Ellman lawsuits were repeated by American General in

courts throughout this country. In a 256-count, 50 page amended complaint (docket entry 36),

which included causes of action under RICO and fraud, American General alleged that the

Ellman application contained misrepresentations concerning the insured's financial condition

and that the Trust concealed the fact that the policy was destined for the investor market.

LIPSIUS-BENHAIM LAW, LLP

Honorable Tonianne J. Bongiovanni, U.S.M.J.
March 19, 2012
Page 3

American General further alleged that had it known that the Ellman policy was an investment policy it would have never issued it. The amended complaint included the following allegations:

4.      Ellman, Rubin and the Ellman Trust also represented that the purpose of the Ellman Policy was "estate planning," meaning preservation of the insured's purportedly sizeable estate from anticipated estate taxes. However, upon information and belief, the actual beneficiary of the Trust is neither Ellman's estate nor his natural heirs, but rather "strangers" to Ellman seeking a windfall profit upon his death.

5.      Each of the defendants knew that all of these representations were false or recklessly disregarded the veracity of the representations and further knew that the transaction was consummated through fraud and deception, but each defendant nonetheless encouraged, facilitated, aided and abetted, transmitted and/or directly made representations to American General with the intention of defrauding American General into issuing the Ellman Policy.

LIPSIUS-BENHAIM LAW, LLP

Honorable Tonianne J. Bongiovanni, U.S.M.J.
March 19, 2012
Page 4

## Background
### (Stranger-Originated Life Insurance)

21.    Likely fueled by the same seemingly insatiable thirst for ever more

exotic and lucrative investment opportunities that led to the current credit crisis, a

secondary market for interest in the proceeds of life insurance policies has emerged

as a new an potentially destructive phenomena in the life insurance industry in

recent years.  Referred to variably as Stranger-Owned or Stranger-Originated Life

Insurance  ("SOLI "or "STOLI"), or Investor-Owned or Investor-Originated Life

Insurance ("IOLI"), the scheme typically involves the acquisition of outright or

beneficial ownership interest in life insurance policies with large face amounts by

investors who are strangers to the person insured by the policy and who have no

insurable interest in the life of the person insured.

22.    These investor strangers typically take on the obligation of paying

LIPSIUS-BENHAIM LAW, LLP

Honorable Tonianne J. Bongiovanni, U.S.M.J.
March 19, 2012
Page 5

premiums due on the policy in exchange for their interest in it, including the right to

all or a portion of the death benefits to be paid when the insured person dies. Of

course, the sooner the insured person dies, the fewer premiums the investor stranger

is required to pay and the higher the return on their investment. In an attempt to

ensure the highest possible rate of return through prompt pay-out of the death

benefits, the investor strangers typically recruit elderly individuals to participate in

the application process and serve as the proposed insured. The proposed insured is

typically offered something of value, such as immediate cash payments, in exchange

for his or her participation in the application process.

LIPSIUS-BENHAIM LAW, LLP

Honorable Tonianne J. Bongiovanni, U.S.M.J.
March 19, 2012
Page 6

23.     Similarly, the higher the death benefit on the policy, the greater the

ultimate return on the investor stranger's investment. Thus, as in this case, the net

worth and other material information concerning the proposed insured is often

inflated or otherwise misrepresented in order to qualify for the most valuable

policies with the highest available death benefits at the lowest available premiums.

24.     These arrangements violate state statutory and common law insurable

interest laws and are contrary to public policy because the strangers or investors

acquire significant speculative economic and pecuniary interests which are best

served by the prompt and premature death of the person insured rather than his or

her continued life.

25.     The investor strangers have devised various schemes to conceal their

lack of insurable interest and circumvent insurable interest laws and public policy.

One such scheme – like the one perpetrated by the defendants in this case – involves

the formation of an irrevocable life insurance trust ostensibly established by the

insured.  Perpetrators of the fraud identify a willing proposed insured, match the

proposed insured with investor strangers to fund the premiums required to acquire

the policy, arrange for preparation of a trust document, and arranges for any other

services necessary to conceal the fraud and secure issuance of the policy.

LIPSIUS-BENHAIM LAW, LLP

Honorable Tonianne J. Bongiovanni, U.S.M.J.
March 19, 2012
Page 7

76.     If American General had been aware of the true reason for the
Ellman Policy American General would not have executed, issued or caused to be
delivered the Ellman Policy.

The Trust moved to interpose an answer with included counter-claims against American General for fraud (Docket Entry 73). The Trust alleged that in its zeal to cater to the elderly, high-value market, American General sought to write policies even if it knew that such policies were destined for the investor market. Moreover, in its thirst for the astronomical premiums these policies generate, American General routinely ignored its own guidelines, ignored red-flags which would indicate that the financial representations in the application were inaccurate and purposefully turned a blind eye to financial and STOLI misrepresentations. These allegations were based, in part, on an email exchange between an American General executive, Scott Bussalachi and the wholesale agent wherein American General admitted that it conducted an audit shortly after the Ellman policy was issued which revealed the fact that the Ellman policy was likely an investment policy. After the audit, not only did American General continue to accept premiums and did not move to rescind the policy at that time, but American General even assured the broker that the audit was only an effort to take inventory of investment policies and that no further action was going to be taken.

American General opposed the Trust's motion (Docket Entry 77). On December 17, 2010, Judge Tonianne J. Bongiovanni issued an order allowing the Trust to interpose the counter-claims. The decision was based in part on the email exchange.

LIPSIUS-BENHAIM LAW, LLP

Honorable Tonianne J. Bongiovanni, U.S.M.J.
March 19, 2012
Page 8

**Discovery**

American General's refusal to participate in discovery in this action is well documented and was the subject of four applications to this Court seeking to compel American General's compliance (Docket Entries, 91, 100, 108 and 109). Each time, American General was granted the opportunity to comply voluntarily. In an order issued February 16, 2012 (Docket Entry 113) American General was warned that if it fails to meet its discovery obligations by February 29, 2012, the Court will consider sanctioning American General. Although the threats resulted in some production, it is now clear that American General concealed in discovery documents detrimental to its case here as well as all of the similarly situated lawsuits filed by AIG across the nation.

The following is a recounting of all of the documents eventually extracted from American General over the course of this action. American General produced the documents it identified in the Rule 26 disclosure at the outset. On May 7, 2011, we served AIG with our First Request for Production of Documents and First Set of Interrogatories **(Exhibit A).** On March 3, 2011, after the pleadings were set, we served a limited Second Request for Production of Documents **(Exhibit B).** American General failed to timely respond. We wrote to AIG on April 6, 2011 requesting a response. AIG did not respond. A conference was held before your Honor on May 31, 2011 when we again requested a response. AIG promised that responses were "on their way." AIG responded to the May 7, 2010 requests on May 31, 2011 and to the March 3, 2011 requests on June 16, 2011. AIG did not produce a single document in response and instead peppered its "response" with boilerplate, inapplicable and unsubstantiated objections. After

LIPSIUS-BENHAIM LAW, LLP

Honorable Tonianne J. Bongiovanni, U.S.M.J.
March 19, 2012
Page 9

getting repeatedly stonewalled by AIG, on June 24, 2011, we wrote to this Court requesting a conference.

In response to our June 24, 2011 letter, the Court ordered the parties to meet and confer. The parties met and conferred on July 18, 2011 and again on July 28, 2011.   During the conferences, the requests were narrowed, qualified or withdrawn.   AIG advised that it will consider the requests or take them under advisement.

On August 17, 2011, AIG advised that it will produce if the parties enter into a confidentiality agreement for our consideration.  Later that day, we executed the agreement and AIG produced 87 more documents which purported to be all of the underwriting guidelines, agent memos and bulletins responsive to the Trust's requests.

On August 18, 2011, we again appeared before your Honor where we advised that AIG had our narrowed requests under advisement.  On September 28, 2011, we wrote to AIG seeking the outstanding discovery outlining a list of 16 categories of documents that remain unanswered and requested that AIG advise us within seven days whether it will voluntarily produce the documents.  On September 30, 2011, AIG advised that it will respond by the middle of October. True to its form, AIG did not respond.

On November 3, 2011, AIG responded with 19 pages of documents, which purported to be all of American General's marketing materials responsive to the Trust's demands.  After the Trust refuted AIG's claim denying the existence of an MIB report, on November 30, 2011, American General produced one MIB report.   On December 1, 2011, American General produced 225 pages concerning its relationship with Chaim Rubin. On January 23, 2012,

LIPSIUS-BENHAIM LAW, LLP

Honorable Tonianne J. Bongiovanni, U.S.M.J.
March 19, 2012
Page 10

American General finally produced some documents concerning the other policies alleged in the complaint make up part of American General's RICO claims. After fighting the production of emails for months, on February 2, 2012, American General produced **one** email, which purported to be all non-privileged emails responsive to the Trust's requests. On February 29, 2012, after being ordered to make the same exact production in another case, American General produced approximately 600 policies which insured similar risks; *i.e.*, elderly insureds for high face amounts.

**The Audit**

Defendant Chaim Rubin produced an email exchange between American General's Scott Busalacchi and the wholesale insurance broker for the Ellman policy, Denise Bell **(Exhibit C).** In the email, which was sent approximately seven months after the Ellman policy was issued, Ms. Bell asked as follows:

> Hey Scott,
> When you have time when you get back to WI, please let me know which of Rubin's cases may have looked like IOLI.
>
> Thanks!!!
>
>
> Denise Bell – CEO

IOLI stands for Investor Owned Life Insurance. STOLI stands for Stranger Owned Life Insurance. They mean the same thing.

LIPSIUS-BENHAIM LAW, LLP

Honorable Tonianne J. Bongiovanni, U.S.M.J.
March 19, 2012
Page 11

In response, Mr. Busalacchi attached an excel sheet called US Central Policy Audit,

which identified a series of policies, including the Ellman policy and stated:

Here is the list of your cases that hit the report. There are a couple that are listed as 'Yes' to being
suspect. I don't know why those and not others. Maybe the trust was in a different state or something
else strange.

The Ellman policy was identified as a STOLI policy. Ms. Bell then asked:

Scott,
Will the company be pursing any further investigation on the "yes" ones?

Mr. Busalacchi replied that no further action will be taken because the audit was "just an

effort to estimate the total how much IOLI business we may have." He stated:

Denise,

To my knowledge we are not planning anything further on this. From what I gathered, it was just an
effort to estimate the total how much IOLI business we may have. Since there is not a clearly defined
parameter to identify it, we simply guessed based on general parameters. The first cut was cases with
Insured Age 70+, premium of 100K or more and something tied to Face. I think once they had that
list they looked closer to see who the owner/payor/beneficiary was. I think most IOLI were identified
by having a Trust from Delaware listed as one of those. I think they even based it on if the trust was
out of the insured's state. I'm not sure if they did any phone interviews or things like that (after the
fact - we did do them while UW the cases later on in the process.)

So, I don't think there will be anything further. If I do hear something I will let you know. I nose
around a little with legal as well -just in general -not specifics or names.

On March 3, 2011, the Trust requested all communications and documents concerning

this audit. Specifically, the Trust requested as follows:

LIPSIUS-BENHAIM LAW, LLP

Honorable Tonianne J. Bongiovanni, U.S.M.J.
March 19, 2012
Page 12

     2.     All Documents and Communications concerning the investigation of the Chaim Rubin policies as discussed in the email exchange between Scott Busalacchi and Denise Bell identified in the second amended complaint.

     American General initially responded on June 17, 2011 as follows:

**Response:**

     American General objects to this request on the grounds that it is vague and ambiguous insofar as it refers to an "investigation" without a description of such investigation sufficient to allow American General to conduct a reasonable search of its records to ascertain the existence of responsive documents.  American General objects to this request on the grounds and to the extent that it seeks confidential and proprietary documents and information, the disclosure of which would violate trade secrets of American General and/or place American General at a competitive disadvantaged and/or cause American General to lose a competitive advantage.  American General further objects to this request on the grounds that it calls for information the disclosure of which would violate the attorney-client privilege.

     Subject to and without waiver of any objections, American General refers defendants to the relevant, non-privileged portions of the claim and underwriting files pertaining to the Policy at issue, as well as documents referenced in connection with American General's Initial Disclosures in connection with this matter, which may contain documents responsive to this request.   American General further refers defendants to the documents produced by USCAS in response to American General's subpoena.

     On November 23, 2011, after the Trust raised this deficient response with the Court, American General supplemented its response and stated:

     Our investigation has revealed that the document produced to you by United States Central Agency Services, including the email string between Scott Busalacchi and Denise Bell referring to policies sold by Chaim Rubin does not indicate an investigation of Rubin.   Therefore, documents and information relating to that correspondence are not responsive to your request.  We invite you to explore this issue further at the deposition of Mr. Busalacchi, which deposition you have already noticed.  American General did, however, engage in an investigation of Mr. Rubin leading to the termination of his producer privileges.   We are currently preparing the file relating to this review for

LIPSIUS-BENHAM LAW, LLP

Honorable Tonianne J. Bongiovanni, U.S.M.J.
March 19, 2012
Page 13

production, and expect to be able to forward the relevant and non-privileged portions of the file to you next week.

To date, American General has produced not a single document relating to the audit. American General even had the audacity to declare the emails "highly confidential" in order to suppress its presentation before the Southern District of New York in an action wherein American General was also refusing to participate in discovery.

On December 16, 2011, Southern District Magistrate Judge Yanthis held a telephone conference in *American General v. Spira*, 7:2008cv06843, concerning American General's refusal to produce emails in that action as well. During the Spira conference, the Ellman emails were raised by the Spira-defendants as evidence of the importance of email discovery. A few minutes after the conference, AIG's counsel advised as follow:

> Please be advised that American General hereby designates as Highly Confidential documents bearing bates numbers 103 through 106, produced by defendant Chaim Rubin, pursuant to the attached Stipulated Confidentiality Order (please see Paragraphs 4 and 11). The documents are Highly Confidential because they contain proprietary information/communications which have no connection to any investigation of Chaim Rubin. Rather, the information/communications contained in the documents relate to other business purposes which are irrelevant to the subject matter of the present litigation. Please note that we did not previously designate the documents as Highly Confidential because we only recently confirmed the context in which the information/communications arose.
> Accordingly, we have provided appropriately stamped versions of documents 103 through 106 with a "Highly Confidential" designation (attached). Kindly destroy all other copies of documents 103 through 106 which are not designated as Highly Confidential.

Counsel for the Trust, in that action, notified counsel for AIG as follows:

> I believe the designation by AIG is an intentional bad-faith attempt by the AIG companies to prevent the use of these very documents before Judge Yanthis in

LIPSIUS-BENHAIM LAW, LLP

Honorable Tonianne J. Bongiovanni, U.S.M.J.
March 19, 2012
Page 14

the Spira action and was inspired by Mr. Lesko's attempt to avoid production of emails in that action as the production of the documents at issue in the Spira action will show the AIG companies refusal to search emails throughout the company is a blatant attempt to prevent production of discoverable information in both the Spira and Ellman actions. It is not coincidental that hours after Mr. Lesko's accuses me of misrepresenting these very documents, before Magistrate Judge Yanthis, and I offer to produce the very documents to Judge Yanthis in support of the discovery request, AIG, through Mr. Lesko, attempts to suppress production of the documents.

As I suggested before Magistrate Judge Yanthis, an immediate, and limited telephone deposition be held of a representative of AIG familiar with the computer search capabilities of the AIG companies. AIG's refusal to agree to a short and limited deposition on the issue is clear; AIG does not want the truth revealed.

There is absolutely no good-faith basis whatsoever for AIG to attempt to declare the emails confidential. It certainly does not contain any information that can be considered propriety business information. The sole purpose AIG attempted to declare the emails confidential was to allow it to continue to conceal the facts, this time, from Judge Yanthis.
In actuality, the emails cannot be deemed confidential by AIG because the protective order in Ellman only allowed a party to the action to designate material "confidential" if that material was either produced (1) by that party or (2) by a non-party. Since those documents were produced by another party, Chaim Rubin, and not a non-party, AIG improperly designated the material "confidential."

The STOLI audit and the email exchange was heavily relied upon by this Court in allowing the amended counter-claim which specifically identified the communication as evidence that American General knew that the Ellman policy was destined for the investor market and did willingly issue such a policy. The exchange also destroys American General's

LIPSIUS-BENHAIM LAW, LLP

Honorable Tonianne J. Bongiovanni, U.S.M.J.
March 19, 2012
Page 15

credibility in the complaint wherein it alleges that it was shocked and appalled upon first learning that the policy was STOLI after Ellman's death.

The audit will also reveal the methods already in place by which American General was able to identify STOLI policies when the Ellman policy was issued, including evidence of misrepresentations in the application, which will lead to admissible evidence concerning the materiality (or lack thereof) of these misrepresentations. Moreover, since American General continued to accept premiums after learning of the alleged grounds for rescission, it is barred, as a matter of law, from rescission. See, generally, *American General Life Ins. Co. v Salamon*, 2011 WL 976411, *3, 2011 US Dist LEXIS 27118, *9-10 [ED NY 2011, Matsumoto, J.]).

