UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

(609) 989-2040

CHAMBERS OF                                                          U.S. COURTHOUSE

**TONIANNE J. BONGIOVANNI**                             402 E. STATE STREET, RM 6052

UNITED STATES MAGISTRATE JUDGE                   TRENTON, NJ 08608

July 2, 2012

**LETTER ORDER**

**Re:**   American General Life Insurance Company v. Ellman Savings Irrevocable Trust, et al.
Civil Action No. 08-5364 (MLC)

Dear Counsel:

As you are aware, pending before the Court is Defendant Ellman Savings Irrevocable Trust

and Jeffrey Levitin's (collectively, the "Trust") motion for sanctions against Plaintiff American

General Life Insurance Company ("American General"). Through its motion, the Trust asks the

Court to strike American General's Amended Complaint and declare that the Ellman Policy is not

void and remains in full force and effect. The Trust seeks these sanctions to remedy American

General's alleged intentional frustration of discovery. For example, the Trust claims that American

General purposefully withheld numerous categories of relevant documents, including information

pertaining to the US Central Policy Audit, emails, American General's 2006 or 2007 decision to

require tax returns to be submitted with applications as well as its subsequent decision to rescind

this requirement and pertinent underwriting materials. American General opposes the Trust's

motion for sanctions, arguing that it is in full compliance with its discovery obligations and that the

Trust's motion is procedurally improper. The Court has reviewed all arguments made in support of

and in opposition to the Trust's motion. The Court considers the Trust's motion without oral

argument pursuant to FED.R.CIV.P. 78.  For the reasons set forth more fully below, the Trust's

motion is denied without prejudice.  American General, however, is directed to timely produce the

information required by this Order.

## I.      Standard of Review

Rule 37(b)(2) addresses the imposition of sanctions against a party who fails to comply

with a discovery order.  According to Rule 37(b)(2):

> If a party. . . fails to obey an order to provide or permit discovery,
> including an order under Rule 26(f), 35, or 37(a), the court where
> the action is pending may issue further just orders.  They may
> include the follow
>        (i) directing that the matters embraced in the order or other
> designated facts be taken as established for purposes of the action, as
> the prevailing party claims;
>        (ii) prohibiting the disobedient party from supporting or
> opposing designated claims or defenses, or from introducing
> designated matters in evidence;
>        (iii) striking pleadings in whole or in part;
>        (iv) staying further proceedings until the order is obeyed;
>        (v) dismissing the action or proceeding in whole or in part;
>        (vi) rendering a default judgment against the disobedient
> party; or
>        (vii) treating as contempt of court the failure to obey any
> order except an order to submit to a physical or mental examination.

By its own terms, Rule 37(b)(2) only applies where a party has failed to comply with an order to

provide or permit discovery.

Further, where, as here, the sanction sought would "deprive a party of the right to proceed

with or defend against a claim," the Court examines the propriety of imposing such a sanction by

applying the six-part test enunciated in *Poulis v. State Farm & Casualty Co.*, 747 F.2d 863 (3d Cir.

1984).  *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1148 (3d Cir. 1990).  The *Poulis* factors are:

> (1) the extent of the party's personal responsibility; (2) the
> prejudice to the adversary caused by the failure [to comply with
> Court orders]; (3) a history of dilatoriness; (4) whether the conduct

> of the party or the attorney was willful or in bad faith; (5) the
> effectiveness of sanctions other than dismissal, which entails an
> analysis of alternative sanctions; and (6) the meritoriousness of the
> claim or defense.

747 F.2d at 868.  No single *Poulis* factor is determinative and depriving a party of the right to

proceed with or defend against a claim may be appropriate even if some of the factors are not

met.  *See Mindek v. Rigatti,* 964 F.2d 1369, 1373 (3d Cir. 1992).  Nevertheless, the Court is

mindful that such a sanction is considered "drastic" and has been "termed 'extreme' by the

Supreme Court[.]" *Poulis*, 747 at 867-68 (quoting *National Hockey League v. Metropolitan

Hockey Club, Inc.*, 427 U.S. 639, 643, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (describing sanction

of dismissal as "extreme").