It does not matter whether the audit was one of Chaim Rubin or one which Chaim Rubin's policies were identified. The Trust was entitled to learn who requested the audit, what method was used to determine STOLI, why the audit was undertaken, who was involved in the audit and to review all communications and learn everything about this audit. American General has no basis whatsoever to conceal the circumstances surrounding the audit. It is clear that American General concealed this evidence because of its value to the defendants and for no other reason.

**American General's Tax Return Requirement**

On August 17, 2011, AIG made a supplemental 27-page production which purported to be all responsive "field memos" and bulletins responsive to defendants' request.

We have now learned that AIG concealed certain records given to the New Business Department. American General only produced a selection of responsive documents and hid from

LIPSIUS-BENHAIM LAW, LLP

Honorable Tonianne J. Bongiovanni, U.S.M.J.
March 19, 2012
Page 16

defendants the existence of memos which support defendants' claim that AIG purposefully turned a blind eye to financial representations in policy applications. We have come in possession of a field memo issued by AIG on May 22, 2006 where it instructed New Business Agents:

> Effective immediately, AIG American General Life will no longer approve applications received that are investor owned, stranger owned, or viatical transactions.

Since the bulletin was issued two months after the Ellman policy was issued, it is clear evidence that American General approved STOLI up until that point and now it "no longer" wished to ignore faulty financial representations made in applications seeking high-value insurance for elderly insureds. Since STOLI applications often have incorrect financial information in the applications, the memo instructs its agents that all applications seeking such products must be accompanied by the insured's tax returns. This way, AIG began taking one simple step which would go a long way in making it difficult for underwriters to ignore faulty financial representations. The memo is attached as **Exhibit D**. It was never produced by American General.

At a deposition of AIG's vice-president of underwriting, Mr. Robert Cicci, while refusing to divulge the existence of Exhibit D, conceded that other documents exist which addressed this decision. Mr. Cicci testified as follows:

LIPSIUS-BENHAM LAW, LLP

Honorable Tonianne J. Bongiovanni, U.S.M.J.
March 19, 2012
Page 17

Q       Were there memoranda issued on
this issue?

A       Were there memoranda specifically?

Q       Let's see.  Did you have any
correspondence with Kent Major, Mr. Gabel,
Marketing and Distribution, Legal Department
regarding the implementation of mandating
financial -- tax returns?

A       Yes, I did.

Q       And did you have any
correspondence with Kent Major, Brad Gabel,
Marketing and Distribution, Legal regarding
the rescission of that requirement?

A       We had meetings.  I can't
specifically remember if there was a
memorandum that was crafted as a result or a
meeting.

Q       Did you maintain any physical file
regarding that issue?

A       We had electronic files for that,
e-mails and that type of thing.

Q       And have those e-mails been
preserved?

A       I believe they have.

Q       And has the electronic file been
preserved?

A       I believe it has, yes.

LIPSIUS-BENHAIM LAW, LLP

Honorable Tonianne J. Bongiovanni, U.S.M.J.
March 19, 2012
Page 18

AIG also admitted that only a few weeks after instituting the tax return requirement
it saw that its market share tumbled significantly and decided to revert to its original policy
of inviting false financial representations by canceling the requirement. Mr. Cicci testified
as follows:

```
Q        Was the issue raised by Marketing

and Distribution that it was causing

problems in sales?
```

Mr. Cicci responded:

```
A        I'm sure it was.
```

Relevant portions of Mr. Cicci's deposition testimony are attached as **Exhibit E.**

Accordingly, the Trust requested the following:

> 3.    All documents or communications concerning, discussing or resulting
> from the 2006 or 2007 decision by AIG to require tax returns during application and the
> decision rescinding the requirement, including, but not limited to all records and emails
> maintained, sent, or received by Kent Major, Marketing and Distribution, Brad Gabel,
> Royce Imhoff, Dennis Roberts, Mr. Cicchi and the Legal Department.

American General responded as follows:

LIPSIUS-BENHAIM LAW, LLP

Honorable Tonianne J. Bongiovanni, U.S.M.J.
March 19, 2012
Page 19

American General objects to this request on the grounds that it is vague and
ambiguous insofar as it refers to "the 2006 or 2007 decision by AIG to require tax returns
during the application and the decision rescinding the requirement" without a description
sufficient to allow American General to conduct a reasonable search of its records to
ascertain the existence of responsive documents. American General objects to this
request on the grounds that it seeks disclosure of information that is not within the
possession, custody or control of American General. American General further objects to
this request on the grounds and to the extent that it seeks confidential and proprietary
documents and information, the disclosure of which would violate trade secrets of
American General and/or place American General at a competitive disadvantaged and/or
cause American General to lose a competitive advantage. American General further
objects to this request on the grounds and to the extent that it seeks information that is
neither relevant to the claims or defenses asserted by either party in connection with the
litigation nor reasonably calculated to lead to the discovery of admissible evidence.
American General further objects to this request on the grounds and to the extent that it is
overly broad and unduly burdensome as to respond to said request would require
disproportionately time-consuming and expensive search of American General's records.

After the Trust complained to this Court about this non-response, American General

supplemented its response by denying the existence of responsive documents. On November 23.

2011 American General advised:

> Implementation and Withdrawal of Tax Returns as Mandatory Underwriting
> Requirement: You asked us to investigate and consider producing, in response to
> second request for documents no. 3, internal communications regarding American
> General's decision to make tax returns a mandatory underwriting requirement for
> certain applications and subsequent relaxation of that requirement as evidenced by
> communications to the field that were previously produced. We have determined that
> the request is unreasonably burdensome in relation to its potential for probative value,
> and therefore decline to undertake the search because, among other reasons, the
> requirement in question was initially put into effect months after the Ellman Policy was
> applied for and issued.

American General's counsel also took the position that no emails were written

concerning this decision, in direct contradiction to the testimony by Mr. Cicci and common

sense.

LIPSIUS-BENHAIM LAW, LLP

Honorable Tonianne J. Bongiovanni, U.S.M.J.
March 19, 2012
Page 20

The memo to the agents, which was sent on May 22, 2006, took place a mere two months after the Ellman policy was issued, which was March 17, 2006. It clearly indicated that up until that point, American General approved STOLI policies, exactly as alleged by the Trust in his counter-claim. The communications concerning the decision to require tax returns and then within a few weeks after watching its market share plummet, reversing such a requirement directly supports the Trust's contention that American General purposefully chose to turn a blind eye to the financial representations in the application because these representations did not affect the risk assumed by American general; namely, how long the insured will live. The Trust was entitled to all communications and all documents concerning this decision to require tax returns and certainly the decision made a few weeks later to rescind this requirement lie at the heart of the Trust's claims in this action and essentially prove the allegations by the Trust. American General had no good faith basis to suppress this production and did so only because of its value to the defendants. Such behavior is what the extreme sanction of striking the amended complaint was designed to address.

**Emails**

American General strongly resisted the Trust's request to produce emails and even refused to search for emails without court intervention. When American General finally agreed to search and produce emails, it chose the narrowest possible search. The search resulted in the production of exactly one non privileged email. The only email produced in this case was an email sent by Ira Lipsius, the attorney representing the Trust in this action, to American General. American General also identified a few privileged emails that were dated after Ellman's death

LIPSIUS-BENHAIM LAW, LLP

Honorable Tonianne J. Bongiovanni, U.S.M.J.
March 19, 2012
Page 21

but failed to identify even one email sent or received during the underwriting of the policies. The

entire email production is attached as **Exhibit F**.

The search conducted by American General failed to include the search term defendant

Chaim Rubin or the defendant Trust. It also did not search any archived materials and failed to

search through any emails of former employees even though most of the underwriters involved

with the Ellman policy are no longer with American General.

Incredibly, the search conducted by American General failed to even produce the Denise

Bell/Scott Busalacchi exchange even though it contained the Ellman policy number, which was

supposedly a search term and it was an account purportedly searched by American General.

Evidence of the existence of other emails can be found throughout the underwriting

notes. For example, in one note, underwriter Pat Wood states that she emailed underwriter Cindy

Hitchcox:

```
MIB Ran: I have emailed Cindy to have this done
```

Sandy Hitchcox notes:

```
Sent e-mail to Denise: uscentral@comcast.net regarding the balance sheet.
```

No such email was produced or identified by American General. In another note, Pat wood

states,

```
per email from uscentral@comcast.net -
Per the agt, Ms Perlstein no longer has a driver's lic. At 82, that is a good
thing!!}
```

Pat Wood also writes:

LIPSIUS-BENHAIM LAW, LLP

Honorable Tonianne J. Bongiovanni, U.S.M.J.
March 19, 2012
Page 22

Denise Bell called & was wondering why IR & MVR weren't ordered yet.  She
said Don told her they would be ordered as soon as the new policy number was
submitted. I emailed Mary Midoux to have her look at as a RUSH.

A second underwriter, Sherry Walton, notes:

## emailed Denise with information below.

Ms. Walton also notes:

## Walton, Sherry

## emailed Denise to see if accountant call in for IR.

Another underwriter, Don Garrow, appears to have emailed Denise Bell as follows:

Hi Denise,  Net worht figures from Irving & inspection differ by about $6MM.
I see that his sone is his Accountant.  Have him provide a balance sheet with
breakdown of assets & liab. The fin stmt provided by Irving DID NOT provide a
breakdown of assets & liab.

Mr. Garrow also references an email sent to a doctor:

Dr Pete;  See email with current echo attached.  Mil AI & MR.  OK for std
now?

Don

Another underwriter was apparently concerned about the financial representations in the

application and sent an email to his supervisor:

Karen,
    Wanted to get your opinion.  I don't like the conflicting financial info
Please note finances on IR given by applicant (income of 643K and net worth of
5.1 Mil.) And then see accountant info with income of 1.5 Mil. and net worth
of 11.3.  also note that the son is the accountant.  I understand that the son
may very well know more about the finances than the applicant but would
prefer to confirm finances.  Applicant has 2 Mil in force (from IR not the app
.) that will not be replaced. Using the future values calc. and income was at
5 Mil. total line for the low figures and using the accountants info was at 10
Mil. total line on the high numbers

LIPSIUS-BENHAIM LAW, LLP

Honorable Tonianne J. Bongiovanni, U.S.M.J.
March 19, 2012
Page 23

Despite the fact that the notes are replete with evidence that American General relied on email as a means of communications (it appears that email is the communication tool relied upon more than any other) American General's search did  not result in identifying even one email before October of 2008. Not one email sent or received during underwriting or at any time prior to Ellman's death is even identified by American General to have existed.

Moreover, American General's amended complaint references three other policies which, together with the Ellman policy, make up the RICO claim. Although AIG (finally) produced records relating to these policies on January 23, 2012, it admittedly did not search for any emails in connection with these policies.

It is evident that after refusing to even search for emails, and after this Court indicated that failure to search for emails may result in sanctions, American General chose to conduct an email search so narrow that it would render a result that would in effect, conceal the existence of vital communications. Considering American General's heinous behavior throughout discovery, it would come as no surprise to learn that American General may have even conducted a more thorough search which was suppressed when it yielded communications detrimental to American General's fabricated allegations in the amended complaint.

### Underwriting Materials

American General also hid underwriting guidelines. An American General agent bulletin dated June 20, 2006 states:

We recently informed you that AIG American General temporarily suspended sales of most single life universal life policies for insureds age 75 and older. Please refer to Field Bulletin 06-052 for details.

LIPSIUS-BENHAIM LAW, LLP

Honorable Tonianne J. Bongiovanni, U.S.M.J.
March 19, 2012
Page 24

American General has not produced any evidence of why this decision why taken, who was involved, and why the decision was reversed.

More importantly, although American General claimed that on August 17, 2011 it produced all relevant underwriting guidelines, we have independently obtained financial underwriting guidelines not produced by American General in this action. **Exhibit G**. It comes as no surprise that in issuing the Ellman policy, American General was in complete violation of these guidelines. For example, the guidelines provide that for policies of $10 million or more, the minimum number of references contacted to verify financials is the applicant plus 5 outside sources. Here, American General only contacted the insured and his son, in violation of the guidelines. The guideline also provides that financial and credit checks are to be performed. Here, no financial checks were performed and the credit check resulted in a poor credit report and a fraud warning which were both ignored by American General in its zeal to write the policy. American General concealed these guidelines because it knew that evidence of such guidelines would prove the Trust's allegations that in its greedy rush to collect the hefty Ellman premiums, it ignored its own underwriting guidelines.

AIG concealed this information because evidence that AIG ignored its own guidelines in its zeal to issue the high-premium generating Ellman policy would destroy its claim that it materially relied on the financial representations in the applications.

## Sanctions

Throughout this action, American General refused to voluntarily produce documents until it was pressed by the Court to do so or was faced with evidence that it was hiding discovery.

LIPSIUS-BENHAIM LAW, LLP

Honorable Tonianne J. Bongiovanni, U.S.M.J.
March 19, 2012
Page 25

American General used every possible delay tactic to try and run out the clock in the hopes

defendants will not catch it in its deceptions. Even still, it has purposefully concealed the most

crucial evidence necessary to defendants' case.

Rule 37(b)(2) provides that a court may impose sanctions against a party that "fails to

obey an order to provide or permit discovery . . . ." *Salahuddin v. Harris*, 782 F.2d 1127, 1132-

33 (2d Cir. 1986). Sanctions may be granted against a party under Rule 37(b)(2) if there is

noncompliance with an order, "notwithstanding a lack of willfulness or bad faith, although such

factors 'are relevant . . . to the sanction to be imposed for the failure.'" *Auscape Int'l v. Nat'l*

*Geographic Soc'y*, 02 Civ. 6441 (LAK), 2003 U.S. Dist. LEXIS 561, 2003 WL 134989 at *4

(S.D.N.Y. Jan. 17, 2003) (Kaplan, D.J.), quoting 8 Charles A. Wright, Arthur R. Miller &

Richard L. Marcus, Federal Practice & Procedure § 2283, at 608 (2d ed. 1994); see *Melendez v.*

*Ill. Bell Tel. Co.*, 79 F.3d 661, 671 (7th Cir. 1996) ("Bad faith . . . is not required for a district

court to sanction a party for discovery abuses. Sanctions are proper upon a finding of willfulness,

bad faith, or fault on the part of the noncomplying litigant" (citations omitted)); *Alexander v.*

*Fed. Bureau of Investigation*, 186 F.R.D. 78, 88 (D.D.C. 1998) ("In making the determination of

whether to impose sanctions, Rule 37(b)(2) does not require a showing of willfulness or bad faith

as a prerequisite to the imposition of sanctions upon a party" (citations omitted)). The decision to

impose sanctions "is committed to the sound discretion of the district court and may not be

reversed absent an abuse of discretion." *Luft v. Crown Publishers, Inc.*, 906 F.2d 862, 865 (2d

Cir. 1990), citing, inter alia, *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639,

642, 96 S. Ct. 2778, 49 L. Ed. 2d 747 (1976) (per curiam); see *Design Strategy, Inc. v. Davis*,

LIPSIUS-BENHAIM LAW, LLP

Honorable Tonianne J. Bongiovanni, U.S.M.J.
March 19, 2012
Page 26

469 F.3d 284, 294 (2d Cir. 2006) ("A district court has wide discretion in imposing sanctions,

including severe sanctions, under Rule 37(b)(2) . . . . "); *Daval Steel Prods. v. M/V Fakredine*,

951 F.2d 1357, 1365 (2d Cir. 1991) (same); *Dove v. City of New York*, 06 Civ. 1096 (SAS), 2006

U.S. Dist. LEXIS 93392, 2006 WL 3802267 at *2 (S.D.N.Y. Dec. 26, 2006) (Scheindlin, D.J.)

(same); see generally S. *New England Tel. Co. v. Global NAPS Inc.*, 624 F.3d 123, 144-45 (2d

Cir. 2010).

   Rule 37(b)(2) directs  a court to "make such orders in regard to the failure as are just,"

including, *inter alia*, striking the party's pleading, precluding the introduction of certain

evidence, or dismissing the action or rendering a judgment by default. Fed.R.Civ.P. 37(b)(2).

Additionally, the court must impose reasonable expenses and attorney's fees on the disobedient

party "unless the court finds that the failure was substantially justified or that other

circumstances make an award of expenses unjust." Fed.R.Civ.P. 37(b)(2).

   In deciding whether to impose sanctions under Rule 37, the court considers the following

factors: "(1) the willfulness of the noncompliant party or the reasons for noncompliance; (2) the

efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the

noncompliant party had been warned of the consequences of his noncompliance." *Nieves v. City

of New York*, 208 F.R.D. 531, 535 (S.D.N.Y. 2002)(Marrero, D.J.) (citing *Bambu Sales, Inc. v.