## II.    Discussion

Here, the Court finds that the imposition of sanctions is not warranted at this time.  While

the Court has certainly addressed numerous discovery issues with the parties at various

conferences, including the conferences held on May 31, 2011, August 18, 2011 and December 2,

2011, the Court never specifically ordered American General to provide the discovery the Trust

claims American General has wrongfully withheld.  On December 2, 2011, the Court did instruct

American General to complete its document production by January 17, 2012 and by that date to

submit an accompanying certification setting forth that its production as to each category of

documents requested by the Trust was complete and also indicating whether American General

possessed documents responsive to each category of requested documents.  (*See* 12/2/11 Tr. at

12-13).  The Court issued this instruction with the understanding that the Trust, after receiving

and reviewing the last of American General's production, would then submit a deficiency letter

3

to the Court, identifying all deficiencies, if any, in American General's production so that the Court would be in a position to substantively rule on all alleged deficiencies.  *See Id.* at 16).

The Court extended the January 17, 2012 date for American General's complete document production until February 29, 2012 via Its Letter Order entered on February 16, 2012 [Docket Entry No. 113].  In that same Letter Order, the Court also instructed the Trust to submit its deficiency letter by March 16, 2012 and, given the Trust's request that sanctions be imposed against American General, further instructed the Trust to include any request for the imposition of sanctions in its deficiency letter.  (2/16/12 Letter Order; Docket Entry No. 113).

On the record before It, the Court finds that the imposition of sanctions under Rule 37(b)(2) is not appropriate.  While the Court understands the Trust's obvious frustration with American General's document production, American General has not failed to produce discovery required by court order.  Indeed, until today, the Court has not substantively ruled on American General's alleged deficiencies and has not ordered American General to produce any specific document or categories of documents.  As a result, the Court declines to impose sanctions at this juncture.  Nevertheless, the Court shall require American General to produce the following information as outlined below:

**A..    US Central Policy Audit**

The Court finds that documents and communications concerning the investigation described in the email exchange between Scott Busalacchi and Denise Bell and the related attachment, attached as Ex. C to the Trust's motion for sanctions [Docket Entry No. 125, Pages 53-56], are relevant to this matter.  In reaching this conclusion, the Court is mindful that the scope of discovery in federal litigation is quite broad.  Indeed, pursuant to Rule 26(b)(1),

4

"[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . .  Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."

American General argues that the investigation discussed in the Busalacchi/Bell email exchange is not relevant because "[i]t does not reflect any investigation as to insurable interest or representations made in connection with the application for any policy or policies. . . . The information in the email does not reflect any effort by American General to identify any policy or policies that were or even may have been obtained through fraud or without valid insurable interest.  Nor is it evidence of an investigation or audit of policies procured by Chaim Rubin or otherwise related to the subject matter of this action."  (American General Opp. at 15). The Court disagrees with American General.

First, according to the email exchange, the investigation was "an effort to estimate the total [sic] how much IOLI business we [American General] may have." [Docket Entry No. 125 at 53].  Second, while the investigation may not have been an investigation or audit of policies procured by Chaim Rubin, a number of policies procured by Chaim Rubin were uncovered by the investigation, with some of the identified Chaim Rubin policies being flagged as suspect:

> Hey Scott, When you have time when you get back to WI, please let me know which of Rubin's cases may have looked like IOLI. Thanks!!!

> Here is the list of your cases that hit the report.  There are a couple listed as 'Yes' to being suspect.

[Docket Entry No. 125 at 54-55; List Attached at 56].

American General in its Amended Complaint describes IOLI as follows:

21. . . . Referred to variably as Stranger-Owned or Stranger-Originated Life Insurance ("SOLI "[sic] or "STOLI"), or Investor-Owned or Investor-Originated Life Insurance ("IOLI"), the scheme typically involves the acquisition of outright or beneficial ownership interest in life insurance policies with large face amounts by investors who are strangers to the person insured by the policy and who have no insurable interest in the life of the person insured.

22. These investor strangers typically take on the obligation of paying premiums due on the policy in exchange for their interest in it, including the right to all or a portion of the death benefits to be paid when the insured person dies. Of course, the sooner the insured person dies, the fewer premiums the investor stranger is required to pay and the higher the return on their investment. In an attempt to ensure the highest possible rate of return through prompt pay-out of the death benefits, the investor strangers typically recruit elderly individuals to participate in the application process and serve as the proposed insured. The proposed insured is typically offered something of value, such as immediate cash payments, in exchange for his or her participation in the application process.