Ozak Trading Inc.*, 58 F.3d 849 (2d Cir. 1995))

   *Oseni v. Tristar Patrol Servs.*, 05 Civ. 2875 (RJD)(LB), 2006 U.S. Dist. LEXIS 75842,

2006 WL 2972608 at *7 (E.D.N.Y. Oct. 18, 2006*); accord, Agiwal v. Mid Island Mortg. Corp.*,

555 F.3d 298, 302-03 (2d Cir. 2009).

LIPSIUS-BENHAIM LAW, LLP

Honorable Tonianne J. Bongiovanni, U.S.M.J.
March 19, 2012
Page 27

Here, all of these factors have been met. American General's non-compliance was not only willful but part of a calculated litigation strategy taken by AIG in all of these cases to hide the corporation's true attitude towards STOLI policies. Lesser sanctions will simply have no effect on the insurance conglomerate that is AIG, as can be seen from the fact that it was sanctioned before. Attached as **Exhibit H** is an order by this Court sanctioning AIG in a similarly situated action for its attempt to frustrate discovery in a similar manner. It made no difference to AIG. The duration of the non-compliance has been throughout this litigation and in similar lawsuits. Finally, this Court has given American General every opportunity to participate in good faith in the discovery process. It has been repeatedly warned and it chose to ignore these warning.

Here, it is abundantly clear that AIG concealed and continues to conceal documents that harmed its litigation position in the hope that defendants will not learn of the existence of such evidence. We therefore, respectfully request that this Court issue an order striking the amended complaint.

**Conclusion**

For the reasons set forth in this letter brief, defendants seek an order striking the amended complaint.

Respectfully yours,

LIPSIUS-BENHAIM LAW, LLP

David BenHaim

Enclosures

# EXHIBIT

# A

Ira S. Lipsius (IL 5704)
SCHINDEL, FARMAN, LIPSIUS, GARDNER & RABINOVICH LLP
14 Penn Plaza, Suite 500
New York, NY 10122
Telephone No.: (212) 563-1710
*Attorneys for Ellman Savings Irrevocable Trust and Jeffrey Levitin, Esq.,*
*As Trustee of the Ellman Savings Irrevocable Trust*

## THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| AMERICAN GENERAL LIFE INSURANCE COMPANY, | § | |
| | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. |
| | § | 7:08-cv-10046- SCR |
| | § | |
| vs. | § | |
| | § | |
| ELLMAN SAVINGS IRREOCABLE TRUST, JEFFREY LEVITIN, ISRAEL KUGIELSKY, CHAIM RUBIN and JOHN DOES 1-10, | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | **ELLMAN SAVINGS IRREVOCABLE LIFE INSURANCE TRUST, JEFFREY LEVITIN, AS TRUSTEE, FIRST REQUEST FOR THE PRODUCTION OF DOCUMENTS TO AMERICAN GENERAL LIFE INSURANCE COMPANY** |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| JEFFREY LEVITIN, ESQ., as Trustee of the Ellman Savings Irrevocable Trust, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| vs. | § | |
| | § | |
| AMERICAN GENERAL LIFE INSURANCE COMPANY, | § | CIVIL ACTION NO. |
| | § | 3:10-cv-1458 |
| | § | |
| Defendant. | § | |

TO:   Robert P. Lesko
       Wilson, Elser, Moskowitz, Edelman & Dicker LLP
       33 Washington Street
       Newark, NJ 07102
       973-624-0800
       Attorneys for American General Life Insurance Company

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of New Jersey, Ellman Savings Irrevocable Life Insurance Trust (the "Trust"), and Jeffrey Levitin, as Trustee (the "Trustee"), by and through their attorneys, hereby request that, American General Life Insurance Company ("AIG"), answer the following produce the documents described below.

## DEFINITIONS

1. "Applicant" shall mean either of the insured of a life insurance policy or the owner of a life insurance policy.

2. "Communicated". This term means transmitted orally, electronically or in writing (in the form of facts, ideas, inquiries or otherwise) between any Person as defined below.

3. "Concerning". This term means relating to, referring to, describing, evidencing or constituting.

4. "Challenge Policy" or "Challenge Policies" shall mean any of the following High Value Life Insurance policies which AIG identifies, identified, suspects, suspected, alleges, or alleged as: investor-owned life insurance, stranger-owned life insurance, charity-owned life insurance, purchased for the purpose of life settlement, purchased for the purpose of viatical settlement, senior life insurance, based upon non-recourse loans, or lacking insurable interest.

5. "Other Insurance Misrepresentation" shall mean allegedly false, inaccurate or incomplete responses (as alleged by AIG) to questions Concerning other life insurance existing, in force or

2

pending on the life of the Applicant in applications for life insurance in which the applications are bound into the policy.

6.    "AIG" means American General Life Insurance Company, its parent company, any sister life insurance companies, including, but not limited to, U.S. Life Insurance Company in the City of New York, or any agent or representative acting on their behalf.

7.    "Document".   This term shall have its customary broad meaning and shall include, without limitation, the following items, whether printed, recorded or reproduced by any other mechanical process, or written or produced by hand, whether on microfiche, computer memory, disk or tapes and whether or not claimed to be privileged against discovery on any ground: agreements; communications, including intercompany and intracompany communications; correspondence; letters; telegrams; telexes; memoranda; notebooks; summaries or records of telephone conversations; summaries or record of personal conversations or interviews; diaries; statistical statements; graphs; laboratory and engineering reports and notebooks; manuals; specifications; purchase orders; order acknowledgments; work orders; requests for quotations; quotations; instructions; charts; plans; drawings; minutes or records of meetings; minutes or records of conferences; expressions or statements of policy; lists of persons attending meetings or conferences; reports or summaries of investigations; opinions or reports of consultants; opinions of counsel; records; reports or summaries of negotiations; photographs; brochures; pamphlets; advertisements; circulars; trade letters; press releases; drafts of any documents; original or preliminary notes; marginal comments appearing on any document; stenographic or steno type notes; any voice recordings whether on tape or a record.

8. "High Value Life Insurance" shall mean policies of life insurance issued by AIG in which, at the time of the policy application, the insured was equal to or older than 80 years of age and the face value of the policy was $5 million or more.

9. "Identify" (with respect to persons). When referring to a person, "to identify" means to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this paragraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

10. "Identify" (with respect to documents). When referring to Documents, "to identify" means to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; (iv) in the case of life insurance policies, the policy number, name of insured and year of issuance; and (v) author(s), addressee(s) and recipient(s).

11. "Financial Misrepresentation" shall mean any false, inaccurate or incomplete responses (as alleged by AIG) to financial questions in applications for life insurance in which the applications are bound into the policy.

12. "Parties". The terms "AIG' and "defendant" as well as a party's full or abbreviated name or a pronoun referring to a party means the party and, where applicable, its .officers, directors, employees, partners, corporate parent, subsidiaries or affiliates. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

13. "Person". This term is defined as any natural person or any business, legal or governmental entity or association.

4

14. "Possession or control". This term means in the possession or control of AIG, its officers, agents, attorneys, affiliated or constituent corporate entities or from any other person from whom AIG might obtain the requested information or document.

15. "Ellman Policy". This term shall mean AIG Life Insurance Policy No. UM0030862L issued by AIG on the life of Irving Ellman.

16. The following are rules of construction:

    (a)    "All/Each". The term "all" and "each" shall be construed as all and each.

    (b)    "And/Or". The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

    (c)    Number. The use of the singular form of any word includes the plural and vice versa.

## INSTRUCTIONS

1. Each request for production of a document or documents shall be deemed to be a request for the production of the original document or documents, to the extent that they are in or subject to, directly or indirectly, your control. In addition, each request should be considered as including all copies and, to the extent applicable, preliminary drafts of documents which, as to content, differ in any respect from the original or final draft or from each other (*e.g.* by reason of handwritten notes or comments having been added to one copy of a document but not on the original or other copies thereto).

2. Each request that seeks information relating in any way to communications to, from, or within a business and/or corporate entity is hereby designated to mean, and should be construed

to include, all communications by and between representatives, employees, agents and/or servants of the business and/or corporate entity.

3. Any request propounded in the disjunctive shall also be read as if it is propounded in the conjunctive, and vice versa. Any request propounded in the masculine gender shall also be read as if propounded in the feminine and neuter gender, and vice versa. Any request propounded in the singular shall also be read as if propounded in the plural and vice versa. Any request propounded in the present tense shall also be read as if propounded in the past tense, and vice versa.

4. If a privilege not to answer is claimed, identify each matter as to which the privilege is claimed, the nature of the privilege and the legal and factual basis for each such claim. If such claim of privilege relates to a document, identify the author, addressee, and all recipients of copies of the document, setting forth the date and general subject matter thereof, and state the basis for the claim of privilege. Whenever a claim of privilege is made with respect to any oral communication or statement, identify the participants to the communication and/or the person giving and receiving the statement, and set forth the date and place of the communication or statement and state the general subject matter thereof and state the basis for the claim of privilege.

5. If any document was, but is no longer, in your possession; was, but is no longer, subject to your control, or was, but is no longer, in existence, sate whether it: (a) is missing or lost; (b) has been destroyed; (c) has been transferred, voluntarily or involuntarily, to others;; or (d) has been otherwise disposed of. In each instance, explain the circumstances surrounding any authorization for such disposition, including the date of such disposition; the person(s) responsible for such disposition; the identity of the person, if any, to whom the document was

6

transferred, and the policy, procedure, role, order, guideline, or other authority by, under or pursuant to which such disposition was made.

6. If a refusal to answer a request is based on the grounds that the interrogatory is overly burdensome, identify the number and nature of documents needed to be searched.

7. If you are unable to produce documents fully responsive to a request, produce to the extent possible and specify the reasons for your inability to provide a complete production.

8. An objection or claim of privilege directed in part of a request does not obviate the requirement to respond to the parts of the request for which no objection or claim of privilege is made.

9. These requests for production are continuing and should you acquire any additional information responsive to these interrogatories, the answers shall be supplemented to provide the additional information in accordance with the applicable Federal Rules of Civil Procedure and Local Court Rules.

## DOCUMENTS REQUESTED

1. All Documents identified in AIG's Rule 26(a)(1)(A) Initial Disclosures, to the extent not already disclosed.

2. All Documents Concerning the Ellman Policy.

3. All Documents used by, relied upon or consulted by AIG in responding to Trusts's First Set of Interrogatories.

4. All Documents identified in AIG's responses to the Trust's First Set of Interrogatories.

5. All Documents Concerning Irving Ellman, including, without limitation to, (i) Documents Concerning or relating to any policy of insurance issued by AIG insuring the life of Irving Ellman; (ii) Documents Communicated between AIG and Irving Ellman; and (iii)

7

Documents Communicated between AIG and Larry Ellman.

6. Copies of any correspondence, or any Documents Communicated, between AIG and any other Person (including, without limitation to, agents, reinsurers, and brokers) Concerning Irving Ellman or the Ellman Policy.

7. All Documents Concerning in any way commissions paid in connection with the Ellman Policy, including, without limitation to, (i) Documents, contracts or agreements with any persons receiving any commission in connection with the Ellman Policy; and (ii) Documents substantiating or evidencing commissions paid to any persons in connection with the Ellman Policy.

8. All pleadings and motions filed in any legal action identified in response to Interrogatory No. 10 of Trust's First Set of Interrogatories.

9. All discovery requests exchanged in any legal action identified in response to Interrogatory No. 10 of Trust's First Set of Interrogatories.

10. All Documents in support of AIG's claim that it has been damaged as a result of fraud allegedly committed by Defendants.

11. All Documents Concerning any investigation taken in connection with the facts and circumstances of this litigation or Concerning any investigation of Irving Ellman, the Ellman Policy or Larry Ellman, including, without limitation to, (i) any and all records, memoranda, notations, statements summaries and other Documents which were obtained from or as a result of interviewing persons having or purporting to have knowledge of the facts and circumstances surrounding this action; (ii) transcripts of all telephone conversations recorded with regard to any investigation conducted Concerning Irving Ellman, Larry Ellman, and the Ellman Policy; and (ii) copies of all investigation reports Concerning the Ellman Policy

12. Any and all films, photographs, video tapes or audio tapes, including transcripts or memoranda thereof, made either before, after or at the time of the policy rescission, Concerning the rescission of the Ellman Policy. This request calls for actual reports from the negatives and includes all films, photographs, video tapes or audio tapes which AIG intends to rely on at the time of trial.

13. Transcripts of all telephone conversations recorded with regard to any application made

in connection with the Ellman Policy.

14. All Documents Communicated with any financier of premiums Concerning insurable interest for the period from 2002 to the present, including, without limitation to, bulletins, memoranda or agent letters issued by AIG since January 1, 2002 Concerning insurable interest.

15. A copy of any and all underwriting guidelines used by AIG from January 1, 2002 to the present relating to High Value Life Insurance policies. If an underwriting guideline applies to policies of which High Value Life Insurance polices are a subset of the applicable policies, then such guideline or guidelines are included within this Request.

16. All Documents used by AIG to determine premiums or pricing for High Value Life Insurance policies.

17. All internal memoranda, newsletters, bulletins, agent letters or agent memos Concerning High Value Life Insurance policies from January 1, 2002 to the present.

18. All internal memoranda, newsletters, bulletins, agent letters or agent memos Concerning Challenge Policies from January 1, 2002 to the present.

19. Copies of any guidelines or Documents that establish ratios or charts that compare total insurance in force and face values permitted for any policies issued by AIG.

20. Copies of all Documents Communicated between AIG and its agents Concerning High Value Life Insurance policies from January 1, 2002 to the present, including, without limitation to, (i) marketing materials Concerning High Value Life Insurance policies; and (ii) Documents Concerning the sale of High Value Life Insurance policies; and (iii) Documents Concerning the net worth of applicant or insureds of High Value Life Insurance policies.

21. Copies of all Documents Communicated between AIG and its agents or brokers Concerning the total life insurance in force for individual insureds or potential insureds of High Value Life Insurance policies from January 1, 2002 to the present.

22. Copies of Documents regarding the rescission of policies or denial of coverage or denial of a claim on the basis of Other Insurance Misrepresentations, financial statements made in the policy application or on the basis of other life insurance available on the life of the insured.

9

23.  Copies of all applications (appropriately redacted) submitted from January 1, 2002 to the present to AIG seeking life insurance coverage for a person over 75 years old and seeking coverage of $5 million or more.

24.  Copies of all Documents discussing or Concerning the impact or materiality of Financial Misrepresentations on the risk or hazard assumed by a life insurer.

25.  Copies of all Documents discussing or Concerning the impact or materiality of Other Insurance Misrepresentations on the risk or hazard assumed by a life insurer.

26.  Copies of all newsletters, bulletins, agent letters or agent memos regarding insurable interest from January 1, 2002 to the present.

27.  Copies of any internal memos Concerning the sale of life insurance policies with face value of $2 Million or more.

28.  Any actuarial filings made in connection with the rating of High Value Life Insurance Policies.

29.  Any Documents Communicated between AIG and any reinsurer Concerning any High Value Life Insurance policies and/or any Challenge Policies.

30.  All applications, agent reports, inspection reports, and policies (appropriately redacted) Concerning each and every policy which AIG has identified as a Challenge Policy, has identified as a suspected Challenge Policy, or which AIG has expressed a belief may be a Challenge Policy.

31.  All applications and policies (appropriately redacted) Concerning each and every High Value Life Insurance policy which AIG has conducted any investigation as to insurable interest.

32.  Copies of all Documents Communicated to or from AIG Concerning premium financing since January 1, 2002.

33.  Copies of all Documents Communicated Concerning insurable interest between AIG and

10

any premium finance company since January 1, 2002.

34. All Documents and communications between AIG and any entity which AIG has identified as being involved in Challenge Policies.

35. All reports, investigation materials, training materials, and pamphlets, in AIG's possession, regarding Challenge Policies.

36. Copies of all newsletters, bulletins, agent letters or agent memos regarding insurable interest from January 1, 2001 to the present.

37. Copies of all Documents that evidence the materiality of financial representations Concerning an insured.

38. All internal memos issued since January 1, 2001 Concerning premium financing, insurable interest, high value life insurance, elderly life insurance, stranger owned life insurance or financial representations made in a policy application.

39. Copies of all newsletters, bulletins, agent letters or agent memos regarding Stranger Owned Life Insurance policies, Charity Owned Life Insurance policies, Investor Owned Life Insurance Policies or viatical settlements since January 1, 2001.

40. Copies of all Documents used to determine premiums or pricing of high value life insurance policies.

41. Copies of any guidelines or Documents that establish ratios or charts that compare net worth and face values for any policies issued by AIG.

42. Copies of all Documents Communicated by or to AIG Concerning the sale of High Value Life Insurance policies from January 1, 2002 to the present.