23. Similarly, the higher the death benefit on the policy, the greater the ultimate return on the investor stranger's investment. Thus, as in the this case, the net worth and other material information concerning the proposed insured is often inflated or otherwise misrepresented in order to qualify fo the most valuable policies with the highest available death benefits at the lowest available premiums.

(American General Am. Complt. ¶¶ 21-23)

Given American General's description of IOLI in its Amended Complaint coupled with the fact that the investigation referred to in the Busalacchi/Bell email exchange apparently identifies certain policies procured by Chaim Rubin as suspect IOLI in 2006, the Court finds that documents and communications concerning the investigation are relevant. Indeed, the Court finds that such documents and communications are reasonably calculated to lead to the discovery of admissible evidence concerning the Trust's claim that American General continued to collect

6

premiums on the Ellman Policy after it suspected that the Ellman Policy was IOLI, a ground for

rescinding the policy, and, as a result, is now barred from challenging the Ellman Policy as IOLI.

Similarly, the Court finds that such documents and communications are reasonably calculated to

lead to the discovery of admissible evidence that alleged misrepresentations made during the

application process were not material to American General's decision to insure an insured.

American General obviously retains the right to argue to a fact-finder that the

investigation was not meant to identify IOLI polices, but was simply a "high level management

review of a broad block of business in an effort to forecast a trend in business."  (American

General Opp. at 16).  Indeed, American General may proffer any arguments it sees fit with

respect to the investigation identified in the Busalachi/Bell email exchange.  Such arguments,

however, do not preclude discovery concerning the investigation.

As a result, American General is directed to produce **all documents and**

**communications concerning the investigation discussed in the Busalachi/Bell email**

**exchange.  The information produced by American General should include, but is not**

**limited to, documents and communications (1) identifying who requested the investigation;**

**(2) why the investigation was undertaken; (3) what parameters were used to determine**

**IOLI for the investigation; (4) what parameters were used to flag policies identified in the**

**investigation; (5) what parameters were used to flag policies identified in the investigation**

**as suspect; (6) who was involved in conducting the investigation; and (7) who received the**

**results of the investigation**.[1]  American General is directed to produce the aforementioned

---

[1]The Court notes that the information It is ordering American General to produce differs
slightly from the specific document request served by the Trust, which requested "[a]ll Documents
and Communications concerning the investigation of the Chaim Rubin policies as discussed in the
email exchange between Scott Busalacchi and Denise Bell identified in the second amended

documents no later than **July 31, 2012**.  On or before July 31, 2012, American General is also

directed to submit to the Court as well as opposing counsel a certification describing the efforts

taken to locate and produce the aforementioned documents.  The certification should set forth the

specific details of the search including whose files were searched and how the search was

conducted (if electronic, search terms should be identified).

### B.    Tax Return Requirement

In litigating the matter, the Trust identified a document with a footer that classifies it as a

"New Business Training" document from May 22, 2006 (the "May 22, 2006 New Business

Training document.")  (*See* The Trust Br., Ex. D; Docket Entry No. 124).  Notably, American

General did not produce this document to the Trust.  The May 22, 2006 New Business Training

document states:

> Effective immediately, AIG American General Life will no longer
> approve applications received that are investor owned, stranger
> owned, or viatical transactions.
>
> •    In order to verify that applications and quotes
>      received are consistent with this new policy, <u>all of
>      the following documents</u> must be received for any
>      **single permanent life insurance application** for a
>      proposed insured that is **age 70 or greater** with a
>      requested **death benefit of $1,000,000.00 or
>      greater:**
>
>                          **...**

complaint."  Regardless of the exact wording of the Trust's request, the Court believes it was fairly clear to American General, especially in light of the parties' meet and confers, what information the Trust sought - information concerning the investigation discussed in the Busalacchi/Bell email exchange which specifically identified insurance polices procured by Chaim Rubin.  The Court does not appreciate American General's attempt to avoid production through artful word smithing - "neither the referenced email between Busalacci and Bell nor the information attached to it pertains to any investigation or audit of Rubin or any policy sold by Rubin.  Therefore, American General does not have any documents or information responsive to this request."  (American General Opp. at 14).