43. Copies of internal Documents regarding the rescission of policies or denial of coverage or denial of a claim on the basis of financial misrepresentation, financial statements made in the policy application or on the basis of other life insurance available on the life of the insured.

11

44. Copies of all Documents discussing the impact or materiality of financial misrepresentations on the risk or hazard assumed by a life insurer.

45. Copies of any correspondence between AIG and any reinsurer Concerning financial misrepresentations in policy applications.

46. All statements made by any party, or of any agent, employee or representative of a party named herein, whether written, oral, videotaped, audiotaped, and/or by any other recording medium Concerning this action. If oral, set forth the substance of the statement.

47. A true and accurate copy of each photograph, video tape, or other visual recording, associated with this action.

48. All documents Concerning any of the following AIG insureds:

   a.   Lily Buchsbaum
   b.   Sarah Perlstein
   c.   Lena Deblasio
   d.   Judith Liebowitz
   e.   Olga Rozencweig
   f.   Edith Wolpin
   g.   Tsvi Klein
   h.   Risha Goldklang
   i.   Rachelle Kremer
   j.   Judith Rosenthal

Dated:  New York, New York
        May 7, 2010

                          SCHINDEL, FARMAN, LIPSIUS,
                          GARDNER & RABINOVICH LLP
                          Attorneys for Defendant


        By:    _____
                          Ira S. Lipsius
                          14 Penn Plaza, Suite 500
                          New York, NY 10122
                          (212) 563-1710

## CERTIFICATE OF SERVICE

Ira S. Lipsius certifies that service of the foregoing **Ellman Irrevocable Trust, and Jeffrey Levitin, as Trustee, First Request for the Production of Documents to AIG American General Life Insurance Co.** has, on this date, been made by depositing a true copy thereof enclosed in a post-paid wrapper, in an official depository under the exclusive care and custody of the U.S. Postal Service within this State, addressed to the following:

Robert P. Lesko
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
33 Washington Street
Newark, NJ 07102
Attorneys for AIG

I certify that the statements made herein are true and correct to the best of my knowledge and belief. I understand that if any statement made herein is knowingly false, I am subject to punishment.

Dated: May 7, 2010

_____
IRA S. LIPSIUS

13

# EXHIBIT B

Ira S. Lipsius (IL 5704)
SCHINDEL, FARMAN, LIPSIUS, GARDNER & RABINOVICH LLP
4 Cornwall Drive, Suite 101
East Brunswick, NJ  08816
Telephone No.: (732) 390-0166
*Attorneys for Ellman Savings Irrevocable Trust and Jeffrey Levitin, Esq.,*
*As Trustee of the Ellman Savings Irrevocable Trust*

## THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| AMERICAN GENERAL LIFE INSURANCE COMPANY, | § § § | |
| Plaintiff, | § § | **CIVIL ACTION NO.** |
| | § | **7:08-cv-10046-  SCR** |
| vs. | § § | |
| ELLMAN SAVINGS IRREOCABLE TRUST, JEFFREY LEVITIN, ISRAEL KUGIELSKY, CHAIM RUBIN and JOHN DOES 1-10, | § § § § § | |
| Defendants. | § § § | **ELLMAN SAVINGS IRREVOCABLE LIFE INSURANCE TRUST, JEFFREY LEVITIN, AS TRUSTEE, SECOND REQUEST FOR THE PRODUCTION OF DOCUMENTS TO AMERICAN GENERAL LIFE INSURANCE COMPANY** |
| JEFFREY LEVITIN, ESQ., as Trustee of the Ellman Savings Irrevocable Trust, | § § | |
| Plaintiff, | § § | |
| vs. | § § | |
| AMERICAN GENERAL LIFE INSURANCE COMPANY, | § § | **CIVIL ACTION NO.** **3:10-cv-1458** |
| Defendant. | § § | |

TO:   Robert P. Lesko
      Karen Peck
      Wilson, Elser, Moskowitz, Edelman & Dicker LLP
      33 Washington Street
      Newark, NJ 07102
      973-624-0800
      Attorneys for American General Life Insurance Company

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of New Jersey, Ellman Savings Irrevocable Life Insurance Trust (the "Trust"), and Jeffrey Levitin, as Trustee (the "Trustee"), by and through their attorneys, hereby request that, American General Life Insurance Company ("AIG"), answer the following produce the documents described below.

## DEFINITIONS

1.  "Applicant" shall mean either of the insured of a life insurance policy or the owner of a life insurance policy.

2.  "Communicated". This term means transmitted orally, electronically or in writing (in the form of facts, ideas, inquiries or otherwise) between any Person as defined below.

3.  "Concerning". This term means relating to, referring to, describing, evidencing or constituting.

4.  "Challenge Policy" or "Challenge Policies" shall mean any of the following High Value Life Insurance policies which AIG identifies, identified, suspects, suspected, alleges, or alleged as: investor-owned life insurance, stranger-owned life insurance, charity-owned life insurance, purchased for the purpose of life settlement, purchased for the purpose of viatical settlement, senior life insurance, based upon non-recourse loans, or lacking insurable interest.

2

5. "Other Insurance Misrepresentation" shall mean allegedly false, inaccurate or incomplete responses (as alleged by AIG) to questions Concerning other life insurance existing, in force or pending on the life of the Applicant in applications for life insurance in which the applications are bound into the policy.

6. "AIG" means American General Life Insurance Company, its parent company, any sister life insurance companies, including, but not limited to, U.S. Life Insurance Company in the City of New York, or any agent or representative acting on their behalf.

7. "Document". This term shall have its customary broad meaning and shall include, without limitation, the following items, whether printed, recorded or reproduced by any other mechanical process, or written or produced by hand, whether on microfiche, computer memory, disk or tapes and whether or not claimed to be privileged against discovery on any ground: agreements; communications, including intercompany and intracompany communications; correspondence; letters; telegrams; telexes; memoranda; notebooks; summaries or records of telephone conversations; summaries or record of personal conversations or interviews; diaries; statistical statements; graphs; laboratory and engineering reports and notebooks; manuals; specifications; purchase orders; order acknowledgments; work orders; requests for quotations; quotations; instructions; charts; plans; drawings; minutes or records of meetings; minutes or records of conferences; expressions or statements of policy; lists of persons attending meetings or conferences; reports or summaries of investigations; opinions or reports of consultants; opinions of counsel; records; reports or summaries of negotiations; photographs; brochures; pamphlets; advertisements; circulars; trade letters; press releases; drafts of any documents; original or preliminary notes; marginal comments appearing on any document; stenographic or steno type notes; any voice recordings whether on tape or a record.

3

8. "High Value Life Insurance" shall mean policies of life insurance issued by AIG in which, at the time of the policy application, the insured was equal to or older than 80 years of age and the face value of the policy was $5 million or more.

9. "Identify" (with respect to persons). When referring to a person, "to identify" means to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this paragraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

10. "Identify" (with respect to documents). When referring to Documents, "to identify" means to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; (iv) in the case of life insurance policies, the policy number, name of insured and year of issuance; and (v) author(s), addressee(s) and recipient(s).

11. "Financial Misrepresentation" shall mean any false, inaccurate or incomplete responses (as alleged by AIG) to financial questions in applications for life insurance in which the applications are bound into the policy.

12. "Parties". The terms "AIG' and "defendant" as well as a party's full or abbreviated name or a pronoun referring to a party means the party and, where applicable, its .officers, directors, employees, partners, corporate parent, subsidiaries or affiliates. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

13. "Person". This term is defined as any natural person or any business, legal or governmental entity or association.

4

14. "Possession or control". This term means in the possession or control of AIG, its officers, agents, attorneys, affiliated or constituent corporate entities or from any other person from whom AIG might obtain the requested information or document.

15. "Ellman Policy". This term shall mean AIG Life Insurance Policy No. UM0030862L issued by AIG on the life of Irving Ellman.

16. The following are rules of construction:

      (a)     "All/Each". The term "all" and "each" shall be construed as all and each.

      (b)     "And/Or". The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

      (c)     Number. The use of the singular form of any word includes the plural and vice versa.

**INSTRUCTIONS**

1. Each request for production of a document or documents shall be deemed to be a request for the production of the original document or documents, to the extent that they are in or subject to, directly or indirectly, your control. In addition, each request should be considered as including all copies and, to the extent applicable, preliminary drafts of documents which, as to content, differ in any respect from the original or final draft or from each other (*e.g.* by reason of handwritten notes or comments having been added to one copy of a document but not on the original or other copies thereto).

2. Each request that seeks information relating in any way to communications to, from, or within a business and/or corporate entity is hereby designated to mean, and should be construed

5

to include, all communications by and between representatives, employees, agents and/or servants of the business and/or corporate entity.

3.   Any request propounded in the disjunctive shall also be read as if it is propounded in the conjunctive, and vice versa.  Any request propounded in the masculine gender shall also be read as if propounded in the feminine and neuter gender, and vice versa.  Any request propounded in the singular shall also be read as if propounded in the plural and vice versa.  Any request propounded in the present tense shall also be read as if propounded in the past tense, and vice versa.

4.   If a privilege not to answer is claimed, identify each matter as to which the privilege is claimed, the nature of the privilege and the legal and factual basis for each such claim.  If such claim of privilege relates to a document, identify the author, addressee, and all recipients of copies of the document, setting forth the date and general subject matter thereof, and state the basis for the claim of privilege.  Whenever a claim of privilege is made with respect to any oral communication or statement, identify the participants to the communication and/or the person giving and receiving the statement, and set forth the date and place of the communication or statement and state the general subject matter thereof and state the basis for the claim of privilege.

5.   If any document was, but is no longer, in your possession; was, but is no longer, subject to your control, or was, but is no longer, in existence, sate whether it: (a) is missing or lost; (b has been destroyed; (c) has been transferred, voluntarily or involuntarily, to others;; or (d) has been otherwise disposed of.  In each instance, explain the circumstances surrounding any authorization for such disposition, including the date of such disposition; the person(s) responsible for such disposition; the identity of the person, if any, to whom the document was

6

transferred, and the policy, procedure, role, order, guideline, or other authority by, under or pursuant to which such disposition was made.

6.   If a refusal to answer a request is based on the grounds that the interrogatory is overly burdensome, identify the number and nature of documents needed to be searched.

7.   If you are unable to produce documents fully responsive to a request, produce to the extent possible and specify the reasons for your inability to provide a complete production.

8.   An objection or claim of privilege directed in part of a request does not obviate the requirement to respond to the parts of the request for which no objection or claim of privilege is made.

9.   These requests for production are continuing and should you acquire any additional information responsive to these interrogatories, the answers shall be supplemented to provide the additional information in accordance with the applicable Federal Rules of Civil Procedure and Local Court Rules.

## DOCUMENTS REQUESTED

1.   Any emails, letters, or other written communications by or to the following individuals concerning either Chaim Rubin or the Ellman policy:
   a.  Sarah Wickes
   b.  Lisa Glass
   c.  Mark Childs
   d.  Leo Grace
   e.  Bill Wyong
   f.  Karen Padrucco
   g.  Pat Wood
   h.  Don Garrow
   i.  Jennifer Larson
   j.  Paul Kiepert
   k.  Sherry Walton
   l.  Dru Ruiz
   m.  Scott Busalacchi.

2.   All Documents and Communications concerning the investigation of the Chaim Rubin policies as discussed in the email exchange between Scott Busalacchi and Denise Bell identified in the second amended complaint.

3.   All documents or communications concerning, discussing or resulting from the 2006 or 2007 decision by AIG to require tax returns during application and the decision rescinding the requirement, including, but not limited to all records and emails maintained, sent or received by Kent Major, Marketing and Distribution, Brad Gabel, Royce Imhoff, Dennis Roberts, Mr. Cicchi and the Legal Department..

4.   A copy of any MIB reports obtained by AIG during the underwriting of the Ellman policy.

Dated:   March 3, 2011

SCHINDEL, FARMAN, LIPSIUS,
GARDNER & RABINOVICH LLP
Attorneys for Defendant

By: _____
Ira S. Lipsius
4 Cornwall Drive, Suite 101
East Brunswick, NJ  08816
(732) 390-0166

8

## CERTIFICATE OF SERVICE

Ira S. Lipsius certifies that service of the foregoing **Ellman Irrevocable Trust, and Jeffrey Levitin, as Trustee, Second Request for the Production of Documents to AIG American General Life Insurance Co.** has, on this date, been made by depositing a true copy thereof enclosed in a post-paid wrapper, in an official depository under the exclusive care and custody of the U.S. Postal Service within this State, addressed to the following:

Robert P. Lesko
Karen Peck
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
33 Washington Street
Newark, NJ 07102
Attorneys for AIG

I certify that the statements made herein are true and correct to the best of my knowledge and belief. I understand that if any statement made herein is knowingly false, I am subject to punishment.

Dated: March 3, 2011

IRA S. LIPSIUS

9

# EXHIBIT
# C

**US Central**

From:         Scott_Busalacchi@aigag.com
Sent:         Friday, November 17, 2006 9:12 AM
To:           uscentral@comcast.net
Subject:      RE: Audit

Denise,

To my knowledge we are not planning anything further on this. From what I gathered, it was just an effort to estimate the total how much IOLI business we may have. Since there is not a clearly defined parameter to identify it, we simply guessed based on general parameters. The first cut was cases with Insured Age 70+, premium of 100K or more and something tied to Face. I think once they had that list they looked closer to see who the owner/payor/beneficiary was. I think most IOLI were identified by having a Trust from Delaware listed as one of those. I think they even based it on if the trust was out of the insured's state. I'm not sure if they did any phone interviews or things like that (after the fact – we did do them while UW the cases later on in the process.)

So, I don't think there will be anything further. If I do hear something I will let you know. I nose around a little with legal as well –just in general -not specifics or names.

Have a nice weekend.

Scott Busalacchi
AIG Life Brokerage
414.443.5808


        "uscentral"
        <uscentral@comcas      To:    <Scott_Busalacchi@aigag.com>
        t.net>            cc:
                   Subject: RE: Audit
        11/17/2006 04:47
        AM


                              1                      ~0103

HIGHLY CONFIDENTIAL

Scott,

Will the company be pursing any further investigation on the "yes" ones?


Denise Bell – CEO

United States Central Agency Services

609-261-7555 - Phone

609-261-9324 - Fax

uscentral@comcast.net


-----Original Message-----

From: Scott_Busalacchi@aigag.com [mailto:Scott_Busalacchi@aigag.com]

Sent: Thursday, November 16, 2006 12:17 PM

To: uscentral@comcast.net

Cc: Scott_Busalacchi@aigag.com

Subject: Re: Audit


Here is the list of your cases that hit the report. There are a couple that are listed as 'Yes' to being suspect. I don't know why those and not others. Maybe the trust was in a different state or something else strange.

(See attached file: US Central Pol Audit.xls)

Scott Busalacchi

AIG Life Brokerage

414.443.5808


2

*104*

HIGHLY CONFIDENTIAL

"uscentral"

<uscentral@comcas    To:
<Scott_Busalacchi@aigag.com>

t.net>          cc:

Subject: Audit

11/15/2006 07:11

PM

Hey Scott,

When you have time when you get back to WI, please let me know which of Rubin's cases may have looked like IOLI.

Thanks!!!