● A copy of the proposed insured's most
recently filed Federal Tax Return

(Ex. D at 1).  The Trust also learned that the decision to require copies of federal tax returns was

allegedly rescinded in rather short order.  As a result, the Trust submitted a supplemental

document request ("Supplemental Request No. 3") to American General seeking "[a]ll

documents or communications concerning, discussing or resulting from the 2006 or 2007

decision by AIG to require tax returns during application and the decision rescinding the

requirement, including, but not limited to all records and emails maintained, sent, or received by

Kent Major, Marketing and Distribution, Brad Gabel, Royce Imhoff, Dennis Roberts, Mr. Cicchi

and the Legal Department."  (The Trust Reply Br. at 13).

The Trust claims that this information is relevant because the May 22, 2006 New

Business Training document establishes that American General previously had approved

applications that were investor owned or stranger owned.  The Trust additionally argues that the

requested information is relevant because American General's decision to require federal tax

returns in order to avoid approving investor owned or stranger owned policies, coupled with its

later decision to rescind the tax return requirement, shows that American General purposefully

turned a blind eye to financial misrepresentations contained in insurance applications.  Further,

the Trust argues that the fact that the decision to require tax returns was made 60 days after the

Ellman policy issued does not negate its relevance in establishing the culture at American

General when the policy issued - American General ignored financial misrepresentations.

American General initially responded to Supplemental Request No. 3 by setting forth

various objections to producing the discovery requested.  Indeed, American General claimed that

the request was vague and ambiguous, sought information that was not within American

General's possession, custody or control, sought confidential and proprietary information which would violate its trade secrets or place it at a competitive disadvantage, sought information that was not relevant to the claims and defenses asserted in this matter and was overly broad and unduly burdensome.  (The Trust Br. at 19 (citing American General's Response Supplemental Request No. 3)).  After the parties met and conferred on Supplemental Request No. 3, American General informed the Trust that it declined to undertake the requested search because "the request [wa]s unreasonably burdensome in relation to its potential for probative value . . . because, among other reasons, the requirement in question was initially put into effect months after the Ellman policy was applied for and issued."  (*Id*. (quoting American General's Supplemental Response)).

In responding to the Trust's arguments concerning American General's alleged failure to produce documents and communications concerning the aforementioned requirement that tax returns be submitted with insurance applications and then the subsequent recision of same, American General never really addresses Supplemental Request No. 3 except to identify it as "belated."  (American General Opp. at 10).  Instead, American General focuses its opposition on other document requests propounded by the Trust, specifically Document Requests Nos. 17 and 20, arguing that it produced all known communications to the field concerning the underwriting requirement of filed federal income tax returns and that in Document Requests Nos. 17 and 20 the Trust "did not specifically request internal communications related to tax return requirements."  (*Id*. at 8).

Further, American General claims that it did not conceal the May 22, 2006 New Business Training document from the Trust; rather, American General claims that that document "is not

responsive to any reasonably tailored discovery request propounded by defendants in this case; they never asked for it." (*Id*. at 9). In reaching this conclusion, American General again largely ignores the substance of Supplemental Request No. 3 and, instead, focuses on Document Request No. 17, which American General claims seeks only field communications. Nevertheless, despite the focus on Document Request No. 17, American General recognizes the existence of Supplemental Request No. 3, which, unlike Document Request No. 17, is clearly not limited to merely field communications, by arguing that there was no indication that the May 22, 2006 New Business Training document was "'sent or received by Kent Major, Marketing and Distribution, Brad Gabel, Royce Imhoff, Dennis Roberts, Mr. Cicchi and the Legal Department' as per defendants' belated supplemental request number 3." (*Id*. at 10). American General also argues that the May 22, 2006 New Business Training document is not relevant because it post-dates the issuance of the Ellman Policy.