Denise Bell - CEO
United States Central Agency Services
609-261-7555 - Phone
609-261-9324 - Fax
uscentral@comcast.net

3

105

HIGHLY CONFIDENTIAL

| IMO ID | Policy | Prem Adc | Sum Period | Prem Range | Unschedule Count | Face | Sum of Face | AttachID | Support? | Ret Date | Pnl Name | Iss Age | Age Range | Face Range | Paid Date | QTR | Acq Date | IMO State |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 03N65 | UM0330862L | 663,600 | 663,600 | $100M+ | 1 | 10,800,000 | 10,000,000 | 30M$1 | Yes | Mar-06 | CONTINUANT1 | 84 | 80-89 | 10-20M | Mar-06 | 05Q1 | 3/1/2006 | NJ |
| 03N65 | UM0330862L | - | 663,600 | $100M+ | 0 | - | 10,000,000 | 30M$1 | Yes | Apr-06 | CONTINUANT1 | 84 | 80-89 | 10-20M | Mar-06 | 05Q1 | 3/1/2006 | NJ |
| 03N65 | UM0223607L | 577,054 | 577,054 | $100M+ | 1 | 10,000,000 | 10,000,000 | 30M$1 | No | Jun-05 | CONTINUANT1 | 85 | 80-89 | 5-10M | Jun-05 | 05Q2 | | NJ |
| 03N65 | UM0223457L | 240,650 | 240,650 | $100M+ | 1 | 3,500,000 | 3,500,000 | 30M$1 | No | Feb-05 | CONTINUANT1 | 82 | 80-89 | 1-5M | Feb-06 | 05Q3 | 1/1/2006 | NJ |
| 03N65 | UM0339863A | 235,657 | 235,657 | $100M+ | 1 | 5,000,000 | 5,000,000 | 30M$1 | No | Apr-05 | CONTINUANT1 | 83 | 80-89 | 5-10M | Apr-05 | 05Q3 | 3/1/2006 | NJ |
| 03N65 | UM0330862L | - | 235,657 | $100M+ | 0 | - | 5,000,000 | 30M$1 | No | May-06 | CONTINUANT1 | 83 | 80-89 | 5-10M | Apr-05 | 05Q3 | 3/1/2006 | NJ |
| 03N65 | UM0450052L | 235,657 | 235,657 | $100M+ | 1 | 5,000,000 | 5,000,000 | 30M$1 | No | Apr-05 | CONTINUANT1 | 83 | 80-89 | 5-10M | Apr-05 | 05Q3 | 3/1/2006 | NJ |
| 03N65 | UM0331281A | 233,671 | 233,671 | $100M+ | 1 | 8,000,000 | 8,000,000 | 30M$1 | No | May-05 | CONTINUANT1 | 79 | 75-79 | 5-10M | May-06 | 05Q3 | 5/1/2006 | NJ |
| 03N65 | UM0331281L | - | 233,671 | $100M+ | 0 | 8,000,000 | 8,000,000 | 30M$1 | No | Jun-06 | CONTINUANT1 | 79 | 75-79 | 5-10M | Jun-06 | 05Q3 | | NJ |
| 03N65 | UM0227982 | 227,528 | 227,528 | $100M+ | 1 | 4,000,000 | 4,000,000 | 30M$1 | No | Apr-06 | CONTINUANT1 | 80 | 80-89 | 1-5M | Apr-06 | 05Q3 | 3/1/2006 | NJ |
| 03N65 | UM0223750L | 170,646 | 170,646 | $100M+ | 1 | 3,000,000 | 3,000,000 | 30M$1 | No | Apr-06 | CONTINUANT1 | 80 | 80-89 | 1-5M | Apr-06 | 05Q3 | 3/1/2006 | NJ |
| 03N65 | UM0339502L | 169,550 | 169,550 | $100M+ | 1 | 3,000,000 | 3,000,000 | 30M$1 | Yes | Apr-05 | CONTINUANT1 | 79 | 75-79 | 1-5M | Apr-05 | 05Q3 | 4/1/2006 | NJ |
| 03N65 | UM0225652 | 103,149 | 103,149 | $150M+ | 1 | 1,500,000 | 1,500,000 | 30M$1 | No | Feb-06 | CONTINUANT1 | 82 | 80-89 | 1-5M | Feb-06 | 05Q2 | 1/1/2006 | NJ |
| 03N65 | UM0330862L | 291,948 | 291,948 | $250M+ | 1 | 10,000,000 | 10,000,000 | 30M$1 | No | Mar-06 | CONTINUANT1 | 79 | 75-79 | 10-20M | Mar-06 | 05Q1 | 2/1/2006 | NJ |
| 03N65 | UM0330862L | - | 291,948 | $250M+ | 0 | - | 10,000,000 | 30M$1 | No | Apr-06 | CONTINUANT1 | 79 | 75-79 | 10-20M | Mar-06 | 05Q1 | 2/1/2006 | NJ |

UM0330862L INSURED: IRVING ELLMAN

1010

HIGHLY CONFIDENTIAL

# EXHIBIT
# D

## Investor Owned Life Insurance

Effective immediately, AIG American General Life will no longer approve applications received that are investor owned, stranger owned, or viatical transactions.

- In order to verify that applications and quotes received are consistent with this new policy, <u>all of the following documents</u> must be received for any **single permanent life insurance application** for a proposed insured that is **age 70 or greater** with a requested **death benefit of $1,000,000.00 or greater**:

  - A completed and signed Agent Certification Form (AGLC101994)
  - A completed and signed Client Acknowledgement Form (AGLC102053)
  - A copy of the proposed insured's most recently filed Federal Tax Return (IRS Form 1040)

  **All of these documents must be received by New Business before an underwriting decision can be made.**

- The policy's annual premium cannot exceed 20% of the proposed insured's adjusted gross income as stated on their most recent tax return regardless of who is paying the premium or if it is financed.

- Third party CPA financial statements may be requested at Underwriter discretion.

Additionally, effective immediately AIG American General will no longer accept formal applications or informal requests for single life universal life products for insureds **age 75 and older** other than for the **Elite UL product for AGL** and the **Elite Index UL product for USL**. Additionally, we will no longer accept formal applications or informal requests for the 10 Year Ultra term product for insureds **age 70 and older**.

## Indexing Procedures

- The required sources should be named as follows:
  - Agent Certification form (AGLC101994) should be named **IOLI**
  - Client Acknowledgement form (AGLC102053) should be named **IOLICA**
  - Client's most recently filed Federal Tax Return (IRS Form 1040) should be named **NBFINANC**.

**Data Entry Procedures**

If a single permanent life application is received for a proposed insured that is **age 70 or greater** with a requested **death benefit of $1,000,000.00 or greater**:
- Submit the policy on appropriate mainframe.
- Review all AWD sources.  Verify that all of the required forms have been received.
- Rename the sources if necessary.
- If all of the required forms have been received and are completed and signed, add and receipt the requirements on the appropriate mainframe, including the form names and form numbers in the remarks.
  - Vantage/LifeComm – OTHER
  - NBE – FREEFORM (MISC/AWAIT OPTIONS)
- If all of the required forms have not been received, or are not signed and completed correctly:
  - Add and receipt the requirements for the forms that have been received and are completed correctly (as described above)
  - Add an outstanding requirement for the form(s) that have not been received or are not completed correctly.
  - Add comments to AWD indicating the form(s) that are outstanding
- Change the status of the case to VTGINIT


**Requirements Processing**

1. If one or more of the required forms for a **single permanent life insurance application** for a proposed insured that is **age 70 or greater** with a requested **death benefit of $1,000,000.00 or greater is outstanding**:

   - Contact the agent/agency for the completed form(s).
   - Add a requirement to the appropriate mainframe.
   - Add comments to AWD History stating all actions taken.
   - Send the case to the RENDEZ queue via the AWAIT10 status.

2. If an Agent Certification Form is received:
   - Are the questions answered yes or no?
     - If the questions **are** answered yes or no:
       - Is the form signed by the agent (can be any of the agents that signed the application)?
         - If the form is signed, name the source correctly (IOLI), receipt the requirement in the appropriate mainframe, and add comments to AWD.
           Note:  Do not send the case to the underwriter unless the form was the last requirement or other underwriting requirements were received.
         - If the form is not signed, contact the agent/agency to determine if the form was completed correctly or the signature was inadvertently left off the form.

- • If so, request a completed form, add comments to AWD, add a requirement to the appropriate mainframe, and send the case to RENDEZ via the AWAIT10 status.
- • If not, send the case to the Underwriter for closeout instructions.

- o If the questions are **not** answered yes or no,
  - ▪ Contact the agent/agency for a completed/signed form.
  - ▪ Add AWD comments to the case indicating all actions taken.
  - ▪ Send the case to the RENDEZ queue via the AWAIT10 status.

3. If the Client Acknowledgement form is received, receipt the requirement on the appropriate mainframe and note AWD history.

4. If the Federal Tax Return (IRS Form 1040) is received, receipt the requirement on the appropriate mainframe and forward the case to the Underwriter per current procedures.

Note:  Please follow current closeout procedures if the signed Agent Certification Form, Client Acknowledgement Form, and/or Federal Tax Return have not been received in a timely manner.

## Underwriting Guidelines (Formal Applications)

- • All of the following documents must be received for any **single permanent life insurance application** for a proposed insured that is **age 70 or greater** with a requested **death benefit of $1,000,000.00 or greater**:

  - • A completed and signed Agent Certification Form (AGLC101994)
  - • A completed and signed Client Acknowledgement Form (AGLC102053)
  - • A copy of the proposed insured's most recently filed Federal Tax Return (IRS Form 1040)

  **All of these documents must be received by New Business before an underwriting decision can be made.**

- • Any previously closed out application, regardless of the date the original application was received, will require the additional forms described above in order to be reopened.

- • If CWA is received with a formal application, or at any other point in the Underwriting process, the case should be reviewed by the Underwriter to determine if the CWA should be refunded.

## Underwriting Procedures (Formal Applications)

1. Review AWD for the signed and completed Agent Certification Form (IOLI source), Client Acknowledgement Form (IOLICA source) and Federal Tax Return

(NBFINANC source).  If the required forms have been received, and are completed correctly, skip to step 3 to determine if the case is compliant.  If any of the required forms have not been received or are not completed correctly, proceed to step 2.

2.  If the case is received by an underwriter and the completed Agent Certification form, completed Client Acknowledgement Form, and/or the Federal Tax Return have not been received, or if the plan was changed to a permanent (non-survivorship) plan:
   - Add comments to AWD requesting the necessary form(s).
   - Post a requirement in the appropriate mainframe for the required form(s).
   - Send the case to the REQREV queue via the FOLLOWUP status for field contact.

3.  Review the inspection report* for the newly added IOLI questions:
   - Is anyone borrowing all or part of the premiums to pay for this policy?
   - If anyone is borrowing premiums to pay for this policy, what amount of the death benefits do you expect will go to your heirs or designated beneficiaries?
   - Have you received a cash payment, borrowed funds in excess of the scheduled premium payments or received some other consideration as an inducement to acquire this policy?
   - Is there any agreement to transfer ownership of this policy or is there an option or right of first refusal to transfer the policy to another person or entity?

   *Inspection Reports will be ordered on face amounts over $1,500,000.00 and can only be used if ordered from approved vendors.*

4.  Review the proposed insured's Federal Tax Form (IRS Form 1040):

   - Determine if the annual premium is greater than 20% of the insured's adjusted gross income (Federal Tax Form).  If further financial information is needed, a third party CPA financial statement may be requested at the Underwriter's discretion.
      - If the annual premium will be more than 20% of the insured's adjusted gross income, proceed to step 10.
      - If not, proceed to step 5.

5.  Review the following information in the file to determine if the case could possibly be non-compliant:

   - If the stated income of the proposed insured is substantially less than the case premium.
   - If the net worth of the proposed insured is made up primarily of their primary residence.
   - If the proposed insured appears unaware of the sale and the purpose of the coverage (based on the Application, Inspection Report, etc.)

6.  If the case is compliant, skip to step 9.  If not proceed to step 7.

7. Add AWD comments that the Agent Certification form has been reviewed and the case needs further compliance review.  Send the case to the COSIGN status.

8. The Cosigned Underwriter should review the case for compliance.   If the case is compliant, the case should be returned to the original Underwriter via the COSIGNED status.  If the case is not in compliance, the case should be closed out (see step 10).

9. If the case is compliant, Underwriting approval can be made as follows:

   - Add approval comments per current procedures.
   - Add an additional comment that the Agent Certification form has been approved.

10. If the case is to be closed out, the Negative Disposition should be completed as follows:

   - If any of the required forms are not received in a timely manner:

      o Add closeout instructions to incomplete the case due to lack of requirements.
      o Send the case to the CLOSEOUT queue via the INCOMPLETE status.

   - If the case can not be issued due to non-compliance with the IOLI guidelines:

      o Add closeout instructions to decline the case.  The non-medical decline reason should be because 'the application failed to satisfy our general underwriting practices or guidelines.'
      o Send the case to the CLOSOUT queue via the DECLINE status.

## Underwriting Guidelines (Quotes)

   - Pending and newly received quotes, regardless of when they were received, will require the Agent Certification form.  Neither the Client Acknowledgement Form nor federal tax return is required for quote requests.  These forms will be requested if a formal application is received.

## Underwriting Procedures (Quotes)

Review the quote file to determine if the quote is subject to the IOLI guidelines.  If not, proceed with underwriting the quote file.  If so, the following procedures should be followed:

1. Review the quote file to determine if a completed Agent Certification form has been received.  If so, proceed with underwriting the quote file*.  If not, proceed to step 2.

2. Email the Agent Certification form, Client Acknowledgement Form, and the Field Bulletin to the Agent/Agency.

3.  Add comments to AWD indicating all actions taken.

4.  Send the Case to the AWAIT10 status without further Underwriting review until the required forms are received.

5.  The quote should be closed out without an offer if the required forms are not received within 10 days.

### Reissue Procedures:

- If a case is being reissued while in a conditional issue status, and the three forms (Agent Certification Form, Client Acknowledgement Form, and Federal Tax Forms) were not required for the original underwriting process, these forms will not be required for the reissue.

- Cases that are being reissued that have been in force less than 90 days will <u>not</u> require the additional forms.

- Cases that have been issued for 90 days or more are to be processed by Policy Owner Services (POS).

- If the owner or beneficiary is being changed during the reissue, a **<u>newly dated and signed Agent Certification form is required</u>**, even if one is already in the file, and the case should be sent to the Underwriter for further review.

- Any reissue for a proposed insured age 75 or greater must be reissued with either the AGL Elite UL or the USL Elite Index UL product, regardless of the originally requested product.

## New Business and Underwriting IOLI Job Aid

| | Issue Age | Agent Certification Form Required | Client Acknowledgement Form Required | Most Recent Tax Return Required | Special Instructions |
|---|---|---|---|---|---|
| Formal Applications Pending on May 19, 2006 | 70 or Greater | Yes | Yes | Yes | |
| New Formal Applications Received on or after May 19, 2006 | 70-74 | Yes | Yes | Yes | |
| | 75 or greater | Yes | Yes | Yes | Only AGL Elite UL and USL Elite Index UL Available |
| Formal Applications Conditionally Issued On or Before May 18, 2006 | 70 or Greater | No | No | No | |
| Formal Applications Conditionally Issued After May 18, 2006 | 70 or Greater | Yes | Yes | Yes | |
| Formal Applications Placed In Force Before May 19, 2006 | 70 or Greater | No | No | No | |
| Quotes Pending on May 19, 2006 | 70-74 | Yes | No | If UW requests | |
| | 75 or Greater | Yes | No | If UW requests | UW should communicate that offer only available for AGL Elite UL or USL Elite Index UL. If another product is being requested, UW may close out case and refuse to quote |
| New Quotes Received on or after May 19, 2006 | 70-74 | Yes | No | If UW requests | |
| | 75 or Greater | Yes | No | If UW requests | UW should communicate that offer only available for AGL Elite UL or USL Elite Index UL. If another product is being requested, UW may close out case and refuse to quote |
| Policies that were previously referred to Compliance for Review | 70 or Greater | Yes | Yes | Yes | Compliance review is no longer being performed. All three forms should be requested as soon as possible for any case that was placed in an AWAIT status while the compliance review was pending. |
| Policies Reissued On or After May 19, 2006 (Includes inforce reissues and conditionally issued reissues) | 70 or Greater | No* | No* | No* | * If the forms were not required/used in the original underwriting process, then the forms will not be required for the reissue. |
| Previously Closed Out Case File Requesting to be Reopened | 70 or Greater | Yes | Yes | Yes | Any requests to reopen a previously closed out case file should be treated as though received on the reopen date and will follow guidelines stated above. |

**NOTES:**

AGL Elite Universal Life and USL Elite Index Universal Life are the only single life ULs available for proposed insureds over age 74.
The maximum issue age for AGL Ultra 10 year term and USL Ultra 10 year term is 69.

Revised 5/22/2006

**AIG** AMERICAN GENERAL

**Agent Certification Form**

☐ **American General Life Insurance Company, Houston TX**
☐ **The United States Life Insurance Company in the City of New York, New York, NY**
☐ **AIG Life Insurance Company, Wilmington, DE**
*Member companies of American International Group, Inc.*

In this application, the "Company" refers to the insurance company whose name is checked above.

The insurance company shown above is **solely** responsible for the obligation and payment of benefits under any policy that it may issue. No other company is responsible for such obligations or payments.

Insured's Social Security Number _____   Policy Number _____

This Form must be completed prior to taking any application for permanent life insurance seeking a death benefit of $500,000.00 or more and the insured is age 70 or older. AIG American General may also request agents to complete this Form in other situations where it is deemed appropriate. Carefully review these statements and the Company Field Bulletins regarding Investor Owned Life Insurance and Stranger Owned Life Insurance before submitting this Form.

• **Are all or part of the premiums paid towards this policy being financed?** (This does not include financing through a split dollar agreement with your employer or a family's private split dollar agreement.)
• **If the answer is "no" please check the appropriate box and sign below.**
• **If the answer is "yes" please check the appropriate box, review and sign the certification below.** If the answer is "yes" and you cannot sign the certification you should not take the application.