Contrary to Plaintiff's arguments, the Court finds that the May 22, 2006 New Business Training document is relevant to the claims and defenses at issue in this case. The fact that it post dates the issuance of the Ellman Policy by approximately two months does not render the document irrelevant. Instead, the Court finds the Trust could potentially use the document to try to establish that American General willingly issued IOLI/STOLI policies prior to its implementation. More importantly, the Court more broadly finds that the Trust's Supplemental Request No. 3 seeks relevant information. In this regard, the Court finds that information pertaining to American General's 2006 decision to require the submission of a proposed insured's most recently filed federal tax return for any single permanent life insurance application where the proposed insured was age 70 or greater and where the proposed insured sought a death

benefit of $1,000,000.00 or greater, coupled with American General's decision to rescind the federal tax return requirement is relevant to the Trust's claim that American General ignored financial misrepresentations in proposed insured's applications at the time it issued the Ellman policy.

As a result, American General is directed to produce **all documents and communications concerning American General's decision, as identified in the May 22, 2006 New Business Training document, to require the submission of proposed insureds' most recently filed Federal Tax Returns with their applications.  American General's production shall include, but not be limited to, all documents and communications concerning (1) who was involved in determining that tax returns should be required; (2) when this requirement was implemented; (3) how this requirement was implemented; (4) to whom and how this requirement was communicated both internally at American General and externally to the field; (5) why this requirement was implemented; (6) how long this requirement stayed in effect; (7) when this requirement was rescinded; (8) who was involved with the determination to rescind this requirement; (9) why this requirement was rescinded; (10) to whom and how the decision to suspend this requirement was communicated both internally at American General and externally to the field**.  American General is directed to produce the aforementioned documents no later than **July 31, 2012**.  On or before July 31, 2012, American General is also directed to submit to the Court as well as opposing counsel a certification describing the efforts taken to locate and produce the aforementioned documents.  The certification should set forth the specific details of the search including whose files were searched and how the search was conducted (if electronic, search terms should be identified).

12

### C.      Underwriting Guidelines

The Trust argues that American General has failed to produce all of its Underwriting

Guidelines relevant to this matter.  To support this claim, the Trust points to Exhibit G [Docket

Entry No. 124 at 104- 106], attached to its motion for sanctions, as evidence of that failure.

Exhibit G is entitled "AGLC Age & Amount Requirements for Inspection Reports &

Motor Vehicle Reports."  American General argues that Exhibit G is not an Underwriting

Guideline.  Instead, American General argues that this document merely sets forth age and

amount requirements and that from the face of the document it is clear that it is not an

Underwriting Guideline but a document used in training and quality assurance by administrative

personnel in New Business and not by underwriters.  The Trust, however, claims that the

document is an Underwriting Guideline and notes that the document itself includes the header

"Underwriting Requirements."  (*See* The Trust Reply at 12).

At this point in time, the Court believes It need not determine whether Exhibit G is or is

not an Underwriting Guideline.  While the Court understands the importance of the semantic

distinction - it may have impacted whether American General believed the document was

responsive to the Trust's document requests, that distinction is no longer of great import because

the Court finds that Exhibit G, and other similar documents, are relevant to this litigation.  As a

result, regardless of the parties' positions concerning whether such documents had been

previously requested by the Trust, the Court shall require their production now.  No later than

**July 31, 2012**, American General is directed to produce **all documents and communications**

**that refer to, include or describe underwriting requirements relevant to the alleged**

**misrepresentations at issue in this case.  The documents and communications need not be**

13

**official Underwriting Guidelines and need not have been utilized by American General's**
**Underwriting Department.  American General's production shall include both internal as**
**well as field documents and communications**.  Further, no later than July 31, 2012, American
General shall submit to the Court as well as opposing counsel a certification describing the
efforts taken to locate and produce the aforementioned documents.  The certification should set
forth the specific details of the search including whose files were searched and how the search
was conducted (if electronic, search terms should be identified).

     With respect to American General's production of Underwriting Guidelines, the Trust
also claims that American General has not produced all relevant information concerning its
Agent Bulletin dated June 26, 2006.  Pursuant to this Agent Bulletin, "American General
temporarily suspended sales of most single life universal life policies for insureds age 75 and
older."  (The Trust Br. at 23 (quoting 6/26/06 Agent Bulleting) (internal quotation marks
omitted)).  The Agent Bulletin further directed its readers to "refer to Field Bulletin 06-052 for
details."  (*Id*.)  The Trust argues that American General has failed to produce any evidence
concerning why this decision was taken, who was involved with the implementation of the
decision or why the decision was reversed.  It does not appear that American General specifically
responds to the Trust's arguments concerning the aforementioned Agent Bulleting; though
American General does maintain that it "produced all relevant underwriting guidelines and
internal memoranda over a year and a half ago."  (American General Opp. Br. at 13).