1) I have reviewed and am familiar with all aspects of the premium financing proposal.
2) Based upon my review of the financing proposal I believe that the costs associated with this premium financing proposal are such that assuming no change in the insured's health it is more likely than not that the insured will maintain the policy in force for the benefit of his/her beneficiaries and those beneficiaries will receive more than 50% of the policy death benefit.
3) The insured is not receiving any cash payment, borrowing funds in excess of those required to pay the scheduled premiums and interest or receiving any other consideration as an inducement to participate in this transaction.
4) There is no prearranged agreement to transfer the policy nor will the policyholder have a prearranged option or right of first refusal to transfer the policy to a third party.
5) All materials used in connection with the solicitation and sale of this policy or financing of the policy premiums were either produced by the life insurance company or have been submitted to the life insurer for its review and approval.
6) I have read the Field Bulletins regarding Investor Owned Life Insurance, Stranger Owned Life Insurance and Viatical Transactions, and believe this transaction is in compliance with the company policies as set forth in those Bulletins regardless of whether the lending program is a recourse or non-recourse transaction.

☐ **Yes**   All or part of the premiums paid towards this policy are being financed. I have read the statements set forth above and hereby certify that the statements are all true with regard to the application for

_____ (Insured) dated _____.

_____   _____
Agent Signature                                                      Date

☐ **No**   None of the premiums for the policy sought with the application for _____
(Insured) dated _____ will be financed other than pursuant to a split dollar agreement.

_____   _____
Agent Signature                                                      Date

AGLC101994

# EXHIBIT
# E

Case 3:08-cv-05364-MLC -TJB   Document 125   Filed 03/20/12   Page 67 of 117 PageID: 1897
Case 7:08-cv-06843-ER-GAY   Document 59   Filed 02/20/12   Page 19 of 45
Case 7:08-cv-06843-ER-GAY   Document 58-5   Filed 02/17/12   Page 2 of 17

ORIGINAL

1

2  SUPREME COURT OF THE STATE OF NEW YORK
   COUNTY OF NEW YORK

3  - - - - - - - - - - - - - - - - - X

4  THE UNITED STATES LIFE INSURANCE COMPANY
   IN THE CITY OF NEW YORK,

5                          Plaintiff,

6           -against-

7

8  LAZAR GRUNHUT, TRUSTEE OF PIRI GRUNHUT
   2004 B IRREVOCABLE LIFE INSURANCE
   TRUST AND PIRI GRUNHUT,

9                          Defendants.

10 - - - - - - - - - - - - - - - - - X

11                        INDEX NO: 600550/07

12
                    December 14, 2010
13                     10:00 a.m.

14

15         EXAMINATION BEFORE TRIAL of the

16    Witness, ROBERT M. CICCHI, on behalf of

17    Plaintiff, held at the offices of Cozen

18    O'Connor, 277 Park Avenue, New York, New

19    York, before Cynthia Zoller, R.P.R., a

20    Notary Public within and for the State of

21    New York.

22

23              RAPID REPORTING LLC
24        254 South Main Street, Suite 216
            New City, New York 10956
25              (718) 310-0704

Case 3:08-cv-05364-MLC -TJB   Document 125   Filed 03/20/12   Page 68 of 117 PageID: 1898
Case 7:08-cv-06843-ER-GAY   Document 59   Filed 02/20/12   Page 20 of 45
Case 7:08-cv-06843-ER-GAY   Document 58-5   Filed 02/17/12   Page 3 of 17

2

1

2

3   A P P E A R A N C E S:

4

5

6       EDISON McDOWELL & HETHERINGTON, LLP
            Attorneys for Plaintiff
7           Phoenix Tower
            3200 Southwest Freeway, Suite 2920
            Houston, Texas  77027
8
        BY: JESSICA L. WILSON, ESQ.
9           jessica.wilson@emhllp.com

10

11      SCHINDEL, FARMAN, LIPSIUS
        GARDNER & RABINOVICH, LLP
12          Attorneys for Defendants
            14 Penn Plaza, Suite 500
13          New York, New York  10122

14      BY: IRA S. LIPSIUS, ESQ.
            DAVID BENHAIM, ESQ.

15

16

17

18

19

20

21

22

23

24

25

Case 3:08-cv-05364-MLC -TJB   Document 125   Filed 03/20/12   Page 69 of 117 PageID: 1899
Case 7:08-cv-06843-ER-GAY   Document 59   Filed 02/20/12   Page 21 of 45
Case 7:08-cv-06843-ER-GAY   Document 58-5   Filed 02/17/12   Page 4 of 17

3

1

2          IT IS HEREBY STIPULATED, by and
   between counsel for the respective parties
3  hereto, that: All rights provided by the
   C.P.L.R. and Part 221 of the Uniform Rules
4  for the Conduct of Deposition, including the
   right to object to any question, except as
5  to form, or to move to strike any testimony
   at this examination is reserved; and in
6  addition, the failure to object to any
   question or to move to strike any testimony
7  at this examination shall not be a bar or
   waiver to make such motion at, and is
8  reserved to, the trial of this action.  This
   deposition may be sworn to by the witness
9  being examined before a Notary Public other
   than the Notary Public before whom this
10 examination was begun, but the failure to do
   so or to return the original of this
11 deposition to counsel, shall not be deemed a
   waiver of the rights provided by Rule 3116
12 of the C.P.L.R., and shall be controlled
   thereby.  The filing of the original of this
13 deposition is waived.

14

15

16

17

18

19

20

21

22

23

24

25

Case 3:08-cv-05364-MLC-TJB  Document 125  Filed 03/20/12  Page 70 of 117 PageID: 1900
Case 7:08-cv-06843-ER-GAY  Document 59  Filed 02/20/12  Page 22 of 45
Case 7:08-cv-06843-ER-GAY  Document 58-5  Filed 02/17/12  Page 5 of 17

4

```
1                    - Robert M. Cicchi -

2        R O B E R T   M.   C I C C H I,

3        Witness herein, on behalf of Plaintiff,

4   having been first duly sworn by Cynthia

5   Zoller, R.P.R., a Notary Public of the State

6   of New York, was examined and testified as

7   follows:

8                    THE REPORTER:  Please state

9        your name for the record.

10                   THE WITNESS:  Robert M.

11       Cicchi.

12                   THE REPORTER:  Please state

13       your address for the record.

14                   THE WITNESS:  2727 Allen

15       Parkway, Houston, Texas  77019.

16                   MR. LIPSIUS: With corporate

17       party witnesses, I prefer that the

18       record does not have their home

19       addresses, because I feel like I

20       have to protect the privacy of the

21       witness.  I would just like, I will not

22       ask him that question, upon stipulation,

23       that if at trial or before trial he is

24       no longer working for the United States

25       Life Insurance Company in the City of
```

Case 3:08-cv-05364-MLC-TJB  Document 125  Filed 03/20/12  Page 71 of 117 PageID: 1901
Case 7:08-cv-06843-ER-GAY  Document 59  Filed 02/20/12  Page 23 of 45
Case 7:08-cv-06843-ER-GAY  Document 58-5  Filed 02/17/12  Page 6 of 17

5

```
1                  - Robert M. Cicchi -
2          New York or its parent company,
3          we'll be provided with his last known
4          home address and that if he is working,
5          counsel will accept a trial subpoena on
6          his behalf.
7                  MS. WILSON: Agreed.
8      EXAMINATION BY
9      MR. LIPSIUS:
10         Q      I just want to make sure I get
11     your name pronounced correctly.
12         A      Cicchi.
13         Q      Mr. Cicchi; is that correct?
14         A      That's correct.
15         Q      Thank you.  Mr. Cicchi, I am an
16     attorney for Lazar Grunhut, Trustee of the
17     Piri Grunhut 2004 Irrevocable Life Insurance
18     Trust and I'm also counsel for Piri Grunhut
19     in this action.
20                Your company has received a Notice
21     to Take Deposition Upon Oral Examination and
22     I'm going to show you a copy of that notice
23     which has been marked as Exhibit A.  It is a
24     three-page document.  Have you seen that
25     notice?
```

Case 3:08-cv-05364-MLC -TJB   Document 125   Filed 03/20/12   Page 72 of 117 PageID: 1902
Case 7:08-cv-06843-ER-GAY   Document 59   Filed 02/20/12   Page 24 of 45
Case 7:08-cv-06843-ER-GAY   Document 58-5   Filed 02/17/12   Page 7 of 17

6

1                - Robert M. Cicchi -

2        A       Yes, I have.

3        Q       And your counsel has advised that

4    you are prepared to testify as to some of

5    the matters listed on Page 3.  Could you

6    please look at Page 3 of Exhibit A?

7        A       Yes, I am.

8        Q       Could you tell me which matters of

9    those 11 matters you are prepared to testify

10   to?

11       A       Number 1; Number 2; Number 3; 4,

12   I'm not an attorney so I can't, I don't know

13   about all the pleadings so I'm not -- Number

14   5, I guess; nothing relating to Number 6; no

15   to 7; no to 8; yes to 9; yes to 10; yes to

16   11.

17       Q       Okay.  Thank you.  Just a little

18   basic rules.  Have you ever had your

19   deposition taken before?

20       A       Yes, I have.

21       Q       On approximately how many

22   occasions?

23       A       Four or five.

24       Q       When was the last time you had

25   your deposition taken?

Case 3:08-cv-05364-MLC -TJB   Document 125   Filed 03/20/12   Page 73 of 117 PageID: 1903
Case 7:08-cv-06843-ER-GAY   Document 59   Filed 02/20/12   Page 25 of 45
Case 7:08-cv-06843-ER-GAY   Document 58-5   Filed 02/17/12   Page 8 of 17

7

                    - Robert M. Cicchi -

1

2      A       Earlier this year.  April maybe.

3      Q       And where was that deposition

4   taken in April?

5      A       In Houston.

6      Q       And what was the action that it

7   related to?

8      A       It was another case.  I believe it

9   was in Indiana.

10     Q       Do you know which court in

11  Indiana?  Do you know if it was -- I'm

12  sorry, do you know if it was federal or

13  state?

14     A       No.  I have no idea.

15     Q       Okay.  Did it involve a death

16  claim?

17     A       Yes, it did.

18     Q       And did you testify as a corporate

19  designee in that?

20     A       Yes, I did.

21     Q       Now, the other three or four

22  occasions and I'll just start off, this is

23  not a memory test and you know, we

24  understand that things take place and it's

25  not always easy to remember and I'm not

Case 3:08-cv-05364-MLC -TJB   Document 125   Filed 03/20/12   Page 74 of 117 PageID: 1904
Case 7:08-cv-06843-ER-GAY   Document 59   Filed 02/20/12   Page 26 of 45
Case 7:08-cv-06843-ER-GAY   Document 58-5   Filed 02/17/12   Page 9 of 17

8

1                    - Robert M. Cicchi -

2    interested in challenging your memory and if

3    you don't remember, that's fine, but

4    approximately, of the other ones, do you

5    recall any of the other depositions?

6         A       Vague recollections, frankly.   I

7    don't recall any of the specifics.

8         Q       Were any of the other ones within

9    the last three years?

10        A       Yes, they were.

11        Q       Were all of them within the last

12   three years?

13        A       I couldn't testify to that.

14        Q       In the last ten years?

15        A       Yes.

16        Q       And did they involve your

17   company's challenging of a policy?

18        A       Yes, they did..

19        Q       By whom are you employed?

20        A       American General Life.

21        Q       And does American General Life

22   have any other affiliates for which you

23   work?

24        A       Yes.   United States Life Insurance

25   Company in the City of New York.

Case 3:08-cv-05364-MLC -TJB   Document 125   Filed 03/20/12   Page 75 of 117 PageID: 1905
Case 7:08-cv-06843-ER-GAY   Document 59   Filed 02/20/12   Page 27 of 45
Case 7:08-cv-06843-ER-GAY   Document 58-5   Filed 02/17/12   Page 10 of 17

9

```
1                    - Robert M. Cicchi -
2         Q       Any others?
3         A       Those are the two primary
4    companies that I work with.
5         Q       What is your position with
6    American General Life?
7         A       I'm Vice President of
8    Underwriting, Innovation and Research.
9         Q       I'm sorry, Vice President
10   Underwriting --
11        A       Underwriting, Innovation and
12   Research.
13        Q       And how long have you held that
14   position?
15        A       Since April of 2008.
16        Q       And how long have you worked for
17   American General Life?
18        A       Since December of 2002.
19        Q       And what positions have you held
20   from 12/02 to the present with American
21   General Life?
22        A       Just one other position.  I was
23   Vice President of Underwriting and Chief
24   Underwriter for the Independent Agency Group
25   of American General Life/U.S. Life.
```

Case 3:08-cv-05364-MLC -TJB  Document 125  Filed 03/20/12  Page 76 of 117 PageID: 1906
Case 7:08-cv-06843-ER-GAY  Document 59  Filed 02/20/12  Page 28 of 45
Case 7:08-cv-06843-ER-GAY  Document 58-5  Filed 02/17/12  Page 11 of 17

151

```
 1               - Robert M. Cicchi -

 2      Q       Okay.  Now, was there a large

 3  increase in the number of elderly policies

 4  issue by American General and U.S. Life

 5  during the period beginning 2002 through

 6  2008?

 7      A       I think the industry as a whole,

 8  saw an increase on pertinent life insurance

 9  sales for individuals over age 65, yes.

10      Q       And I heard the industry as a

11  whole did it.  Did American General/U.S.

12  Life see that increase?

13      A       I believe that we did, yes.

14      Q       And did American General see that

15  market at anytime between 2002 and 2008?

16              MS. WILSON: Objection to form.

17      A       I wasn't in Marketing and

18  Distribution, but I was aware of the fact

19  that we were seeing applications coming in

20  under the market, yes.

21      Q       Did there come a time that

22  American General requested tax returns on

23  senior policies with large net worth?

24      A       Yes.

25      Q       And when would that have been?
```

Case 3:08-cv-05364-MLC -TJB   Document 125   Filed 03/20/12   Page 77 of 117 PageID: 1907
Case 7:08-cv-06843-ER-GAY   Document 59   Filed 02/20/12   Page 29 of 45
Case 7:08-cv-06843-ER-GAY   Document 58-5   Filed 02/17/12   Page 12 of 17

152

- Robert M. Cicchi -

1

2    A       That was later.  That was after

3  this case was underwritten.  Maybe 2006,

4  2007, I don't know for sure.

5    Q       And as a result, did American

6  General see a reduction in applications for

7  such policies?

8    A       I couldn't speculate on that.  I

9  mean, I think that we began to ask for those

10  requirements just like the rest of the

11  industry began to react to some of the

12  abuses that were taking place in the

13  business.  So as a result of that, did we

14  have a reduced number of applications,

15  maybe, maybe not.  I'm not knowledgeable

16  about that.

17    Q       Did American General rescind

18  the requirement that tax returns be

19  furnished?

20    A       Yes.  We changed our guideline,

21  additional safeguards were introduced.

22    Q       But there was a time following

23  this policy that they required tax returns

24  and then they rescinded that requirement,

25  correct?