     Because it is unclear what information American General produced concerning the Agent
Bulletin dated June 26, 2006 (the "June 26 Agent Bulletin"), the Court hereby explicitly directs
American General to produce **all documents and communications concerning the June 26**

**Agent Bulletin.  American General's production shall include, but not be limited to, all documents and communications concerning (1) why the decision expressed in the June 26 Agent Bulletin was made; (2) who was involved in making the decision expressed in the June 26 Agent Bulletin; (3) how long that decision remained in effect; (4) when the decision was reversed; and (5) who was involved in determining that the decision expressed in the June 26 Agent Bulletin should be reversed**.  American General is directed to produce the aforementioned documents no later than **July 31, 2012**.  On or before July 31, 2012, American General is also directed to submit to the Court as well as opposing counsel a certification describing the efforts taken to locate and produce the aforementioned documents.  The certification should set forth the specific details of the search including whose files were searched and how the search was conducted (if electronic, search terms should be identified).

       **D.**     **Email Communications**

       The Trust takes issue with the fact that American General has only produced one non-privileged email in its entire document production.  With respect to the production of emails, the Trust argues that American General's search for relevant emails was deficient both because the search terms utilized were inadequate and because American General failed to search all relevant files.  In addition, given the paucity of emails produced, the Trust also claims that American General's decision to only search its live system for relevant emails and not search its back-up tapes is unacceptable.  In this regard, the Trust notes that essentially all emails from 2006 and prior, which would include all emails sent and received during the underwriting of the Ellman policy through Mr. Ellman's death - the time frame the Trust claims is the most crucial to the claims presented here, are on back-up tapes.

The specific searches conducted by American General are identified on page 10, footnote six and page 18 of American General's opposition brief.  As noted above by the Trust, the searches conducted by American General were run only in American General's live system. Back-up tapes were not searched.

American General argues that it conducted a reasonable search for emails with parameters designed to capture electronic correspondence relevant to the claims and defenses asserted in this matter. With respect to the specific searches conducted, American General argues that the Trust should not be heard to complain about American General's search parameters because the Trust "repeatedly refused . . . to meet and confer regarding parameters for the search."  (American General Opp. Br. at 17).  In addition, American General argues that it should not be required to search its back-up tapes for relevant emails.  In this regard, American General argues that its back-up tapes are "inaccessible" and American General has no legal obligation to search same. American General also argues that it would be both cost prohibitive and unduly burdensome and disruptive to its business operation to require it to search its back-up tapes for relevant emails. (*Id*.)  Nevertheless, American General contends that, to the extent the Court determines that additional searches are warranted, a proposition with which American General soundly disagrees, the Trust should be required to bear the costs of any such additional searches.

At this juncture, the court shall not require American General to conduct additional searches for emails.  Instead, the Court shall require both American General and the Trust to provide additional information on this topic.

1.      **The Trust**

No later than **July 31, 2012**, the Trust shall submit a chart identifying what its' proposed email search parameters would be.  The Trust should identify its proposed search terms as well as whose files should be searched.  At this juncture, the Trust is directed to **refrain** from including any arguments concerning why back-up tapes, in addition to American General's live email system, should be searched.

2.      **American General**

No later than **July 31, 2012**, American General shall submit a certification providing a detailed explanation concerning how its email back-up system works.  American General's certification shall include, but not be limited, information detailing **(1) the general process by which emails are transferred from American General's live system to back-up tapes; (2) how long emails are generally stored on the live system before they are transferred to back-up tapes; (3) whether information is ever simultaneously located on the live system as well as on back-up tapes; (4) whether information is automatically deleted from the live system once it is transferred to back-up tapes; and (5) whether American General ever stopped transferring emails to back-up tapes once it anticipated litigation in this matter and, if so, (a) when did the transfers stop and (b) which files were no longer transferred to back-up tapes**.

IT IS SO ORDERED.

s/Tonianne J. Bongiovanni
**TONIANNE J. BONGIOVANNI**
**United States Magistrate Judge**

17