Case 3:08-cv-05364-MLC -TJB   Document 125   Filed 03/20/12   Page 78 of 117 PageID: 1908
Case 7:08-cv-06843-ER-GAY   Document 59   Filed 02/20/12   Page 30 of 45
Case 7:08-cv-06843-ER-GAY   Document 58-5   Filed 02/17/12   Page 13 of 17

153

```
1                    - Robert M. Cicchi -

2        A        That's correct.

3        Q        Were you part of that

4   decision-making process in requesting tax

5   returns?

6        A        Yes, I was.

7        Q        Who else made that -- who else was

8   part of that decision-making process?

9        A        There were a number of individuals

10  involved with that decision.

11       Q        Could you tell me those that you

12  recall?

13       A        I believe Kent Major was involved,

14  I believe Brad Gabel was involved, and they

15  would have been from our Marketing and

16  Distribution Leadership team.

17       Q        And who would it have been from

18  that leadership team?

19       A        Royce Imhoff would have probably

20  been the leader.

21       Q        Spell that.

22       A        I-M-H-O-F-F, Royce, R-O-Y-C-E.

23       Q        Anyone else that you can recall?

24       A        Dennis Roberts.

25       Q        Was the Legal Department involved
```

Case 3:08-cv-05364-MLC -TJB   Document 125   Filed 03/20/12   Page 79 of 117 PageID: 1909
Case 7:08-cv-06843-ER-GAY   Document 59   Filed 02/20/12   Page 31 of 45
Case 7:08-cv-06843-ER-GAY   Document 58-5   Filed 02/17/12   Page 14 of 17

154

```
1                  - Robert M. Cicchi -

2    in this decision?

3       A        Yes, they were.

4       Q        And who from Legal was involved?

5       A        I couldn't tell you.  I can't

6    remember.

7       Q        Do you recall a meeting addressing

8    this issue?

9       A        I recall a number of meetings and

10   conversations over time, over this time,

11   yes.

12      Q        And very shortly after the

13   requirement was put in within a few months,

14   that requirement was rescinded; is that

15   correct?

16      A        That's correct.

17      Q        Okay.  And who suggested that it

18   be rescinded?

19      A        It was a decision that was arrived

20   at by the group.  I think that the product

21   was changed, the product was priced

22   differently.  There was different

23   requirements introduced so I mean, I don't

24   recall who specifically suggested that.

25      Q        Was the issue raised by Marketing
```

Case 3:08-cv-05364-MLC -TJB   Document 125   Filed 03/20/12   Page 80 of 117 PageID: 1910
Case 7:08-cv-06843-ER-GAY   Document 59   Filed 02/20/12   Page 32 of 45
Case 7:08-cv-06843-ER-GAY   Document 58-5   Filed 02/17/12   Page 15 of 17

155

```
 1              - Robert M. Cicchi -

 2   and Distribution that it was causing

 3   problems in sales?

 4       A     I'm sure it was.  And again, you

 5   are asking me to remember several meetings

 6   and conversations and I can't specifically

 7   answer the question, but I believe that they

 8   would be the ones that raised it.

 9       Q      Were there memoranda issued on

10   this issue?

11       A      Were there memoranda specifically?

12       Q      Let's see.  Did you have any

13   correspondence with Kent Major, Mr. Gabel,

14   Marketing and Distribution, Legal Department

15   regarding the implementation of mandating

16   financial -- tax returns?

17       A      Yes, I did.

18       Q      And did you have any

19   correspondence with Kent Major, Brad Gabel,

20   Marketing and Distribution, Legal regarding

21   the rescission of that requirement?

22       A      We had meetings.  I can't

23   specifically remember if there was a

24   memorandum that was crafted as a result or a

25   meeting.
```

Case 3:08-cv-05364-MLC -TJB  Document 125   Filed 03/20/12  Page 81 of 117 PageID: 1911
Case 7:08-cv-05843-ERGAY Document 59  Filed 02/20/12  Page 33 of 45

157

```
 1                    - Robert M. Cicchi -

 2       Q       And have those e-mails been

 3  preserved?

 4       A       I believe they have.

 5       Q       And has the electronic file been

 6  preserved?

 7       A       I believe it has, yes.

 8       Q       Is it a separate electronic file

 9  or is it -- is it a separate electronic file

10  regarding that issue?

11       A       I mean, it's just my normal e-mail

12  retention and I assume that all those

13  e-mails are preserved, I just don't know.

14               MR. LIPSIUS: I would like to

15       mark as an Exhibit, USL 675 through USL

16       788.

17               (Whereupon Defendant's Exhibit J

18       was marked for Identification.)

19       Q       And if you can, could you please

20  identify this document and I'm afraid again,

21  it may be out of order, but this the order

22  that's been provided to us by your counsel.

23       A       Okay.  Again, these appear to be

24  file notes from this particular case.  I

25  assume these are one file, the 616Y file
```

# EXHIBIT

# F

To:     Ira Lipsius, Esq.
        David BenHaim, Esq.
        Daniel Grossman, Esq.

Re:    *American General Life Ins. Co. v. Ellman Savings Irrevocable Trust, et al.*
        Civil Action No. 3:08-cv-05364-MLC-TJB
        Our File No.: 07478.00537

Date:  February 2, 2012

## Privilege Log of Documents Withheld from Production of Document Bearing Bates Numbers AGLIC 1113-1133 CONFIDENTIAL

| BATES NUMBER | DATE | DESCRIPTION of REDACTED INFORMATION | From: | To: | CC: |
|---|---|---|---|---|---|
| 1113-1114 | 10/9/08 | Email correspondence chain; privileged (work product and attorney-client) | Sarah Wickes | Nancy Yasso | Tracy Phillips |
| | | | Sarah Wickes | Christopher Strazishar | Sarah Wickes; Tracy Phillips; Nancy Yasson |
| | | | Christopher Strazishar | Vendor Relations | |
| 1119 - 1123 | 10/9/08 - 10/13/08 | Email correspondence chain; privileged (work product and attorney-client) | Sarah Wickes | Nancy Yasso | Tracy Phillips |
| | | | Sarah Wickes | Christopher Strazishar | Sarah Wickes; Tracy Phillips; Nancy Yasson |
| | | | Christopher Strazishar | Vendor Relations | |
| | | | Beth Pyltleski on behalf of Vendor | DGSLEN ExamOne AIG | Mike D. Madden; Carter Palmer; Heather M; Jonna |

1325751.1

| No. | Date | Description | From | To | CC |
|---|---|---|---|---|---|
| | | | Relations<br>Mike D. Madden | Jeannette A Jackson | L. Vollmer |
| | | | Jeannette A Jackson | Beth Pyltleski; Mike D. Madden | Tracy Phillips; Nancy Yasso |
| | | | Beth Pyltleski | Sarah Wickes | |
| | | | Sarah Wickes | Vendor Relations | |
| | | | Beth Pyltleski | Sarah Wickes | |
| 1124-1125 | 10/14/12 | Email correspondence chain; privileged (work product; attorney-client) | Beth Pyltleski | Tracy Phillips; Nancy Yasso; Sarah Wickes | Beth Pyltleski |
| | | | Sarah Wickes | Liza Glass | Tracy Phillips |
| | | | Liza Glass | Sarah Wickes | Tracy Phillips |
| 1126-1129 | 10/9/08 – 10/10/08 | Email correspondence chain; privileged (work product; attorney-client) | Sarah Wickes | Nancy Yasso | Beth Pyltleski |
| | | | Sarah Wickes | Christopher Strazishar | Tracy Phillips |
| | | | Christopher Strazishar | Vendor Relations | Sarah Wickes; Tracy Phillips |
| | | | Beth Pyltleski on behalf of Vendor Relations | DGSLEN ExamOne AIG | Mike D. Madden; Carter Palmer; Heather M; Jonna L. Vollmer |
| | | | Jeannette A Jackson | Beth Pyltleski; Mike D. Madden | |
| | | | Beth Pyltleski | Sarah Wickes | Tracy Phillips; Nancy Yasso |
| 1130 | 10/10/08 | Email correspondence; privileged (work product; | Sarah Wickes | Liza Glass | Tracy Phillips |

1325751.1

| | | | | | |
|---|---|---|---|---|---|
| | | attorney-client) | | | |
| 1131 | 10/7/08 | Email correspondence; privileged (work product; attorney-client) | Sarah Wickes | Tracy Phillips | |
| 1132 | 10/9/08 | Email correspondence, privileged (work product; attorney-client) | Sarah Wickes | Tracy Phillips | |
| 1133 | 10/14/08 | Email correspondence chain; privileged (work product; attorney-client) | Beth Pytleski | Tracy Phillips; Nancy Yasso; Sarah Wickes | |
| | | | Sarah Wickes | Liza Glass | |
| | | | | | |

1325751.1

Redacted

CONFIDENTIAL

AGLIC 1113

Redacted

CONFIDENTIAL

AGLIC 1114

| | |
|---|---|
| **From:** | Ira S. Lipsius <iral@sfl-legal.com> |
| **Sent:** | Friday, October 10, 2008 4:39 PM |
| **To:** | <lglass@aigag.com> |
| **Cc:** | David BenHaim <dbenhaim@sfl-legal.com>; <swickes@aigag.com> |
| **Subject:** | Irving Ellman, Deceased. Our File No. 4206.0002; policy number UM0030862L |
| **Attach:** | Wickes.pdf |

Please find a copy of prior correspondence to Ms. Wickes.

As you are aware, or should be aware, Mr. Ellman passed away subsequent to the expiration of the contestability period.

Payment should be made to the policy owner, the Ellman Savings Irrevocable Trust .

If American General Life has any concerns about Mr. Lawrence Ellman's ownership interest in the policy, I will provide AIG with appropriate documentation releasing American General Life from any liability.

As American General Life has vexatiously reused to pay claim or even respond as to the basis for its refusal to pay the claim, it is expected that American General Life will pay the 9% statutory interest rate.  This is the rate which the Trust is entitled to, as a matter of law, as AIG has refused to fulfill its legal obligation.

Interest continues to accrue at the daily rate of $2465.75.

Please contact the undersigned to arrange for wire transfer of $10,357,533.75 (the amount due through Monday).

Ira S. Lipsius

Schindel, Farman, Lipsius, Gardner & Rabinovich, LLP

CONFIDENTIAL    AGLIC 1115

14 Penn Plaza

New York, NY 10122

212-563-1710 ext. 202

fax: 212-695-6602

  - Wickes.pdf

CONFIDENTIAL

AGLIC 1116

SCHINDEL, FARMAN, LIPSIUS, GARDNER & RABINOVICH LLP

ATTORNEYS AT LAW

14 PENN PLAZA

SUITE 500

NEW YORK, N.Y. 10122

(212) 563-1710

FACSIMILE (212) 695-8602

WEBSITE: www.sfl-legal.com

NEW JERSEY OFFICE
4 CORNWALL DRIVE, SUITE 101
EAST BRUNSWICK, N.J. 08816
(732) 380-0166
FACSIMILE (732) 488-7706

Writer's Extension: 253
Email: dbenheim@sfl-legal.com

September 25, 2008

**VIA EMAIL (swickes@aigag.com)**
**FACSIMILE (214-654-6008) AND MAIL**

Sarah Lockett Wickes
American General Life Insurance Company
Service Center
Post Office Box 4373
Houston, Texas 77210

Re:    Irving Ellman, Deceased
Policy No. UM00060862L
Our File No. 4206.0002

Dear Ms. Wickes:

We are in receipt of your letter dated September 2, 2008 in connection with the above referenced matter wherein you advise that as part of your review, you require a copy of the trust.

We are unaware of any policy provision, statute or other law entitling American General to the trust. Nor do we understand how the trust documents relate in any way to the claim for death benefits or why American General has conducted this investigation at all.

It is undisputed that the policy was issued to the Ellman Savings Irrevocable Trust and that the beneficiary is the Ellman Savings Irrevocable Trust. We represent the Ellman Savings Irrevocable Trust.

Your policy's General Provisions, page 18, provides as follows:

Except as stated below, We [American General] cannot contest this policy after it has been in force during the Insured's lifetime for 2 years from the Date of Issue.

None of the exceptions listed applies.

CONFIDENTIAL

AGLIC 1117

SCHINDEL, FARMAN, LIPSIUS, GARDNER & RABINOVICH LLP

Sarah Lockett Wickes
September 25, 2008
Page 2

The Date of Issue is identified in the policy as March 14, 2006. The insured, Irving Ellman, died on May 21, 2008. Accordingly, your request for the trust documents is not only unwarranted but an invasion of privacy.

American General must submit payment to our client immediately. Any delay to further withhold payment on this claim will be viewed as bad faith conduct by your company, especially in light of the financial peril and uncertain future facing American General. Please overnight payment on this claim to Schindel, Farman, Lipsius, Gardner and Rabinovich, LLP as attorneys for the Ellman Savings Irrevocable Trust. Our Tax ID number is 13-3858209

Very truly yours,

SCHINDEL, FARMAN, LIPSIUS,
GARDNER & RABINOVICH LLP

David BenHaim

DBH:bl

CONFIDENTIAL

AGLIC 1118

Redacted

CONFIDENTIAL

AGLIC 1119

Redacted

☐ CONFIDENTIAL

AGLIC 1120

Redacted

CONFIDENTIAL

AGLIC 1121

Redacted

CONFIDENTIAL

AGLIC 1122

Redacted

This transmission (and any information attached to it) may be confidential and
is intended solely for the use of the individual or entity to which it is
addressed. If you are not the intended recipient or the person responsible for
delivering the transmission to the intended recipient, be advised that you have
received this transmission in error and that any use, dissemination,
forwarding, printing, or copying of this information is strictly prohibited. If
you have received this transmission in error, please immediately notify ExamOne
at the following email address: securityincidentreporting@examone.com

CONFIDENTIAL

AGLIC 1123

Redacted

CONFIDENTIAL

AGLIC 1124

Redacted

CONFIDENTIAL

AGLIC 1125

Redacted

CONFIDENTIAL

AGLIC 1126

Redacted

CONFIDENTIAL

CONFIDENTIAL

AGLIC 1127

Redacted

CONFIDENTIAL

AGLIC 1128

Redacted

----------------------------------------------
This transmission (and any information attached to it) may be confidential and
is intended solely for the use of the individual or entity to which it is
addressed. If you are not the intended recipient or the person responsible for
delivering the transmission to the intended recipient, be advised that you have
received this transmission in error and that any use, dissemination,
forwarding, printing, or copying of this information is strictly prohibited. If
you have received this transmission in error, please immediately notify ExamOne
at the following email address: securityincidentreporting@examone.com

CONFIDENTIAL

AGLIC 1129

Redacted

CONFIDENTIAL

AGLIC 1130

Redacted

CONFIDENTIAL

AGLIC 1131

Redacted

CONFIDENTIAL

AGLIC 1132

Redacted

CONFIDENTIAL

AGLIC 1133

# EXHIBIT G





DEFENDANT'S EXHIBIT

C

12/14/10

## AGLC Age & Amount Requirements for
## Inspection Reports & Motor Vehicle Reports

| Face Amount | Ages 0-17 | Ages 18-39 | Ages 40-55 | Ages 56-70 | Ages 71+ |
|---|---|---|---|---|---|
| Up to $49,999 | n/a | n/a | n/a | n/a | n/a |
| $50,000 to $99,999 | n/a | n/a | n/a | n/a | n/a |
| $100,000 to $249,999 | n/a | n/a | n/a | n/a | n/a |
| $250,000 to $500,000 | n/a | n/a | n/a | n/a | n/a |
| $500,001 to $1.5 million | IC | n/a | n/a | n/a | n/a |
| $1,500,001 to $3 million | IC | Basic Inspection, MVR | Basic Inspection, MVR | Basic Inspection, MVR | Basic Inspection, MVR |
| $3,000,001 to $5 million | IC | Mid Level Inspection Report, MVR | Mid Level Inspection Report, MVR | Mid Level Inspection Report, MVR | Mid Level Inspection Report, MVR |
| $5,000,001 to $10 million | IC | Comprehensive Inspection Report, MVR | Comprehensive Inspection Report, MVR | Comprehensive Inspection Report, MVR | Comprehensive Inspection Report, MVR |
| > $10 million | IC | Street Inspection Report, MVR | Street Inspection Report, MVR | Street Inspection Report, MVR | Street Inspection Report, MVR |
| IC= Individual Consideration MVR = Motor Vehicle Report | | | | | |

Revised 03/17/2003

Individual Life  -  New Business
Underwriting Requirements

DEFENDANT'S
EXHIBIT
D
12/14/10 CP
ALL-STATE LEGAL®

**Risk Evaluation**

Revision Date:  06/25/2001

## Inspection (Consumer) Reports and Motor Vehicle Reports
## Inspection (Consumer) Reports

**General Guidelines**

An inspection report is a comprehensive interview designed to gather general to in-depth background information.  The interviews may be conducted via a telephone call or in person depending on the type of report needed.  The following table describes the different levels of reports used by AGLC for risk assessment.

| INSPECTION REPORTS | | | |
|---|---|---|---|
| Inspection Service | Service Description | Minimum Time Coverage | Minimum Number of Contacts |
| Basic Inspection Report | • Applicant is interviewed by phone for information regarding health, employment, and finances<br>• Supplemental questionnaires are performed, if necessary | 1 Year | Applicant |
| Mid Level Inspection Report | • Applicant is interviewed by phone for information regarding health, employment, and finances<br>• Additional personal and business contacts are interviewed<br>• Financial and credit checks are performed<br>• Supplemental questionnaires are performed, if necessary | 3 Years | Applicant and 2 outside sources |
| Comprehensive Inspection Report | • Applicant is interviewed by phone for information regarding health, employment, and finances<br>• Additional personal and business contacts are interviewed<br>• Financial and credit checks are performed<br>• Supplemental questionnaires are performed, if necessary | 5 Years | Applicant and 3 outside sources |
| Street Inspection Report | • Applicant is interviewed in person for information regarding health, employment, and finances<br>• Additional personal and business contacts are interviewed<br>• Financial and credit checks are performed<br>• Supplemental questionnaires are added, if necessary | 10 Years | Applicant and 5 outside sources |

NOTE: A MVR is necessary any time an inspection report is required.

Inspection reports are ordered by the New Business department based on published age and amount requirements
([a]Inspection Report Age & Amount Requirements).  Producers may also order reports by contacting one of the three AGLC approved vendors listed below. In the event the producer orders the inspection and MVR, the appropriate Home Office must be notified immediately to prevent duplicate orders and multiple calls to the applicant.

## Required Ordering Information

When ordering an inspection report from these vendors the following information must be provided:

1. **Billing Account Number**
2. **AGLC Insurance Company Name** for product being applied for (i.e., All American Life, American Franklin Life, American General Life, Franklin Life,    Old Line Life, United States Life)
3. **Location of the AGLC home office** where application will be processed (ex. Houston, Milwaukee, etc.)
4. **Policy Number** (if available)
5. **Policy Amount** stated on Part A
6. **Type of Report Needed** (see [b]Inspection Report Age & Amount Requirements)
7. **Full Applicant Name**
8. **Social Security Number**
9. **Date of Birth**
10. **Home / Business Phone Number**
11. **Best Date / Time to Contact Applicant** and
12. **Any Special Instructions** (i.e., Lingual Translator or TDD Operator)

**Approved Inspection Report Facilities**
(listed in alphabetical order)

**EMSI**
3003 LBJ Freeway, #100
Dallas, TX 75234
Phone 800-USA-EMSI or 800-872-3674
www.emsinet.com

**Portamedic**
170 Mt Airy Road
Basking Ridge, NJ 07920
Phone 800-444-3737
www.portamedic.com

**SBSI**
13720 East 42nd Terrace
Independence, MO 64055
Phone 800-444-7274 ext. 109
www.sbsikc.com

## Motor Vehicle Reports (MVR)

Motor Vehicle Reports are ordered by the home office for all applications requiring an Inspection Report. Currently, **ChoicePoint, Inc.** is the American General Life Companies' sole approved vendor for MVRs.  If a MVR is ordered along with an inspection report by the producer, please notify the appropriate home office to prevent duplicate requests.

---

(1) -
Notes:///862577F40000A4DF/8625680F00519348862563BE007408C1/8625680F0051934886256A720053A71E
(2) -
Notes:///862577F40000A4DF/8625680F00519348862563BE007408C1/8625680F0051934886256A720053A71E

# EXHIBIT H

Case 3:08-cv-05364-MLC-TJB Document 125 Filed 03/20/12 Page 112 of 117 PageID:
Case 7:08-cv-06843-ER-GAY Document 59 Filed 02/20/12 Page 35 of 45
Case 2:09-cv-05097-FSH -PS Document 104 Filed 12/20/10 Page 1 of 6 PageID: 3103

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

AMERICAN GENERAL LIFE INS. CO.　　：
　　　　　Plaintiff　　　　　　　　：　　Civil Action No. 09-5097(FSH)
　　　　　　　　　　　　　　　　：
　　v.　　　　　　　　　　　　　：
　　　　　　　　　　　　　　　　：　　ORDER ON INFORMAL
SUSSEX 130 LLP, et al.　　　　　　：　　APPLICATIONS & SECOND AMENDED
　　　　　　　　　　　　　　　　：　　PRETRIAL SCHEDULING ORDER
　　　　　　　　　　　　　　　　：
　　　　　Defendants　　　　　　：

　　　　This matter having come before the Court by way of submissions dated December 17, 2010 and December 18, 2010, regarding a request to extend the pretrial deadlines, the plaintiff's alleged failure to comply with certain prior orders, and for sanctions;

　　　　and the Court having considered the submissions, record of proceedings, and governing law;

　　　　and for the reasons set forth in the Opinion delivered on the record on December 19, 2010;

　　　　IT IS ON THIS 19th day of December, 2010

　　　　**ORDERED that:**

　　　　1. The request to extend the pretrial deadlines is granted as set forth herein;

　　　　2. The following depositions shall occur on the dates as set forth below and shall be deemed court-ordered:

| Date | Deponent(s) | Location |
|------|-------------|----------|
| January 11-13, 2011 | Beth Newsom, Mary Warren, & Carolyn Randolph | Texas |
| January 25, 2011 | Jill Stephenson | Minnesota |
| January 16, 2011 | Edna Barber | Minnesota |
| February 1, 2011 | Liza Glass | New Jersey |
| February 4, 2011 | Scott Ulven | New Jersey |
| February 8, 2011 | Michael Strulowitz | New Jersey |
| February 10-11, 2011 | Caitlyn Irby (Rule 30(b)(1) & (b)(6)) | New Jersey |
| February 15-16, 2011 | Robert Cicchi (Rule 30(b)(6)) | New Jersey |
| February 28 and March 1, 2011 | Corbin Connell (Rule 30(b)(6)) | New Jersey |

Case 3:08-cv-05364-MLC-TJB   Document 125   Filed 03/20/12   Page 113 of 117 PageID:
Case 7:08-cv-06843-ER-GAY   Document 59   Filed 02/20/12   Page 36 of 45
Case 2:09-cv-05097-FSH -PS   Document 104   Filed 12/20/10   Page 2 of 6 PageID: 3104

March 15, 2011        Mary Paulette (Rule 30(b)(6))                    New Jersey

3. No later than **January 4, 2011**, the parties shall provide the date and location for the deposition of Ross Hansen and the names of other individuals who will serve as Rule 30(b)(6) witnesses to testify about remaining topics, including the topics set forth in the October 27, 2010 Order concerning Interrogatory Nos. 5 and 6 and the December 6, 2010 Order concerning Interrogatories Nos 1 and 2;

4. No later than **January 10, 2011**, the plaintiff shall complete its search for and production of documents that are responsive to the discovery demands, as modified by the Orders, in the following custodians electronic and paper files: Ross Hansen, Jason Croft, Wayne Arzberger, and Mark McGuire and, based upon the representation that the following are akin to "data processors, the files of the following custodians need not be searched: Ces Batuto, Hanna DeGuzman, Robert Paredes, Lara Serna, and Carmi Reloj;

5. No later than **January 3, 2011**, the plaintiff shall notify the defendants if they oppose searching the paper and electronic files for the production of documents that are responsive to the discovery demands, as modified by the Orders, in following custodians electronic and paper files: Royce Imhoff, Steven Dansker, Ray Sawicki, Chris Ayers, Terri Mills, Jon Kvello, Rachel Soluyo, Scott Brasington, Sarah Wickes, Charlotte Swanks/Charlotte Ford, Susan Umbehant, Tom Geiger, and certain members of the legal department. If there is an objection, the plaintiff shall provide the specific reason. If there is no objection, then the production of the documents shall be completed no later than **January 10, 2011**;

6. In accordance with the agreement of the parties, no later than **December 17, 2010**, plaintiff shall provide the list of October 27, 2010 court-ordered list of employees whose files were searched as a result of the directive in the October 27, 2010 Order and searched before the date of the October 27, 2010 Order;

7. The plaintiff shall produce Caitlyn Irby to testify as a Rule 30(b)(6) witness concerning plaintiff's search for documents reflecting annuities sold to or that American General proposed to sell to Canyon Funding Trust, including communications with representatives of Canyon Funding Trust and communications with AIG about the life insurance policies for Mr. Goldberg (other than communications with counsel concerning this litigation) and the results of the search. The plaintiff shall pay for two hours of the reasonable attorneys fees that defendants will expend to cover this topic at her deposition and for having to raise this issue in the December 17, 2010, submission;

8. No later than **January 10, 2011**, the plaintiff shall produce reflecting the annuities sold to, on behalf of Canyon Funding or via Canyon Funding for the individuals identified on Bates Nos. AG2340-2345;

9. The plaintiff shall produce Brad Gabel, Liza Glass, and Mark Childs as Rule 30(b)(6) witnesses to testify about the search for documents embodying communications with AIG about the policies offered to Mr. Goldberg. The plaintiff shall pay the reasonable attorney's fees and

Case 3:08-cv-05364-MLC -TJB   Document 125   Filed 03/20/12   Page 114 of 117 PageID:
Case 7:08-cv-06843-ER-GAY   Document 59   Filed 02/20/12   Page 37 of 45
Case 2:09-cv-05097-FSH -PS   Document 104   Filed 12/20/10   Page 3 of 6 PageID: 3105

costs for these depositions;

10. The Certification of Robert Lesko is struck pursuant to L. Civ. R. 7.2(a) and because it fails to be from a person with knowledge who can be examined by adverse counsel at a deposition. No later than **January 6, 2011**, the plaintiff shall produce a certification as required by the October 27, 2010 Order from a person with knowledge regarding the search for documents embodying communications with AIG about any life insurance policy insuring Mr. Goldberg and shall respond to the subjects identified on Page 16 at paragraph 2 of the December 17, 2010 joint submission and specifically state whether or not the plaintiff has possession custody or control over such documents;

11. In accordance with the agreement of the parties, no later than **January 10, 2011**, the plaintiff shall provide a certification to its amended responses to the interrogatories and the parties shall re-review their respective privilege logs and produce logs that fully comply with L. Civ. R. 34.1 and Fed. R. Civ. P. 26(b)(5);

12. The request for sanctions is granted as follows: (1) plaintiffs shall pay the reasonable attorney's fees for the depositions as set forth above and (2) plaintiff shall pay one-half of the reasonable attorney's fees defendants expended for the submission of the December 17, 2010 letter concerning compliance with the October 27, 2010 Order that directed searches of custodians' files. Payment shall be made no later than **January 10, 2011**;

**IT IS FURTHER ORDERED** that:

**I. COURT DATES**

1.      There shall be telephone status conferences before the Undersigned on **TO BE SET IF REQUESTED**. Plaintiff shall initiate the telephone calls.

2.      There will be a settlement conference before the Undersigned on **TO BE SET IF REQUESTED**. Trial Counsel and clients with full settlement authority must attend the conference. If the trial counsel **and** client with full settlement authority do not appear, the settlement conference may be cancelled or rescheduled and the noncompliant party and/or attorney may be sanctioned, which may include an assessment of the costs and expenses incurred by those parties who appeared as directed.

3.      The final pretrial conference shall be conducted pursuant to Fed. R. Civ. P. 16(d) on **June 30, 2011 at 10:00 a.m.** The Final Pretrial Conference will occur even if there are dispositive motions pending. The Court will adjourn the Final Pretrial conference <u>only</u> if the requesting party makes a compelling showing that manifest injustice would otherwise result absent adjournment.

**II. DISCOVERY AND MOTION PRACTICE**

Case 3:08-cv-05364-MLC -TJB   Document 125   Filed 03/20/12   Page 115 of 117 PageID:
Case 7:08-cv-06843-ER-GAY   Document 59   Filed 02/20/12   Page 38 of 45
Case 2:09-cv-05097-FSH -PS   Document 104   Filed 12/20/10   Page 4 of 6 PageID: 3106

4.  a. Fed. R. Civ. P. 26 disclosures are to be exchanged on or before **deadline passed.**

b. No later than **deadline passed**, the parties shall submit a proposed discovery confidentiality order and certification as required by Local Civ. R. 5.3[1].

5.  Discovery necessary to engage in meaningful settlement discussions: none.

6.  The parties may serve interrogatories limited to **25** single questions including subparts and requests for production of documents on or before **deadline passed**, which shall be responded to no later than **deadline passed.**

7.  Absent agreement of counsel or order of the Court, the number of depositions to be taken by each side shall not exceed **20**. No objections to questions posed at depositions shall be made other than as to lack of foundation, form or privilege. See Fed. R. Civ. P. 32(d) (3) (A). No instruction not to answer shall be given unless a privilege is implicated. The depositions are to be completed no later than **March 31, 2011.**

8.  Fact discovery is to remain open through **March 31, 2011.** No discovery is to be issued or engaged in beyond that date, except upon application and for good cause shown.

9.  Counsel shall confer in a good faith attempt to informally resolve any and all discovery disputes before seeking the Court's intervention. Should such informal effort fail to resolve the dispute, the matter shall be brought to the Court's attention via a joint letter that sets forth: (a) the request, (b) the response; (c) efforts to resolve the dispute; (d) why the complaining party believes the information is relevant and why the responding party's response continues to be deficient; and (e) why the responding party believes the response is sufficient. No further submissions regarding the dispute may be submitted without leave of Court. If necessary, the Court will thereafter schedule a telephone conference to resolve the dispute.

No discovery motion or motion for sanctions for failure to provide discovery shall be filed before utilizing the procedures set forth in these paragraphs without prior leave of Court.

Any unresolved discovery disputes (other than those that arise during depositions) must be brought before the Court no later than **deadline passed.** The Court will not entertain applications concerning discovery matters, informally or otherwise, after this date. If an unresolved dispute arises at a deposition, then the parties shall contact the Chambers of the Undersigned for assistance during the deposition.

10.  Any motion to amend pleadings or join parties must be filed by **deadline passed.**

11.  All dispositive motions shall be discussed in advance of filing with the Undersigned

---

[1]If a party seeks to file under seal information submitted in connection with a request for non-discovery relief, then the party shall: (1) consult Local Civ. R. 5.3 and (2) contact the Chambers of the Undersigned for instructions regarding the format for presenting such a motion.

Case 3:08-cv-05364-MLC -TJB   Document 125   Filed 03/20/12   Page 116 of 117 PageID:
Case 7:08-cv-06843-ER-GAY   Document 59   Filed 02/20/12   Page 39 of 45
Case 2:09-cv-05097-FSH -PS   Document 104   Filed 12/20/10   Page 5 of 6 PageID: 3107

either in person or by teleconference.  Unless the parties notify the Court that expert discovery is needed to file such motions, any and all dispositive motions must be filed no later than **May 27, 2011** and must be comply with Local Rule 7.1.  No pretrial dispositive motions will be  entertained after that date.  Any responses shall be submitted no later than **June 6, 2011** and any replies shall be submitted no later than **June 13, 2011.** The return date shall be **June 20, 2011** before the Hon. Faith S. Hochberg.  Her Honor's chambers will advise the parties if oral argument will be required.

### III. EXPERTS[2]

12.     All affirmative expert reports shall be delivered by **April 5, 2011.**

13.     All responding expert reports shall be delivered by **May 5, 2011.**

14.     a. All expert reports are  to be in the form and content as required by Fed. R. Civ. P. 26(a) (2)(B).  No expert shall testify at trial as to any opinions or base those opinions on facts not substantially disclosed in the experts report.

        b. All expert depositions shall be completed by **May 20, 2011.**

        c. <u>Daubert</u> motions shall be filed no later than **May 27, 2011.**

### IV. FINAL PRETRIAL CONFERENCE

15.     The final pretrial conference shall be conducted pursuant to Fed. Civ. P. 16(d) on **June 30, 2011 at 10:00 a.m.**  The final pretrial conference will occur even if dispositive motions are pending.  The Court will adjourn the Final Pretrial conference <u>only</u> if the requesting party makes a compelling showing that manifest injustice would otherwise result absent adjournment.

16.     <u>Not later than **20 working days** before the pretrial conference, the parties shall exchange copies of all proposed trial exhibits.  Each exhibit shall be pre-marked with an exhibit number conforming to the party's exhibit list.</u>

17.     All counsel are directed to assemble at the office of Plaintiff's counsel not later than **ten (10) days** before the pretrial conference to prepare the proposed Joint Final Pretrial Order in the form and content required by the Court.  Plaintiff's counsel shall prepare the Joint Pretrial Order and shall submit it to all other counsel for approval and execution.

18.     With respect to non-jury trials, each party shall submit to the District Judge and to opposing counsel proposed Findings of Fact and Conclusions of Law, trial briefs and any hypothetical questions to be put to an expert witness on direct examination.

19.     The original of the Final Pretrial Order shall be delivered to the CHAMBERS of the

---

[2]The parties shall provide the experts information on a rolling basis so that they can produce their expert reports by the deadlines set forth herein.

Case 3:08-cv-05364-MLC-TJB Document 125 Filed 03/20/12 Page 117 of 117 PageID:
Case 7:08-cv-06843-ER-GAY Document 59 Filed 02/20/12 Page 40 of 45
Case 2:09-cv-05097-FSH -PS Document 104 Filed 12/20/10 Page 6 of 6 PageID: 3108

Undersigned no later than **June 21, 2011 at 3:00 p.m.** All counsel are responsible for the timely submission of the Pretrial Order.

20.    The Court expects to engage in meaningful settlement discussions at the final pretrial conference. Therefore, trial counsel who actually has full settlement authority must attend the conference and clients or other persons with full settlement authority must be available by telephone.

### V. MISCELLANEOUS

21.    The Court may from time to time schedule conferences as may be required, either sua sponte or at the request of a party.

22.    Since all dates set forth herein are established with the assistance and knowledge of counsel, there will be no extensions except for good cause shown and by leave of Court, even with consent of all counsel. Any request to extend any deadline or to adjourn a court event shall be made no later than three days before the scheduled date and shall reflect: (1) the good cause the requesting party believes supports the extension or adjournment and (2) whether or not all parties consent to the request. Absent unforeseen emergent circumstances, the Court will not entertain requests to extend deadlines that have passed as of the date of the request.

23.    A copy of every pleading, document or written communication with the Court shall be served on all other parties to the action. Any such communication which does not recite or contain a certification of such service may be disregarded by the Court.

24.    Absent permission from Chambers, communications to the Court by facsimile will not be accepted. All communications to the Court shall be in writing or by telephone conference.

25.    **FAILURE TO COMPLY WITH THE TERMS OF THIS ORDER  MAY RESULT IN SANCTIONS.**

s/Patty Shwartz
**UNITED STATES MAGISTRATE JUDGE**